**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

MICHAEL PHILIP KAUFMAN,

     Plaintiff,

  v.

ZOHO CORPORATION,

     Defendant.

Case No. 1:25-cv-001082-RP

**MOTION OF DEFENDANT ZOHO CORPORATION TO DISMISS UNDER
RULE 12(B)(6) FOR FAILURE TO ASSERT A PATENTABLE CLAIM**

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND ..................................................................................1

III.   LEGAL STANDARD ............................................................................................5

     A.    A Claim for Relief Must Be Plausible ......................................................5

     B.    To Be Enforceable, a Patent Must Qualify for Patent Eligibility Under § 101 .......6

IV.   ARGUMENT ........................................................................................................7

     A.    The Asserted Patents Are Directed To Ineligible Subject Matter ...........................7

          1.    The Claims of the '981 and '220 Patents are Directed to the Abstract Idea of Creating a User Interface for Interacting with a Database ..............7

          2.    The Claims of the '981 and '220 Patents Add No Inventive Concept ........9

          3.    The Claims of the '801 Patent Are Directed to the Abstract Idea of Gathering Information for Display to a User.............................................10

          4.    The '801 Patent Lacks an Inventive Concept............................................16

          5.    The Remaining Claims Do Not Alter This Analysis.................................17

     B.    The Court Should Dismiss Plaintiff's Claims with Prejudice ..............................20

V.    CONCLUSION ....................................................................................................20

# **TABLE OF AUTHORITIES**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) .......6

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266 (Fed. Cir. 2016) ........................1

*Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) ...........................6

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371 (Fed. Cir. 2024) ...........................13

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).....................................................6, 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).......................................................................................5, 6

*Bancorp Servs.*, L.L.C. *v. Sun Life Assur. Co.*, 687 F.3d 1266 (Fed. Cir. 2012) ....................8, 12

*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018) .......................................9, 16

*CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471,

    2020 WL 3564691 (Fed. Cir. July 1, 2020).................................................................................13

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019).....................................8, 15, 20

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019)..................................8, 15

*Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352 (Fed. Cir. 2017) ...7, 10

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,

    776 F.3d 1343 (Fed. Cir. 2014) ........................................................................................passim

*Data Scape Ltd. v. Western Digit. Techs., Inc.*, 816 F. App'x 461,

    2020 WL 3564683 (Fed. Cir. July 1, 2020)................................................................................13

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)..................................1, 13

*Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369 (Fed. Cir. 2016) ..............................................6

*Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332 (Fed. Cir. 2017).....................14

*Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, (Fed. Cir. 2017).................................14

*Mortg. Grader v. First Choice Loan Servs. Inc.*, 811 F.3d 1314 (Fed. Cir. 2016)..................9, 16

*OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015)....................................8, 15

*Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084 (Fed. Cir. 2019) .......................................19

*Ultramercial Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) ...................................................12

*Voip-Pal.com, Inc. v. Apple Inc.*, 375 F. Supp. 3d 1110 (N.D. Cal. 2019), *aff'd sub nom. Voip-*

    *Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020) ...........................................20

*W. View Res., LLC v. Audi AG*, 685 F. App'x 923 (Fed. Cir. 2017) .............................................13

## I.    INTRODUCTION

Plaintiff Michael Philip Kaufman alleges infringement of U.S. Patent Nos. 7,885,981 (the

"'981 patent"), 10,025,801 (the "'801 patent"), and 10,977,220 (the "'220 patent") (the

"Asserted Patents"), which generally relate to automatically generating user-friendly interfaces

to databases.  Dkt. 1.  But the claims recite no specific technological solution.  Instead, they

recite functional limitations and admittedly well-understood, routine, and conventional

computing components and processes that only automate existing methods of generating these

user interfaces.

Patents like these, which do not provide a specific technological solution for the problem

they purport to solve—are ineligible for patent protection and invalid under 35 U.S.C. § 101 and

a long line of Federal Circuit cases applying it.  *See Affinity Labs of Tex., LLC v. Amazon.com,*

*Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d

1350, 1356 (Fed. Cir. 2016).  The Court should therefore hold the Asserted Patents invalid under

§ 101 and dismiss Mr. Kaufman's claims with prejudice for failure to assert a patentable claim.

## II.    FACTUAL BACKGROUND

Mr. Kaufman filed his complaint on July 11, 2024.  Dkt. 1.  He alleges that Zoho's CRM

product infringes three "at least" three claims[1]—claim 5 of the '981 patent, claim 5 of the '801

patent, and claim 14 of the '220 patent.  *Id.* ¶¶ 20, 49, 59.

