UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

MICHAEL PHILIP KAUFMAN,

                   Plaintiff,

      v.

ZOHO CORPORATION,

                   Defendant.

Civil Action No. 25-cv-01082-RP

**PLAINTIFF'S OPPOSING BRIEF ON MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

I.  TECHNOLOGY BACKGROUND ................................................................................ 1

II.  MANUFACTURED PREMISES OF ZOHO'S BRIEF ........................................... 4

   A.  Premise that the claims "offer no specific technological solution" ................................. 4

   B.  Premise that these are mere "do it with a computer" claims ............................................ 5

   C.  "Purely functional" as a dismissive label............................................................................ 6

III.  THE CLAIMS ARE NOT DIRECTED TO ABSTRACT IDEAS ....................... 6

   A.  Zoho's motion fails to provide a proper "directed to" analysis ....................................... 6

   B.  What the claims are properly regarded as directed to...................................................... 7

     1.  '981/'220 Patents ............................................................................................................ 7

     2.  '801 Patent ....................................................................................................................... 8

   C.  The claimed techniques for achieving the identified advances are not abstract ideas...... 9

   D.  Zoho's Step One authorities and arguments are readily distinguished .......................... 12

     1.  Electric Power, Content Extraction, and Affinity Labs............................................. 12

     2.  Zoho's other abstract idea arguments fail ................................................................. 15

       (a)  Zoho's Argument that Claim Steps are "Purely Functional" ................................ 15

       (b)  Zoho's "Shepards Citations" analogy ..................................................................... 16

IV.  THE CLAIMS EMBODY INVENTIVE CONCEPTS ....................................... 17

   A.  '981 and '220 Patents (at Step Two)................................................................................... 17

   B.  '801 Patent (at Step Two)...................................................................................................... 19

V.  ISSUES OF FACT PRECLUDE GRANT OF THE MOTION.......................... 20

VI.  CONCLUSION ....................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) .................................................................................4, 20

*Affinity Labs of Texas, LLC v. Amazon.com, Inc.*,
   838 F.3d 1266 (Fed. Cir. 2016) .................................................................................4, 14

*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) ........................................................................................7

*Alice Corp. v. CLS Bank Int'l*,
   573 U.S. 208 (2014).............................................................................................. *passim*

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016) .................................................................................17, 19

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018) ........................................................................................9

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can. (U.S.)*,
   687 F.3d 1266 (Fed. Cir. 2012) ......................................................................................14

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) .................................................................................18, 19

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ......................................................................................20

*CardioNet LLC v. InfoBionic, Inc.*,
   955 F.3d 1358 (Fed. Cir. 2020) ........................................................................................7

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019) .................................................................................14, 20

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F. 3d 759 (Fed. Cir. 2019) ........................................................................................5

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014) .............................................................................12, 13, 14

*Contour IP Holding LLC v. GoPro, Inc.*,
   113 F.4th 1373 (Fed. Cir. 2024) ......................................................................................6

*Coop. Ent., Inc. v. Kollective Tech., Inc.*,
   50 F.4th 127 (Fed. Cir. 2022) .....................................................................................19, 20

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018) ......................................................................................10

*Data Scape Ltd. v. W. Digit. Corp.*,
   816 F. App'x 461 (Fed. Cir. 2020) ..................................................................................13

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) ...................................................................5, 11

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ................................................................12, 13

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ..............................................................5, 7, 11

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017) .........................................................................14

*Intell. Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017) .........................................................................14

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019) .........................................................................12

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ................................................................ *passim*

*Mentone Sols. LLC v. Digi Int'l Inc.*,
    No. 2021-1202, 2021 WL 5291802 (Fed. Cir. Nov. 15, 2021) .............................10

*Mortg. Grader v. First Choice Loan Servs. Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) .........................................................................14

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) .........................................................................14

*PowerBlock Holdings, Inc. v. iFit, Inc.*,
    146 F.4th 1366 (Fed. Cir. 2025) ..............................................................5, 7, 16

*Solutran, Inc. v. Elavon, Inc.*,
    931 F.3d 1161 (Fed. Cir. 2019) ...........................................................................6

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020) ..............................................................6, 7, 19

*Thales Visionix Inc. v. United States*,
    850 F.3d 1343 (Fed. Cir. 2017) ................................................................10, 19

*Visible Connections, LLC v. Zoho Corp.*,
    No. 1:18-cv-859-RP, 2019 WL 2298704 (W.D. Tex. 2019) .............................4, 18

*Visual Memory LLC v. NVIDIA Corp.*,
    867 F.3d 1253 (Fed. Cir. 2017) ...........................................................................9

*W. View Res., LLC v. Audi AG*,
    685 F. App'x 923 (Fed. Cir. 2017) .....................................................................14