The Asserted Patents, all of which are expired, are from a single family.  The '220 patent

is a continuation of the '801 patent, which is a continuation of several applications tracing back

to a divisional of the '981 patent.  Unsurprisingly, the '801 and '220 patents share a nearly

---

[1] The Complaint does not identify any other asserted claim and does not map any limitations of
any other claim to Zoho's accused product.

identical specification; the '981 patent primarily varies in that it includes excerpts of source code for a "reference implementation" otherwise identified by file name in the other patents. *See* '981 patent at 3:34-40; *see also id.* at col. 27-373. The '981 patent is titled "System And Method For Generating Automatic User Interface For Arbitrarily Complex Or Large Databases," and the other patents are titled "Systems And Methods For Automatically Generating User Interface Elements For Complex Databases." *See* '981 patent at Cover, '801 patent at Cover, '220 patent at Cover. All of the patents claim priority to an October 31, 2000 application and a March 16, 2001 provisional application. *Id.*

The Asserted Patents are generally directed to automatically creating a user interface for accessing a relational database. In such databases, users interact with the "front-end" through a user interface, allowing them to view, use, and manipulate data in a database stored on the server in the "back-end." *Id.* at 2:18-26. The patents acknowledge that such interfaces existed in the past, but state that they were manually created by a computer programmer. *See, e.g.*, '981 patent at 2:23-3:4. This process was time-consuming and required updating if the database structure changed. *Id.* The asserted patents purport to improve on the prior art systems by automatically generating a user interface for interacting with the database. *Id.* at 2:65-3:67, claim 1. The asserted claims of both the '981 and '220 patents, for example, each recite a computer-readable storage medium containing instructions for a general purpose computer for automatically generating a user interface for working with data within a relational database, in which the database is first scanned, after which a "corresponding client application" is constructed. *See* '981 patent at cl. 5, '220 patent at claim 14 (reciting similar limitations).

| **981 Patent, claim 5** | **220 Patent, claim 14** |
|---|---|
| 5. A *computer-readable storage medium containing a set of instructions for a general purpose computer*, for | 14. A non-transitory *computer-readable storage medium containing a set of instructions for a general purpose computer, for automatically* |

| | |
|---|---|
| *automatically generating an end-user interface for working with the data within a relational database*, wherein said relational database comprises a *plurality of tables, constraints and relationships* in accordance with a data model comprising said tables and their column-complements and datatypes, said constraints, and the relationships across said tables, and wherein said relational database may be of any arbitrary size or complexity, said set of instructions comprising: | *generating a user interface for working with the data within a relational database*, wherein the database is described by a data model comprising a *plurality of tables, constraints, and relationships*, said set of instructions comprising: |
| (a) a routine for providing a user interface paradigm comprising a set of modes for interacting with a given database table, said modes comprising *create, retrieve, update and delete, and a corresponding display format for each mode*; | (a) a routine for *scanning the database to determine the tables, constraints, and relationships of the data model*; |
| (b) a routine for *scanning said database and applying a body of rules to determine the table structures, constraints and relationships of said data model*, and for storing representations thereof; and | (b) a *routine for creating machine representations of the tables, constraints, and relationships*; and |
| (c) a routine for using said representations to *construct a corresponding client application*, wherein said client application provides a *connection to said database*, provides *displays of the table contents of said database for each of said modes in accordance with the display format*s of said paradigm, integrates into each said mode display processes for *representing, navigating, and managing said relationships across tables*, for selecting among said modes, and for navigating across said tables and interacting in accordance the selected mode with the data in the tables that are reached by said navigation, while observing and enforcing relational interdependencies among data across said tables. | (c) a routine for *constructing from the representations a corresponding client application* that provides: <br><br> (i) a *connection to the database*; <br><br> (ii) *displays for creating, retrieving, updating, and deleting data within one or more of the tables*; and <br><br> (iii) mechanisms for *representing, managing, and navigating the relationships between data records across related tables*, wherein constructing the corresponding client application does not require any incremental human intervention on a per table basis. |

These claims recite purely functional steps for automatically constructing a user interface for a database by scanning the (already existing) database structure and using that structure to create a user interface "client application" that corresponds to the database structure and data, which can create, retrieve, update and delete data in the database tables, and permits managing and navigating data in related tables. That is, it "automatically and dynamically generates a fully functional user interface (UI) based upon, and connected directly to, an underlying data model." '801 patent at Abstract.