**Statutes**

35 U.S.C. § 101 ............................................................................................ *passim*

Kaufman's patents provide non-routine methods for a machine to construct a working user interface (UI) for an arbitrarily complex relational database, where the database structure can vary widely and is not known in advance. The claims detail how to do this, by systematically extracting structural guides—such as metadata on tables, constraints, and inter-table relationships—from specialized locations within the database itself (*e.g.*, the database "schema" and foreign tables) and constructing the UI therefrom with standardized components specifically crafted for this task. As set forth in the claims and specifications (*see, e.g.*, '981 Pat., cl. 5; '801 Pat., cl. 5), this enables automatic generation, not tied to any particular database structure, of enhanced, navigable user interfaces without manual programming, directly improving computer functionality. These innovations thus integrate specific technical steps in a manner that confers patent-eligibility under the pertinent authorities as addressed herein. Kaufman alleges that Zoho's online CRM database offering automatically generates its UI in a manner covered by these patents.

## I. TECHNOLOGY BACKGROUND

A relational database comprises a plurality of data layouts in tabular form ("tables") that describe (or "model") distinct types of items (aka "entities"). Each table comprises rows (aka "records" or "instances" of that entity-type) and columns (aka "fields" or "attributes" that describe each instance), as well as requirements ("constraints") for the contents of each column, and relations that may exist between the rows of different tables. Each row "relates" to its own table through a "primary key" (PK)—an ID that uniquely identifies that row within the table (and thereby, within the entire database). For example, in a table of companies, each individual entity (Company) will have its own unique ID, which is typically a value "intentionally devoid of intrinsic meaning." '981 Pat., 6:58-67.

An item within a given ("base" or "referencing") table may be related to (or "cross-reference") an item in another ("foreign") table when the base table includes a column that can only

contain PKs from that foreign table. This foreign-table PK, when stored in the base-table column, is referred to as a "foreign key" (FK) for that base-table record. *Id.*, 6:33-44.

The '981 patent provides a sales-lead tracking database as a working example. This database comprises both a Company table and a People table (among others). *See, e.g.*, '981 Pat., Figs. 5D and 5E. People may be associated with the Company they work for because the People table includes a foreign-key (FK) column for Company. Setting the company FK field for a given person to the PK of a given Company row defines a "Cross-Reference" relationship from that person to that company. (The person's FK is then said to "point to" that company.) Conversely, the set of all People rows with the same company FK describes a "Master-Detail" relationship between that Company and the people who work for it. *See* '981 Pat., 6:34-45.

Table interconnection patterns may repeat and multiply throughout the database, resulting in an aggregate structure that can grow to arbitrary levels of size and/or complexity (*e.g.*, thousands of tables, some with billions of entries, with (*e.g.*) hundreds of cross-table interconnections).

Users need to perform four basic types of operations on database records: Create, Retrieve, Update, and Delete, which together are commonly referred to as "CRUD" operations. However, because professional relational database management systems (RDBMS) must maximize flexibility in the construction of context-specific database structures ("schemas"), and because best practices require data to be distributed ("normalized") across separate tables that must then be coordinated, these RDMBS do not provide a user-friendly UI "out of the box" for performing such operations. Instead, the creation of a usable CRUD UI is relegated to a separate application-development effort for each individual use-case.

Conventionally, these database-specific CRUD UIs would be implemented by human programmers, both designing and encoding the required screens, and providing the connectivity

logic to "wire" their on-screen components to the corresponding data and functions of the underlying RDBMS. Because each database differed in its structure, the programmers would have to hand-craft each new implementation, as well as any subsequent modifications required to accommodate changes to the underlying schema. As such databases grow in complexity, such manual-coding requirements "become[] unwieldy." '981 Pat., 2:65-3:4.

The inventor here, Michael Kaufman, conceived of a solution whereby the UI for any existing database, regardless of its size or complexity, could be generated automatically, eliminating the tedious, error-prone, and time-consuming human work previously required. Kaufman's solution was based on a fundamental insight: Though the databases the system would have to work with would vary widely, he knew that every RDBMS incorporated a "data dictionary" which encapsulated the structural organization (or "schema") of the database. He realized he could harness information that was already present, deep in the database, to solve his problem. By programmatically interrogating the schema and extracting its essentials into a representation within machine memory, the program could construct corresponding table displays on its own.

Moreover, Kaufman also knew that the schema defined all the cross-table relationships by which the tables were interconnected. To arrive at an implementation that fully effectuated these relationships, Kaufman also devised a generalized UI paradigm—including a common set of UI "controls" (hyperlinks, dropdowns, breadcrumbs, etc., *see* '981 Pat., 5:10-62)—that could be applied to the in-memory schema to support representation, navigation, and *enforcement* of these relationships throughout the table renderings. In this way, based on its existing internal resources, the system could present a fully-rendered CRUD UI, allowing the user to navigate across tables and/or drill down from one table display to another in carrying out CRUD operations, all while preserving the relational integrity of the database—without requiring *any* human programming.