3

Similarly, asserted claim 5 of the '801 patent requires a relational database with "a plurality of tables," and requires a specific "routines for displaying" data from the database "within a user interface." '801 patent at cl. 5.

> 5.  A non-transitory machine-readable medium, on which there has been recorded machine-readable code for a program executable on a processor, said program comprising routines for displaying, within a user interface operating under control of a processor, an enhanced representation of data from a relational database, the relational database comprising machine-readable data representing a plurality of tables, constraints, and relationships and also operating under control of a processor, wherein the plurality of tables comprises a primary table and a foreign table, wherein each one of the primary table and the foreign table comprises at least one row, and wherein each row comprises a plurality of columns, the routines comprising:
>
> a routine to automatically construct a representation of data from a row of the primary table (primary-table row) by:
>
> > [a]  a routine to identify a foreign key (FK) value in an FK column in the primary-table row, wherein the FK column references the foreign table;
> >
> > [b]  a routine to locate a row in the foreign table (foreign-table row) whose primary key (PK) value matches the identified FK value;
> >
> > [c]  a routine to select a value from the foreign-table row other than the PK value based on at least one of the following attributes of the column in the foreign table that contains the selected value:
> >
> > > column name;
> > >
> > > column datatype;
> > >
> > > at least one column constraint; or
> > >
> > > column position within the foreign table;
> >
> > [d]  a routine to derive a description of the foreign-table row using the selected value; and
> >
> > [e]  a routine to augment or supplant the FK value with the description in constructing the representation; and
>
> [f]  a routine to display the constructed representation.

Like the other asserted claims, claim 5 of the '801 patent recites, in purely functional steps, a process for automatically constructing an "enhanced" representation of the data in a database row by [a] identifying a value in a primary table (a first location); [b] identifying the matching value in a foreign table (a second location); [c]-[d] determining a description of the data in the foreign table based the standard attributes of the database, such as the column name or type; [e]-[f] displaying the representation of data with the user-friendly description replacing or supplementing the primary table value. The specification describes the recited method in simple terms: "[t]he UI [user interface] presentation resolves cross-table relationships so as to supplant internal key fields from the primary table with corresponding descriptive fields derived from the related tables." '801 patent at Abstract; *see id.* at 8:31-36. Like the other Asserted Patents, the core of the '801 patent claims is the process of collecting and displaying relational database data on a user interface.

## III.    LEGAL STANDARD

### A.    <u>A Claim for Relief Must Be Plausible</u>

A complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Facial plausibility" requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, it requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Although the Court must accept Plaintiff's factual allegations as true when ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), that tenet "is inapplicable to

legal conclusions [because] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### B.     To Be Enforceable, a Patent Must Qualify for Patent Eligibility Under § 101

Patent eligibility under 35 U.S.C. § 101 is a threshold question of law that should be answered early "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Patent eligibility is routinely resolved at the pleading stage to prevent parties and courts from expending resources litigating ineligible patents. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion.").

Courts apply a two-step test to determine patent eligibility. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217–221 (2014). First, the Court must determine whether the claims at issue are "directed to" an abstract idea or other patent-ineligible concept. *Alice*, 573 U.S. at 217 (2014). "The 'abstract idea' step of the [*Alice*] inquiry calls upon [the Court] to look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016). If the claim is directed to an abstract idea, the Court proceeds to step two and asks whether the claim elements recite an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217-18. This step-two analysis means an inventive concept cannot be supplied by simply limiting an abstract idea "to a particular technological

environment" or adding "well-understood, routine, conventional activities previously known to the industry." *Id.* at 222, 225.

## IV.    ARGUMENT

### A.    The Asserted Patents Are Directed To Ineligible Subject Matter

#### 1.    The Claims of the '981 and '220 Patents are Directed to the Abstract Idea of Creating a User Interface for Interacting with a Database

Plaintiff alleges that Zoho infringes claim 5 of the '981 patent and claim 14 of of the '220 patent. Dkt. 1 ¶¶ 2, 59. As discussed below in sections IV.A.5.a and b, these claims are representative of the remaining claims because they "are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348; *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1359-60 (Fed. Cir. 2017). The claims are directed to the abstract idea of creating a user interface for interacting with a database. As Plaintiff describes it, claim 5 of the '981 patent is directed to "automatically generating an end-user interface for working with the data within a relational database." Dkt. 1 ¶ 21; *see also* '981 patent at 3:8-25; '220 Patent at 7:64-8:13 (same language).