- 3 -

Prior to Kaufman's invention, this was not possible. The Complaint (D.I. 1) alleges (*e.g.*, at ¶¶ 13-14) how the claimed functionalities, with steps that differed from the human ones, represented major technological advances over existing practice. Those allegations as to the advantages and inventive nature of the claimed solutions must be taken as true for purposes of this motion. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *Visible Connections, LLC v. Zoho Corp.*, No. 1:18-cv-859-RP, 2019 WL 2298704, at *5 (W.D. Tex. May 30, 2019).

## II. MANUFACTURED PREMISES OF ZOHO'S BRIEF

### A. Premise that the claims "offer no specific technological solution"

Even a casual review of the source documents—from the very Abstract on the cover page, to the 35 pages of detailed figures, to the 170 pages of fully functional source code contained in the patent specification—*absolutely negates* Zoho's opening assertion that Kaufman's patents "do not provide a specific technological solution for the problem they purport to solve." D.I. 8 ("Br.") at 1. *See, e.g.*, '781 Pat., 9:40-52 (summarizing the functionality of the provided source code). The inherently technological nature of the solution that Kaufman provides is clear and unmistakable from the patent documents. Yet, by selective quotation, Zoho strips the technical details from Kaufman's implementation, hoping thereby to shortcut its task.

By contrast to *Affinity Labs of Texas, LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) (cited at Br. 1) (streaming content generally, without reciting any mechanism), the patent claims here incorporate technical specifics to carry out a machine-performable implementation of their objects. They recite in concrete, machine-addressable steps how to generate a fully functional user interface for an arbitrary relational database without human coding. The '981 and '220 patents prescribe specific steps: scanning the database schema; creating machine representations of tables, constraints, and relationships; and constructing a client application, based on

specified rules and the types of cross-table relationships determined via schema interrogation, which enforces referential integrity across the tables and supports CRUD operations. '981 Pat., 4:63-9:7. The published disclosure itself incorporates the complete working source code for a reference implementation (*id.*, 4:25-30, 27:1-34:48, 347:1-376:32). This same code rendered the patent's actual illustrations, as explained at length in the written description (*id.*).

The '801 patent (which contains the same underlying written description and drawings) adds claims to machine-performable rules for deriving descriptive values from foreign tables that may exist in any number of formats, based on attributes such as column names, datatypes, and internal constraints. These are not aspirational results; they are detailed procedural steps that differ from human steps and enable a computer to perform what could previously be done only manually. Far from being abstract, the claimed methods leverage the internal structure of relational databases to achieve a technical improvement in computer functionality, aligning with leading authorities such as *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) and *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

### B. Premise that these are mere "do it with a computer" claims

Zoho treats the claims as bare directives to "automate" previously manual tasks. *See* Br. at 8. However, the present claims go not just to the *object* of automation, but detail *how* to do so. This differs markedly from, *e.g.*, Zoho's cited cases such as *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 770 (Fed. Cir. 2019) ("[T]he inventors here had the good idea to add networking capabilities to existing charging stations to facilitate various business interactions. But that is where they stopped."). By contrast, these claims also spell out *how* a machine can automate the process, with steps that differ from the manual ones as well. *See PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1372-73 (Fed. Cir. 2025) (claim, though broad, deemed "sufficiently focused" on specific improvements to distinguish from "do it on a computer" patents).

### C.  "Purely functional" as a dismissive label

Characterizing claims at "an impermissibly high level of generality" (*see Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379-80 (Fed. Cir. 2024)) is what Zoho does when it uses "purely functional" as a rote categorization without specific support to argue §101 (*see* Br. at 1, 3, 5, 7, 9, 10, and 16). These improper characterizations are part and parcel of the same approach by which Zoho would disregard the technical specifics of the claims (subsection A above) and the "how" of what the claims recite (subsection B above). It is a case of applying an abstraction filter in advance in order to argue that subject matter is "abstract."

## III. THE CLAIMS ARE NOT DIRECTED TO ABSTRACT IDEAS

### A.  Zoho's motion fails to provide a proper "directed to" analysis

What the claims in question are "directed to" lies at the base of the "step one" analysis under *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). However, Zoho's motion makes only token reference to the *legal standard* for determining what claims are "directed to":

> The 'abstract idea' step of the [Alice] inquiry calls upon [the Court] to look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016).

(Br. at 6); *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292-93 (Fed. Cir. 2020); *Solutran, Inc. v. Elavon, Inc.,* 931 F.3d 1161, 1168 (Fed. Cir. 2019).