As discussed above, these claims recite nothing more than purely functional steps for automatically constructing a user interface for a database. That is, these patents claim the abstract process of reviewing existing information about a database and creating a user interface to display and interact with the data in the database, claims that recite no more that automating methods admittedly performed by human programmers before the alleged invention.

The Federal Circuit has been clear that the chief benefit identified by the '981 and '220 patents—computer automation—does not weigh in favor of eligibility. *See* '981 patent at 2:23-27, 11:23-30 (describing "automatic" generation of a database UI). The Federal Circuit has repeatedly held that automating human processes or performing those processes "more

efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012); *id.* at 1279 (finding claims abstract where "the [claimed] computer simply performs more efficiently what could otherwise be accomplished manually"); *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019), *cert. denied* 140 S. Ct. 907 (2020) ("[T]he need to perform tasks automatically is not a unique technical problem."); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible").

The specification and Plaintiff's allegations confirm that the claimed invention of the '801 patent is directed not to a technological improvement but to automating a function that was known to be completed manually.  '801 patent at 2:53-3:4 (describing the problem that the claimed user interfaces solve previously required "by-hand coding" by programmers.); *see also* Dkt. 1, ¶¶ 13-14 ("in the prior practice, the UI routines had to be written and adjusted by hand, on a per-table basis, to fully reflect the underlying database structure . . . The Asserted Patents represented a major advance in technology, by providing an automated process . . . .").

Nor does any other aspect of the claims reflect that the claimed solution provides a technical improvement rather than simply automating a previously manual process.  Rather, as discussed below in connection with the *Alice* step two analysis, the claims of the '801 patent use purely generic computer components as a means for carrying out the claimed abstract information gathering-and-displaying process.  Moreover, neither the claims nor the specification ever suggest that any of the components used to carry out the abstract process are "improved from a technical perspective" or "operate differently than [they] otherwise could." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019).  Thus, Claim 5 of the '981 patent

and claim 14 of the '220 patent are directed to an unpatentable abstract idea under the first step of *Alice*.

### 2. The Claims of the '981 and '220 Patents Add No Inventive Concept

The limitations of the claims of the '981 and '220 patents, considered individually or in combination, lack an inventive concept that would transform them into a patentable invention under the second step of *Alice*. The elements of the claims include only generic functional steps directed to the abstract idea (*e.g.*, scanning a database structure, generating user interface elements corresponding to aspects of that structure that permit known database operations) and generic computer elements (*e.g.*, a "routines" executed by a "processor," a "user interface," and a "relational database"). Neither functional steps that are part of an abstract idea nor generic computer elements can provide an inventive concept. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept"); *Mortg. Grader v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) ("[T]he claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database.' These generic computer components do not satisfy the inventive concept requirement.").

Indeed, the specification of the Asserted Patents acknowledges that there is nothing inventive about the recited computer elements and function, describing them as "general[]" traits of modern databases. In the section titled "Description of the Related Art," the '981 patent admits that conventional databases are "generally composed of a 'back-end' relational database management system (RDBMS)" and "a 'front-end' presentation layer or user interface, which mediates the end-users' work with the back-end data." '981 patent at 2:29-40; *see id.* at 26:29-52. In the same section, the patent characterizes the recited functions as well-known in the prior

art, stating that "[c]urrent tools for easing the development burden" include those that "associat[e] individual user-interface elements with specific back-end storage locations" or "automatically generate the code for a simple UI display which manipulates a single underlying (back-end) data table." *Id.* at 2:53-64.  The specification further concedes that user interface functions enabled by the claims are "conventional database activities" that can be implemented in a "conventional client-server or native-GUI system."  *Id.* at 3:19-25, 26:29-34.  This is aligned with the patents' focus on automating a well-known process previously performed by humans. In light of these facts, there is nothing inventive in claim 5 of the '981 patent, claim 14 of the '220 patent, or these patent more generally, to render them patent eligible.