While Zoho's motion contains this single isolated quotation of a legal standard , it fails to address, for any of the claims, the *criterion* specified in the standard: "the focus of the claimed advance over the prior art." Such failure is a frequent basis for denying a § 101 motion, or a reversal*. See, e.g.*, *TecSec*, 978 F.3d at 1294 (emphasis added):

> The Step 1 "directed to" analysis called for by our cases depends on an accurate characterization of what the claims require and of what the patent asserts to be the claimed advance. *The accuracy of those characterizations is crucial to the sound conduct of the inquiries into the problem being addressed and whether the line of specificity of solution has been crossed*.

*See also CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1370-71 (Fed. Cir. 2020) (reversing district court's assumption "that the claims are directed to automating known techniques … seems incongruous with the claimed subject matter"; "it is difficult to fathom how [users] mentally or manually [performed  steps] required by claim 10").

### B.  What the claims are properly regarded as directed to

#### 1.  '981/'220 Patents

Zoho's position is simply that "the claims are directed to the abstract idea of creating a user interface for interacting with a database." Br. at 7. This is an over-abstraction. *See TecSec*, 978 F.3d at 1294 ("[T]hat characterization … is materially inaccurate. To arrive at it, Adobe had to disregard elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements."); *PowerBlock*, 146 F.4th at 1373 ("Courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") (internal quotations and citations omitted).

In particular, Zoho's characterizations completely expunge the patents' advance over the prior art —that is, providing a series of specified operations that enable a machine to automatically perform UI generation, in a general manner, for any arbitrary database (*i.e.,* one whose structure will not be known in advance, and could be of any size or relational complexity), with no human intervention. They also fail to address the claims taken as a whole.

The '981 and '220 patent claims recite exactly that, achieved by extracting data model details from metadata within the database and building an internal representation of the model, then using that representation to generate specified classes of table displays which incorporate a defined set of operating controls that manifest the cross-table relationships of the model. To disregard those express claim elements is to proceed at "a high level of abstraction" that is "untethered from the claim language" and "overgeneraliz[es] the claim." *Enfish*, 822 F.3d at 1337.

### 2.  '801 Patent

Zoho's statement of what the '801 claims are "directed to" is: "generating a UI that . . . augment[s] or supplant[s] (and then display[s]) the referenced foreign key value in a table" with a description *from elsewhere* in that table, thus creating an "improved representation of intertable relationships." Br. at 10-11 (emphasis added). This formulation recites the ultimate result, but fails to capture the claims' differentiating aspect, which lies in their directions as to how to achieve the specified end. Specifically, it misses that the claims also provide a defined technical mechanism that a machine can use to determine *where* to look within a foreign table of variable structure to find the enhanced description, as opposed to the vague "elsewhere" (Br. at 10) or "one of several options" (Br. at 11) in Zoho's formulation.

While humans do sometimes go through a process of finding data from elsewhere in a database to enhance the representation of raw (numeric or "pointer") cross-references, the human works with one relationship at a time, on a table of a given structure, where this determination is performed on a one-off basis. What Kaufman devised was a *generally applicable* approach so that a *machine* could usefully locate the enhancing text on its own—not just for one table within a particular database, but for *any* table (regardless of its differing structures) in *any* database that happens to be presented—and could do so without having to rely on human tagging or other intervention. Being able to do this in a generally workable but automated manner would immensely improve an automatically-generated UI that otherwise would be limited to displaying cryptic cross-references throughout, including within dropdowns ("picklists"), and would make entering or updating such cross-references impractical at best. Without the benefit of the claimed process, a machine-generated CRUD interface would be virtually unusable, dragging down Kaufman's entire automated-UI approach.

The '801 claims thus specify additional rule-based steps to select enhancement text within an arbitrary related (foreign) table, finding one or more appropriate source columns based on at least one of the following: column names (*e.g.*, if the column heading includes the word "NAME"), column datatypes (e.g., character or string), their constraints (*e.g.*, UNIQUE), and their position within the table (*e.g.*, whether it is the first or left-most column, or is next to that table's PK column). *See* '801 Pat., 11:55-61. Applying the set of rules specified in these claims significantly improves the display of both FK-column values and dropdown-selection items in automated renditions of complex databases, by thereby incorporating some meaningful descriptive information into these displays. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016) (likewise, an automated rule-based approach to a process (lip-syncing of 3D animation), previously performed manually, found "not directed to an abstract idea").

The '801 claims may therefore be regarded as directed to: providing a defined set of rules that reliably enable a machine to find appropriate text for the enhanced representation of cross-table relationships within an arbitrary database whose structure is not known in advance. This goes considerably beyond a mere abstract idea.