### 3.    The Claims of the '801 Patent Are Directed to the Abstract Idea of Gathering Information for Display to a User

Plaintiff alleges that Zoho infringes at least claim 5 of the '801 patent.  Dkt. 1 ¶ 20.  As discussed below, *infra* IV.A.5.c, claim 5 is representative of the remaining claims because they "are substantially similar and linked to the same abstract idea."  *Content Extraction*, 776 F.3d at 1348; *Cleveland Clinic Found.*, 859 F.3d at 1359-60 (Fed. Cir. 2017).  Claim 5 of the '801 patent is directed to a similar abstract idea as the '981 patent—creating a user-friendly interface to a relational database.  The claims of the '801 patent are directed to a simple variation on the idea claimed by the '981 patent:  within a user interface for a database, substituting the representation of data in a database with a user-friendly representation when displaying it to a user.  *See* '801 patent at 8:31-36.

In Plaintiff's words, the claims of the '801 patent are directed to "generating a UI that . . . augment[s] or supplant[s] (and then display[s]) the referenced foreign key value in a table" with a description from elsewhere in that table, thus creating an "improved representation of inter-table relationships."  Dkt. 1 at ¶¶ 50-51.  Claim 5 describes just this, reciting in purely functional

steps a process for automatically constructing an "enhanced" representation of the data in a database row by linking a numeric foreign key value in one table to a description of that value in another table based on known database attributes such as the column name or type and then displaying that user-friendly description.

This is similar to other well-known methods of handling tabular data that people have handled for decades, with or without computers. As an example, consider a report of departmental expenses prepared for an executive. When compiling the information for the report, the executive's team might prepare an initial chart itemizing expenses by department (*e.g.,* 106)—the format the expenses are maintained in the expense database. But for the report, the executive's team prepares a more user-friendly chart replacing the department number with one of several options from a separate chart. The executive's team uses one or more attributes of the data in the department chart (e.g., a column name of "Department Name" or the fact that one column is a number and the name is text) to select a value ("Accounting") from the chart. The team then substitutes this user-friendly value as a description for each department in the final report.

This information gathering process, which could easily be performed via pen and paper, falls squarely within the scope of the '801 patent. Plaintiff recognizes as much, alleging in its Complaint that the claimed invention covers to "replacing what would have been an unintelligible alphanumeric "pointer" value (without intrinsic meaning) with a more human-friendly description derived from the second table." Dkt. 1, ¶ 53 (p. 23); *see id.* at ¶ 54. Notably, Plaintiff never alleges any improvement to computer technology. Rather, Plaintiff describes the claims as only an improvement in the representation of data in a user interface, taking advantage of known ways of using databases, i.e. "the fact that descriptive material may be found in nearby

columns having, e.g., a 'character' or 'text' datatype," along with "knowledge of how developers often structure such tables."  Dkt. 1., ¶ 51.  That is, the purported improvement in the claims is taking well-known relational concepts and applying them to conventional database technology.  Similar methods have been implemented with pen and paper since before the advent of computers.  For instance, many information repositories have used a unique but not intelligible key value, e.g., banks have long used account numbers internally but routinely augmented or replaced those numbers with more user-friendly descriptions, like "Checking Account."  And every lawyer or law student above a certain age went through the process of "Shepardizing" cases by finding subsequent authority by scanning a table of unique alphanumeric citations that each corresponded to a human-readable case name.  Applying generic computer components to this concept does not remove the '801 patent from the realm of abstract ideas.  *Bancorp Servs., L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible."); *Ultramercial Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible.").

These examples are aligned with the claimed solution.  The '801 patent frames its method as follows: "Foreign-key fields occurring within a table—that is, fields which contain 'keys' that uniquely identify cross referenced records from secondary (a.k.a. 'foreign', or 'referenced') tables—are automatically 'resolved' for display purposes, so as to substitute a corresponding (and, presumably, more meaningful) 'name' field from the foreign table record (in lieu of the key value itself—which, per generally accepted data modeling conventions, is generally intentionally devoid of intrinsic meaning)."  '801 patent at 11:45-54.  That is, the solution claimed in the '801 patent merely cross-references information from two tables to locate descriptive information to

display to a user. *See* '801 patent at Abstract; *see id.* at 8:31- 36. This is the kind of human process that constitutes an abstract idea under step one of *Alice*.