## C.  The claimed techniques for achieving the identified advances are not abstract ideas

As discussed, the subject claims are "directed to" specific UI generation methods that automatically adapt to any arbitrary database. Such technological measures, fashioned to adapt to or overcome differences in the subject matter to be automated, are not mere abstract ideas. *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1256-57 (Fed. Cir. 2017) (citing claims "allow[ing] different types of processors to be installed with the [same] subject memory system without significantly compromising their individual performance."); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018) (claim upheld based on its uses of "specific and unique characteristics of [computer's] BIOS," comparable to Kaufman's use of database schema

here); *Mentone Sols. LLC v. Digi Int'l Inc.*, No. 2021-1202, 2021 WL 5291802, at *3-4 (Fed. Cir. Nov. 15, 2021) (nonprecedential) (shifting timeslots for signaling "to allow configurations that would otherwise be impossible due to insufficient turnaround time."); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362-63 (Fed. Cir. 2018) (among other improvements, claim provided unconventionally for previewing app data in unlaunched state).

Significantly, the automated process claimed here *differs in its steps* from its manual counter-part. The manual process "require[d] by-hand coding at a very low level," or "at best" was done with tools that still only generated code to "manipulate[] a single … table" at a time ('981 Pat., 2:53-62), and it had to be done in advance for every table. By contrast, the claims provide a gen-eralized solution that is automated for any table. The claimed methods create an in-memory model that drives the entire UI generation. The claimed steps execute systematically from metadata, rather than from bespoke code manually crafted per table. They use the same basic source code (*see, e.g.*, '981 Pat., 27:1-61:42 (AddEditForm.jsp), 65:10-103:16 (BrowseForm.jsp)) regardless of the table being addressed, for this generation, and they do so on the fly, accessing relevant extracted schema data from the in-memory model for each individual screen display only as needed, responsive to the user's real-time table browsing, navigation, and other input activity. The above-cited code in the patent shows that the source modules work in a standard but self-adapting manner to generate those display screens in a manner corresponding to the schema data, and then to insert likewise adaptable controls (as claimed) to implement the cross-table relationships. This is *not* "do the same thing faster."

*McRO*, 837 F.3d at 1314-15, expressly relied on this difference between manual and auto-mated processes to distinguish the same argument made here by Zoho: that of allegedly taking a manual process and merely doing the same thing with a computer. *See also Thales Visionix Inc.*

*v. United States*, 850 F.3d 1343, 1348-49 (Fed. Cir. 2017) ("unconventional choice" reflected in the claims, to separate motion sensors on tracked object and moving platform, provided technical benefit of being able "to more accurately calculate position and orientation of the object" and therefore did not constitute an abstract idea).

*Enfish* reflects where step one may be satisfied by an improved software-based approach to a problem. In *Enfish*, the court held that claims directed to a self-referential table (where schema metadata is used as actual table data, to enable what was previously stored in several tables to be fully represented in one) were patent-eligible because they expanded database capability in a manner not previously available, even though they used generic hardware. 822 F.3d at 1336. Just as *Enfish* improved database operation by using schema to create a universal table structure, thus eliminating the need to manage multiple tables, Kaufman's claims improve computer functionality by using schema metadata as data to create a universal UI—thus eliminating manual coding.

In *DDR*, the court upheld claims that solved a problem "necessarily rooted in computer technology" by altering the conventional behavior triggered by a hyperlink click. 773 F.3d at 1257. Instead of sending the user to the linked site, the claimed system generated a hybrid page that combined content from the linked site with the "look and feel" of the host site. *Id.* at 1248-50. This was not a standard use of the Internet; it was a specific technical solution that selectively merged content across web sites, much as Kaufman's '801 claims, contrary to the default "normalization" (table separation), selectively merge content across database records. *Id.* at 1258-59.

There is no principled distinction between compositing two web pages in *DDR* and replacing a cryptic FK in one table with a human-intelligible descriptor from an off-screen table in the '801 patent. Both approaches override the system's default behavior to achieve a technical result that improves usability. Likewise, *McRO* is highly analogous on the '801 patent, as it similarly

involved a rule-based approach to automating a process previously performed manually—in that case, determining morph-weights for facial feature animation based on analysis and timing of speech phoneme sequences. *McRO*, 837 F.3d at 1306. Also relevant is *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143 (Fed. Cir. 2019), where the claims concerned devices for data transmission that would regularly permute the bits in a check-data generation algorithm, as specified in the claim, to resolve an error that, under a *fixed* generation algorithm, would have systematically evaded detection. The claims passed review at step one because, like the claims here, they (1) specifically recited *how* the data is permuted (*i.e.*, modified for different data blocks), and (2) they provided a technical advantage (in that case, by catching previously unde-tectable systematic errors). *Id.* at 1153. Approached from any number of directions, the claims here pass review at *Alice* step one, which in itself mandates denial of the instant motion.

**D. Zoho's Step One authorities and arguments are readily distinguished**

**1. Electric Power, Content Extraction, *and* Affinity Labs**

Zoho relies extensively on *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), but this reliance is misplaced. The *Electric Power* decision itself limited its holding to claims that "do not go beyond requiring the collection, analysis, and display of available infor-mation in a particular field, [which] stat[e] those functions in general terms, *without limiting them to technical means for performing the functions that are arguably an advance over conven-tional computer and network technology*." 830 F.3d at 1351 (emphasis added). "[T]he advance [the claims] purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions." *Id.* at 1354.