The Federal Circuit has repeatedly held ineligible claims directed to simply gathering and displaying information. *See, e.g.*, *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024) (finding ineligible claims related to creating user-friendly views of complex stored data and noting that "the steps of obtaining, manipulating, and displaying data, particularly when claimed at a high level of generality, are abstract concepts"); *Data Scape Ltd. v. Western Digit. Techs., Inc.*, 816 F. App'x 461, 2020 WL 3564683, at *2 (Fed. Cir. July 1, 2020) (finding ineligible claims related to "selective data storage, transfer, and processing"); *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 2020 WL 3564691, at *3 (Fed. Cir. July 1, 2020) (finding ineligible claims related to "collecting, analyzing, and displaying data"); *W. View Res., LLC v. Audi AG*, 685 F. App'x 923 (Fed. Cir. 2017) (finding ineligible claims related to "receiving or collecting data queries, analyzing the data query," retrieving and generating a response, and "generating a visual or audio response to the initial data query").

For example, in *Electric Power Group, LLC v. Alstom S.A.*, the Federal Circuit considered claims directed to "systems and methods for performing real-time performance monitoring of an electric power grid." 830 F.3d 1350, 1351 (Fed. Cir. 2016). The method claimed in that case called for receiving data or data streams from various sources, detecting and analyzing events from the data, displaying the results of that analysis, updating the results in real time, and deriving a reliability indicator based on those measurements and other metrics. *Id.* at 1351-52. The Federal Circuit held that the claims were directed to a "familiar class" of patent-ineligible concepts—"the combination of th[e] abstract-idea processes … of gathering and analyzing information of a specified content, then displaying the results." *Id.* at 1353-54.

Claim 5 of the '801 patent is analogous to the claims found invalid in *Electric Power*. Like the claims in *Electric Power*, claim 5 recites the "familiar class" of abstract processes of gathering information and displaying the results on a less advanced scale than the claims in *Electric Power*. Claim 5 recites identifying a foreign key ("receiving data or data streams" in *Electric Power*), locating corresponding content and selecting a value from corresponding content ("detecting and analyzing events" from the data), and deriving and displaying a description ("displaying the event analysis results" and "deriving a reliability indicator"). Claim 5 is thus directed to the same class of abstract idea found ineligible by the Federal Circuit in *Electric Power*—gathering and presenting information.

*Electric Power* is not unique in holding that claims directed to methods of gathering and presenting information to a user are abstract under the first step of *Alice*. *See also Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (determining that claims directed to "creating an index and using that index to search for and retrieve data" merely recited the abstract concepts of collecting, classifying, and filtering information); *Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (holding claims which recited creating a "dynamic document" using content from multiple electronic records ineligible under § 101).

The Federal Circuit has been clear that the chief benefit identified by the '801 patent—computer automation—does not weigh in favor of eligibility. *See* '801 patent at 5:59-64, 8:31-36 (describing "automatic" generation of a display). The Federal Circuit has repeatedly held that automating human processes or performing those processes "more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter." *Bancorp*, 687 F.3d at 1278; *id.* at 1279 (finding claims abstract where "the [claimed] computer simply performs

more efficiently what could otherwise be accomplished manually"); *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019), *cert. denied* 140 S. Ct. 907 (2020) ("[T]he need to perform tasks automatically is not a unique technical problem."); *OIP Techs., Inc. v. Amazon.com, Inc*., 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible"). *Content Extraction*, 776 F.3d at 1347 (finding an abstract idea where "humans have always performed" the claimed functions).

The specification and Plaintiff's allegations confirm that the claimed invention of the '801 patent is directed not to a technological improvement but to automating a function that was known to be completed manually. '801 patent at 5:65-7:34 (describing the problem that the claimed user interfaces solve previously required "by-hand coding" by programmers.); *see also* Dkt. 1, ¶¶ 13-14 ("in the prior practice, the UI routines had to be written and adjusted by hand, on a per-table basis, to fully reflect the underlying database structure . . . The Asserted Patents represented a major advance in technology, by providing an automated process . . . .").

Nor does any other aspect of the claims reflect that the claimed solution provides a technical improvement rather than simply automating a previously manual process. Rather, as discussed below in connection with the *Alice* step two analysis, the claims of the '801 patent use purely generic computer components as a means for carrying out the claimed abstract information gathering-and-displaying process. Moreover, neither the claims nor the specification ever suggest that any of the components used to carry out the abstract process are "improved from a technical perspective" or "operate differently than [they] otherwise could." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019). Thus, Claim 5 of the '801 patent is directed to an unpatentable abstract idea under the first step of *Alice*.