By contrast, the asserted claims here *do* limit the solution to a specific technical means— schema interrogation, in-memory modeling, and rule-based UI generation—that enables a

computer to generate a fully functional CRUD application without human coding. This is not merely "displaying" data; it is a machine-implementable process that launches a new form of machine activity. *McRO*, which involved specific rules to automate speech animation (vs. specific rules, here, to automate database UI generation) is remarkably similar in this regard. *See McRO*, 837 F.3d at 1315 ("[T]he automation goes beyond merely organizing existing information into a new form …. The claimed process uses a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results.") (internal quotations and citations omitted).

Likewise, the '801 patent does not merely "update" a display. It formalizes a series of strategies and criteria by which a machine-directed process should prefer non-PK foreign-key columns in sourcing text to enhance the display automatically, thereby transforming what was previously an *ad hoc* human judgment into a reproducible process applicable across arbitrary schemas. Nothing in *Electric Power* addresses this type of technical solution.

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014) concerned collecting data items, extracting fields that matched a pattern, and storing them. The claims here, however, only *start* at extracting the database schema and storing a representation of same. Unlike that case (and similar cases, such as *Data Scape Ltd. v. Western Digital Corp.*, 816 F. App'x 461 (Fed. Cir. 2020) cited at Br. 13-14 and 19), the actual focus of the present claims further comprises what to *do* with the extracted schema data, in a manner a machine can implement, including creating views of the data in specified "display modes," and creating and inserting into those display modes a set of standardized UI controls for "for representing, navigating, and managing" cross-table relationships as defined in the schema. Indeed, the *reason* for extracting the schema data was not simply to look at it, but to use it (and again,

with instructions on *how* to use it) for the actual goal of automated UI generation. The added di-

mension of *using* the extracted data in a specified technical manner goes far beyond *Content Ex-

traction* (or anything that can be considered merely "abstract."). Unlike Zoho's citation of *Affin-

ity Labs-Amazon,* 838 F.3d at 1269 (Br. at 1), the claims here "provid[e] limiting detail that con-

fines claim to a particular solution to an identified problem." They disclose a "particular mecha-

nism" (*id.*) for the result brought about. The further cases Zoho cites to this effect are of no avail.

*Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017), found claims for

using XML tags to build an index to search a database was abstract because, unlike Kaufman's

claims, "[t]he claims are not focused on *how* usage of the XML tags alters the database in a way

that leads to an improvement in the technology of computer databases." (emphasis in original).

In *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332, 1342 (Fed. Cir.

2017), the claims did not recite "particular features to yield [the asserted] advantages" of incom-

patible XML document, as they did not "indicate what steps are undertaken to overcome the

stated incompatibility problems with XML documents to propagate [the claimed] modifications

into the XML document." Finally, *West View Research, LLC v. Audi AG*, 685 F. App'x 923 (Fed.

Cir. 2017), is cited by Zoho with a wholly conclusory squib (Br. at 13) as a makeweight, adding

nothing to its argument.

Further cases Zoho cites for merely automating a manual process are likewise distinguisha-

ble. *E.g.*, *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1278

(Fed. Cir. 2012) (automated the same set of steps as human, only faster); *Cellspin Soft, Inc. v.

Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019) (merely substituting wireless for prior wired

connection); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015) ("of-

fer-based price optimization" was a "fundamental economic concept" of the type the Supreme

Court had found to represent abstract ideas); *Mortg. Grader v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) (pure mental steps of credit grading and lender selection based thereon).

### 2. *Zoho's other abstract idea arguments fail*

#### (a) *Zoho's Argument that Claim Steps are "Purely Functional"*

The "purely functional" characterization is to say that a claim only recites its operations in terms of their results, without providing or requiring any specific way of achieving them, and is thus inherently abstract. Such claims would cover *any way* of performing the specified function, rather than a particular manner or process. As addressed above, however, Zoho gets to this characterization only through wholesale disregard of express claim limitations. While Zoho does argue the procedural limitations themselves (alleged "manual steps" etc., fully addressed herein, separately), "purely functional" is an outright mischaracterization. Given the substance of those limitations in the applicable technical domain, they simply cannot written off out-of-hand as Zoho would do, as being claimed in "purely functional terms."