### 4.    The '801 Patent Lacks an Inventive Concept

The '801 patent claim limitations, considered individually or in combination, lack an inventive concept that would transform them into a patentable invention under the second step of *Alice*. The elements of claim 5 include only generic functional steps directed to the abstract idea (*e.g.*, identifying a value in a primary table, locating a row in a foreign table to match the identified value, and displaying a representation of a value in the primary table) and generic computer elements (*e.g.*, a "routines" executed by a "processor," a "user interface," and a "relational database"). Neither functional steps that are part of an abstract idea nor generic computer elements can provide an inventive concept. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept"); *Mortg. Grader v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) ("[T]he claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database.' These generic computer components do not satisfy the inventive concept requirement.").

As discussed above with respect to the '981 and '202 patents, the specification of the '801 patent also acknowledges that there is nothing inventive about the recited computer elements and "general[]" traits of modern databases. *See* '801 patent at 5:65-6:67; *see id.* at 31:4-28. As also discussed above, these functions were well-known in the prior art, and the only purported novelty is the automation of the process. *See id.* at 7:14-26, 7:48-54, 31:4-9. And the recited "foreign key (FK) value" and "primary key (PK) value" relied upon by the claims operate entirely as expected—as cross-references between database tables. *Id.* at 11:45-48 ("Foreign-key fields occurring within a table-that is, fields which contain 'keys' that uniquely identify cross-

referenced records from secondary (a.k.a. 'foreign', or 'referenced') tables…").  Again, this is congruent with the patent's focus on automating a well-known process previously performed by hand.  Further, the fact that the '801 patent recites conventional components only underscores its potential to preempt virtually any use of user interfaces in a relational database context.

Nor is there anything inventive about "using a processor to derive a description of the foreign-table row using the selected value."  *Id.* at cl. 5.  The specification confirms as much, indicating that fields in the primary table are replaced "with corresponding descriptive fields derived from the related tables."  *Id.* at 8:31-36.  The specification goes on to describe that "'deduc[ing]' relational interdependencies between tables" amounts to no more than "compar[ing] field-names and associated attributes across tables, so as to identify columns which (for instance) are identically named."  *Id.* at 28:62-29:7; *see also id.* at 12:20-26.  In light of these facts, there is nothing inventive in claim 5 of the '801 patent (or the patent generally) to render it patent eligible.

### 5.    The Remaining Claims Do Not Alter This Analysis

Although Plaintiff does not allege that Zoho infringes any other claim that the three independent claims described above, as explained below, the other claims of the Asserted Patents do not materially alter the analysis.

### a.    The '981 Patent

The '981 patent recites 6 claims, three of which are independent—claims 1, 4, and 5. Claims 1 and 4 are mirror method and computer readable medium claims.  Like claim 5, they are for "automatically generating an end-user interface for working with the data within a relational database defined within a relational DBMS whose data is stored in machine-readable media." Each recites steps of providing an "output stream for user display and input devices" (i.e., a user interface) that define a user interface for interacting with a database table in the same create,

retrieve, update and delete display formats as described in claim 5. They also recite a step of scanning the database to determine its structure and using that structure to "construct a corresponding client application," that includes the same requirements as in claim 5. These claims, then, "recite little more than the same abstract idea" as claim 5, rendering them ineligible. *Content Extraction*, 776 F.3d at 1348. The dependent claims add little more. Claim 2 adds the requirement that the user interface also display and enforce database constraints defined for each table column. Claim 3 requires that "relational interdependencies are embodied in referential-integrity constraints within the underlying database," a "generally accepted data-modeling convention. '981 patent at 4:55-59. Finally, claim 5 claims a specific form of the claimed computer instructions—that they be "are integrated with an RDBMS also provided in machinereadable form." *Id.* cl. 6. Each of these claims is "linked to the same abstract idea" as claim 5 and do not alter the eligibility analysis. *Content Extraction*, 776 F.3d at 1348.

### b.  The '202 Patent

The '202 patent recites 16 claims, of which claims 1, 11, and 14 are independent. The independent claims mirror one another, materially differing only in that claim 1 is a method, claim 11 is a computer-implemented system with a server that includes routines implementing the method of claim 1, and claim 14 is a computer-readable storage medium containing instructions for implementing the method of claim 1. These are ineligible for the same reasons as claim 14. The dependent claims add little more. Claims 2, 12 and 15 add the requirement that the client application not include table-specific code, and claims 3, 13 and 16 similarly require no database-specific code. Finally, claims 4-7 require the application to not depend on the data structure of the analyzed database being arranged in a particular manner. Claims 8 and 9 require that each table be rendered the same and support the same functionality, and claim 10 requires that the client application preserve and enforce referential integrity, as with claim 2 of the '981

patent.  Again, none of these added limitations change the abstract nature of the claims, nor do they rely on anything more than conventional database and computer technology.