Zoho also fails to address claim language as a whole. For example, the claims recite an operation to "provide an output stream," but one that "defin[es] a user interface paradigm comprising a set of modes for interacting with a given database table, said modes comprising create, retrieve, update and delete, and a corresponding display format for each mode"—which Kaufman identified as a minimum set of screens needed to provide a fully functional CRUD UI. They say to "scan the database," but go on further to spell out what to scan for ("the table structures, constraints and relationships of said data model"). They say to "use said representations [of the data model] to construct a corresponding client application," but again, this is coupled with a substantive description of what the application does: it provides "a connection to the database," "displays of the table contents of said database for each of said modes in accordance with the display

formats of said paradigm," and "integrates into each said mode display processes for representing, navigating, and managing said relationships across tables." These recitals spell out in technical detail the functionality to be built into the generated application, sufficient for it to perform its intended task, which is to provide a robust CRUD application for the database in question. To call these prescriptions "purely functional" is to completely ignore the provided technical directions. *See PowerBlock,* 146 F.4th at 1371-73 (forcefully rejecting the district court's assessment that claim failed to provide "any particular system or method" for achieving its claimed function, where it specifically provided for adjusting weights by moving a selector to couple or decouple weights from a lifting bar).

### (b) Zoho's "Shepards Citations" analogy

Zoho's analogy to Shepardizing a case citation shares the same flaw as many of its other arguments in failing to engage with the full substance of the claims. Shepards provides a list of forward citations for the cited reference, in a somewhat cryptic legal citation syntax. A human looks up each of the forward cites in another tabulation, in this case the referenced Reporter volumes. At the top of each cited case will always be a caption of some sort from which the enhanced data for the brief or memo being worked on may be readily drawn. Inserting the full citation into the human work product is then purely routine.

The problem with this analogy is that the "system" comprised of Shepard's Citations and the Reporter system has a *fixed schema*. The Shepards cites are always found in the same source, and always look the same; the reporters they cite are likewise in relatively fixed formats, where the case decisions are reproduced in sequence, and are always headed by a caption that contains the relevant additional information. A relational database, by contrast, can be organized in countless ways. There is tremendous variability in how database table structures may be organized,

ordered, named, and stored. The '801 patent claims are designed to deal with such variability, and overcome technical problems that the legal researcher does not face.

Contrary to Zoho's assertions (Br. at 17) the claims, being drawn to a particular approach for UI generation, do not preempt other UI-generation methods. They are confined to a technical implementation that specifically incorporates schema interrogation, in-memory metadata modeling, and rule- and relationship-based, just-in-time UI generation—limitations which exclude many other ways of automatically creating database UIs.

## IV. THE CLAIMS EMBODY INVENTIVE CONCEPTS

*Alice*'s "step two" can be confounding, especially in how it relates to step one. *See, e.g.*, *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016) ("Recent cases … suggest that there is considerable overlap between step one and step two … the two stages involve overlapping scrutiny of the content of the claims ... [and] there can be close questions about when the inquiry should proceed from the first stage to the second.")

Per *Alice*, an "inventive concept" is "something extra" that transforms a "claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217, 221. It cannot be the abstract idea itself. *Id.* at 221-22. Nor can it be the concept of the same abstract idea simply applied in a routine and conventional manner. *Id.* at 223. In any case, the patents-in-suit easily pass step two, should there be any need to reach it.

### A.  '981 and '220 Patents (at Step Two)

The patents themselves tell us what the prior human procedure was, again, as noted above: to manually "synchronize" a "front-end" structure (the UI programming) with a corresponding "back-end" database system (containing a schema designed for a specific use-case), "requir[ing] by-hand coding at a very low level of functionality", or perhaps the use of basic "'form generator'

or 'wizard' facilities to automatically generate the code for a simple UI display [to manipulate] a single [specific] underlying (back-end) data table" at a time. *See* '981 Pat., 2:45-64.

What the present claim language actually addresses is how to move beyond manual, table-specific software development and provide a *generally applicable technique* by which a machine can automatically perform UI generation on a "relational database … of any arbitrary size or complexity"—and not for just one selected target scenario, but for any database.

This involves numerous distinct yet cumulative inventive concepts, over and above merely the opening directive to "create[e] a user interface for interacting with a database:"

1. Extract an already embedded structure (the database schema) for use as a foundation for UI generation, *e.g.*, '981 Pat., cl. 5, 377:5-8.
2. Limit generation to defined categories of views deemed necessary: four CRUD display modes, *e.g.*, '981 Pat., cl. 5, 377:58-378:4.
3. Scaffold the extracted structure in memory to drive automated just-in-time display generation, *e.g.*, '981 Pat., cl. 5, 378:8-10.
4. Present inter-table relationships through a set of controls, including links for navigation and dropdowns to constrain valid inputs and enforce referential integrity, *e.g.*, '981 Pat., cl. 5, 378:14-21.

Any one of these is an inventive concept that meets step two. In combination, application of these concepts as claimed solves the problem, "necessarily rooted in computer technology," of how to generate a fully functional CRUD interface for any relational database without human coding. No prior art disclosed a general-purpose, machine-executable method for doing so.