### c.  The '801 Patent

The '801 patent recites 22 claims, only two of which are independent—claims 1 and 5. Claim 1 is a mirror image of claim 5—the former a method, the later a "machine-readable medium" that performs the method of claim 1.  *See* '801 patent, cls. 1 and 5.  The two independent claims are, therefore, "substantially similar in that they recite little more than the same abstract idea" of gathering information from another source and displaying that information to a user, rendering both claims ineligible.  *Content Extraction*, 776 F.3d at 1348.

The dependent claims also fail to include limitations beyond the abstract idea encompassed in the independent claims.  Dependent claims 2-4 and 6-8 recite an additional "specification of instructions" to derive the description for display—reiterating the abstract idea of gathering information for display to a user.  Using different rules to determine what to display does not alter the eligibility analysis.  Claims 9 and 16, mirror images, merely address how to determine the description of the foreign table row—the same type of computerization of a manual process that is not patent eligible.  *Id.* at cls. 9 and 16.  Claims 11 and 18, also mirror images, limit the determinations of claims 1 and 5 to considering the "column datatype."  *Id.* at cls. 11 and 16.  Using table attributes to gather and present information is the same abstract concept addressed earlier—steps that can be performed by a human without a computer. *See, e.g.*, *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) ("As a general rule, the collection, organization, and display of … information on a generic display device is abstract.") (internal quotation marks omitted).  Dependent claims 10, 12, 13, and 17-20 reflect claims 11 and 18, merely limit "select[ing] a value" to one of the attributes (*i.e.*, column name, datatype, etc.) recited in the independent claims.  Claims 14, 15, 21, and 22 introduce a third

table from which to gather information, but do not alter the nature of the claims. In sum, all of the dependent claims are "linked to the same abstract idea" as claim 5 and do not alter the eligibility analysis. *Content Extraction*, 776 F.3d at 1348.

> **B.**     **The Court Should Dismiss Plaintiff's Claims with Prejudice**

Although *Alice* step two may implicate fact issues in some cases, *Berkheimer*, 891 F.3d at 1368, here there is no such factual dispute that would preclude resolution of patent eligibility. Mr. Kaufman alleges no facts in its complaint that raise a fact dispute on whether a claim element is well-understood, routine, and conventional. Nor can "any allegation about inventiveness, wholly divorced from the claims or the specification," defeat a motion to dismiss. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019). For the same reason, the Court should not permit Plaintiff to amend his complaint. Because no amendment could change the abstract nature of the asserted claims, any amendment would be futile. *See, e.g., Voip-Pal.com, Inc. v. Apple Inc.*, 375 F. Supp. 3d 1110, 1145 (N.D. Cal. 2019), *aff'd sub nom. Voip-Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020) ("[A]ttorney argument in the complaint cannot save the claims because the purported improvements have not been captured in the claim language.").

## V.     CONCLUSION

For these reasons, the Court should hold the claims of the Asserted Patents invalid for failure to claim patent-eligible subject matter under § 101 and dismiss Plaintiff's claims with prejudice for failure to state a claim under Rule 12(b)(6).


Dated: September 4, 2025                 */s/ Phillip J. Haack* _____

Ryan J. Marton (*pro hac vice* forthcoming)
Hector J. Ribera (*pro hac vice* forthcoming)
Carolyn Chang (*pro hac vice* forthcoming)
Phillip J. Haack (CA 262060, admitted W.D. Tex.)
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
Telephone:  (415) 360-2515
Email:      ryan@martonribera.com
              hector@martonribera.com
              carolyn@martonribera.com
              phaack@martonribera.com

Darryl J. Adams (Texas Bar No. 00796101)
SLAYDEN GRUBERT BEARD PLLC
401 Congress Ave., Ste. 1650
Austin, TX 78701
Tel: 512.402.3562
Email: dadams@sgbfirm.com

*Counsel for Defendant Zoho Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing is being served on the

counsel of record via the CM/ECF system on September 4, 2025.


By:    /s/ *Phillip J. Haack*_____
         Phillip J. Haack