Even if the Court were to conclude at step one that the claims are directed to an abstract idea, the above features also supply the inventive concept at step two because in combination, they represent a novel, non-conventional arrangement of elements that operate together to achieve an improvement in computer functionality. In fact, this Court has held as much on a prior § 101 motion by Zoho itself. *See Visible Connections,* 2019 WL 2298704, at *5 (upholding the challenged claims at step two, criticizing Zoho's oversimplification of the claims in that prior case: "*Zoho's characterizations of the claims at issue elide their allegedly inventive aspects*"

(emphasis added)); *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 351 (Fed. Cir. 2016) (where the inventive step of moving content filtering to a remote server, in combination with the capability to identify users from TCP/IP protocols and using specific per-user filtering rules, reduced dependence on prior inflexible local filtering schemes); *see also Amdocs*, 841 F.3d at 1300-01 (holding claims patent-eligible at step two because they recited a non-conventional distributed architecture that processed network accounting data close to its source in order to reduce congestion, thereby improving system scalability); *TecSec*, 978 F.3d at 1296; *Thales*, 850 F.3d at 1349. Likewise, the claims here feature an inventive combination that includes harvesting existing metadata, generating a defined set of displays based on that metadata, and devising a small set of controls insertable therein that generally work to implement cross-table processes, which together provide the power to automatically fit a fully functioning CRUD UI to an arbitrarily structured database.

### B. '801 Patent (at Step Two)

With regard to the '801 claims, Kaufman devised a set of rules for identifying pertinent enhancement data which, in combination, proved effective against arbitrary database structures encountered in practice, conveying a massive benefit to users as compared with simply utilizing raw FK values themselves throughout the UI.

It was inventive for Kaufman to recognize and apply the insight that, even within an arbitrary database layout, strong guidance on which columns of a related foreign table to look to for descriptive text may exist in: the name(s) the schema designer chose to give to the foreign-table columns; the specified datatypes for the columns; the existence of column constraints (such as UNIQUE), and/or the order of appearance of columns within the table definition. Even if this approach provided enhancement in only a majority of instances, it would add great value to the overall solution. *See, e.g.*, *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127 (Fed. Cir. 2022)

(traceroute segmentation of content to improve speed of P2P distribution plausibly alleged as inventive); *BASCOM*, 827 F.3d at 1349-50 (combination of allegedly "conventional pieces" in "non-generic arrangement" that enabled the elements to achieve an additional benefit held as inventive for step two).

## V.  ISSUES OF FACT PRECLUDE GRANT OF THE MOTION

Whether schema interrogation and generalized UI-control generation were "well-understood, routine, and conventional" is a factual question. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-70 (Fed. Cir. 2018). The record does not establish conventionality; to the contrary, the patents describe these steps as a departure from prior art. The complaint plausibly alleges technical claim features that provide a technological benefit, and inventive techniques to implement them. Dismissal under Rule 12(b)(6) is therefore improper. *See also Coop. Ent.*, 50 F.4th at 133; *Cellspin Soft*, 927 F.3d at 1316-17 (complaint sufficiently raised factual issue that claimed combination was not routine, nor conventional); *Aatrix Software*, 882 F.3d at 1128 (factual disputes on improvement bar dismissal).

## VI. CONCLUSION

This is a clear case of patent claims that provide substantial technological advantages and recite how these benefits are achieved with specified technical steps, much like that in the 20+ cases addressed herein that likewise found patentable subject matter. The technological approach that these claims represent—which automate processes that could not previously be automated—do not constitute abstract ideas. Accordingly, the Court should deny Zoho's motion and uphold the eligibility of all asserted claims at step one of *Alice* and, if not, at the very least at step two.

Date:  September 18, 2025

Respectfully submitted,

*/s/ Gina K. Kim*
Ronald Abramson\*
New York Bar No. 1457126
ron.abramson@listonabramson.com
David G. Liston\*\*
New York Bar No. 2642049
david.liston@listonabramson.com
Ari J. Jaffess\*\*
New York Bar No. 4621397
ari.jaffess@listonabramson.com
Alex G. Patchen\*\*
New York Bar No. 4246021
alex.patchen@listonabramson.com
M. Michael Lewis\*\*
New York Bar No. 4467007
michael.lewis@listonabramson.com
Gina K. Kim
Texas Bar No. 24097937
gina.kim@listonabramson.com
**Liston Abramson LLP**
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
212-257-1630

Wasif H. Qureshi
Texas Bar No. 24048155
wqureshi@jw.com
**Jackson Walker LLP**
1401 McKinney, Suite 1900
Houston, Texas  77010
Telephone: (713) 752-4521

\**pro hac vice* application pending
\**pro hac vice* application to be submitted

**COUNSEL FOR PLAINTIFF MICHAEL PHILIP KAUFMAN**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing is being served on the counsel of record via the CM/ECF system on September 18, 2025.

Dated: September 18, 2025

By: */s/ Gina K. Kim*
Gina K. Kim