UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

MICHAEL PHILIP KAUFMAN,

        Plaintiff,

v.

ZOHO CORPORATION,

        Defendant.

Case No. 1:25-cv-001082-RP

**ZOHO'S REPLY IN SUPPORT OF MOTION TO DISMISS UNDER
RULE 12(B)(6) FOR FAILURE TO ASSERT A PATENTABLE CLAIM**

I.      INTRODUCTION

Plaintiff's opposition brief cannot escape the fundamental problem with the Asserted Patents: they claim the abstract idea of automatically generating database user interfaces without claiming any specific technological solution, merely speeding up a previously manual process. Despite Plaintiff's attempt to recast the claims as technological improvements, the patents merely recite results-oriented functional language that could be implemented in countless ways using routine computer components.

Plaintiff's own characterizations confirm the abstract nature of the claims. Plaintiff describes the patents as claiming the ability to automatically create a user interface for a database based on its "schema"—the information that dictates the structure of the database tables and their relationships. Nothing about the resulting user interface is novel interface—it is created "with standard components" based on known "structural guides" present in the relational database systems. (Opp. at 1). The only purported point of novelty over the manual process is the fact of the automation itself; this is precisely the type of claim that courts routinely find abstract.

The Federal Circuit has made clear that "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015). That is exactly what these patents do—they use computers to automate the previously manual process of creating database interfaces. Even if that process was "unwieldy" (Op. at 3), taking the drudgery out of a task formerly performed by humans is not enough to make the claims patent eligible.

Plaintiff's opposition highlights that claims are abstract. According to Plaintiff, the improvement of Mr. Kaufman's inventions is that the inventions can automatically create "database-specific CRUD UIs [that] would be [previously] implemented by human programmers, both designing and encoding the required screens . . ." (Opp. at 2-3). This would,

"eliminat[e] the tedious, error-prone, and time-consuming human work previously required." (Opp. at 3). That is, the alleged improvement is quite literally automatic performance of a manual task. *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("[T]he computer simply performs more efficiently what could otherwise be accomplished manually.").

Plaintiff attempts to distinguish the claims by arguing they use "specific technical steps in a manner that confers patent-eligibility" (Opp. at 1), but the purported "specific technical steps" are little more than what a human programmer would also do, collecting information, analyzing that information, and coding a user interface to display and interact with the database the information describes. Plaintiff identifies the steps below, each of which adds nothing to the manual version of the prior art.

- "scanning the database schema" (reviewing the structure of the database and its tables);
- "creating machine representations of tables, constraints, and relationships" (noting, mentally or on paper, these relationships so they can be applied to build the UI code);
- "constructing a client application, based on specified rules and the types of cross-table relationships determined via schema interrogation, which enforces referential integrity across the tables and supports CRUD operations" (coding a CRUD user interface that reflects the underlying structure of the database and its table).

That is, although Plaintiff contends that these are not the steps a human programmer would have used (Op. at 4), they do not actually identify any difference between the human actions and the steps of the claims. Plaintiff's complaint highlights this similarity:

> 13. Prior to the Asserted Patents, there was a recurring practical problem in implementing data-driven systems with relational databases, in that, *in the prior practice, the UI routines had to be written and adjusted by hand, on a per-table*

2

> *basis, to fully reflect the underlying database structure, including cross-table relationships, as well as any changes that might be made to that structure.*
>
> 14. The Asserted Patents represented a major advance in technology, by providing an automated process that would first *scan the structure of the database*, and then, based on what was learned from that scan, and without requiring further human per-table input or adjustment, construct a working user application for working with the relational database, which *supported all usual modes of interacting with the database* (including CRUD operations), *observed and enforced cross-table relationships defined within the database*, and preserved the data and referential integrity of the database as changes were made to the data through the generated UI. The Asserted Patents contain claims that cover various aspects of the disclosed UI-related processes.

D.I. 1 at ¶¶ 13-14 (emphasis added). These paragraphs describe the difference between the manual process in the prior art (a human analyzing the structure and creating the relevant UI routines by hand) and the automated process as intrinsically the same—scanning the database and "based on what was learned," constructing a user interface application that supported CRUD operations and maintained the appropriate table relationships. *Id.* These are quintessentially functional descriptions that specify what the system does, not how it achieves any novel technological result in a specific way.

**II.   ARGUMENT**

    **A.   <u>Plaintiff's Characterization of the Technology Does Not Save Abstract Claims</u>**

Plaintiff devotes substantial space to describing database technology and Mr. Kaufman's purported insight into conventional database technology (Opp. at 1-3), but this background cannot transform abstract claims into patent-eligible ones. The proper analysis is not how long the specification is, but what is actually claimed. That is, "the focus of the claimed advance over the prior art" must be evaluated based on what the claim language actually recites, not merely what the specification describes. *American Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020); *see also ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767

(Fed. Cir. 2019) ("[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves") (quotations omitted). Plaintiff's reliance on source code in the specification is misplaced.

And even a lengthy technical background cannot transform abstract concepts into patentable subject matter. Kaufman's explanation of conventional database concepts (primary keys, foreign keys, CRUD operations, relational databases) merely describes well-known elements in the field. As the Federal Circuit held in *Electric Power Group*, "the advance [the claims] purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology." 830 F. 3d 1350, 1354 (Fed. Cir. 2016). The technical terminology used here similarly masks the fundamental abstract nature of collecting database information and displaying it in a user interface so that the database can be manipulated in conventional ways.

The presence of implementation details, including source code, in the specification cannot save claims that otherwise recite abstract concepts. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (recognizing that "the claim—as opposed to something purportedly described in the specification" must include "an inventive concept").

Plaintiff argues that the patents provide "non-routine methods" for UI generation (Opp. at 1), but again, examination of the actual claim language reveals only conventional steps: Claim 5 of the '981 Patent recites: 1) Providing a user interface paradigm (defining CRUD operations), 2) Scanning a database to determine its structure, 3) creating representations of that structure, and 4) constructing a user interface based on those representations. Each of these steps describes a conventional function that programmers routinely performed, as the patent admits. "[M]erely

adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility." *Intell. Ventures I LLC v. Capital One Bank,* 792 F.3d 1363, 1370 (Fed. Cir. 2015). The "concrete, machine addressable steps" (Op. at 4) that Plaintiffs claims are recited by the claims are no more than what a programmer would do when performing the same task without the benefit of Mr. Kaufman's alleged invention—look at the structure of the DB (the schema) and "construct[] a client application based on the specified rules and the types of cross-table relationships determined by looking at it." (Br. at 4-5). The claims are not directed to a novel process, they are directed to doing it more easily, automating what was previously drudgery. Plaintiff's protestations about the detailed disclosure aside, the claims still amount to "do it with a computer," even if the specification includes a specific Java implementation of the abstract idea.

### B. The Claims Are Directed to Abstract Ideas Under Alice Step One

#### 1. The '981 and '220 Patents Claim Abstract Database Management Functions

Zoho's motion properly identified the claims as directed to the abstract idea of automatically creating user interfaces for databases, which accurately captures the claimed advance over the prior art. This is precisely the type of abstract information processing rejected by the courts. For example, in *Electric Power Group*, the court found abstract claims that gathered data from multiple sources, analyzed that data, and displayed the results. 830 F.3d 1350, 1353-54 (Fed. Cir. 2016). The court explained that "merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.* at 1354. The '981 and '220 patent claims perform a similar process: gather data (scan database schema), analyze that data (determine relationships), and display results (generate user

interface). And there is no particularly novel or advanced output for the analysis either. As Plaintiff admits, the user interface itself is also comprised of "standard components." Schema interrogation, in-memory modeling, and rule-based UI generation (Opp. at 12) are abstract data processing concepts, not specific technological means. These terms describe what to do (collect database structure information, process it, generate displays) rather than how to achieve a concrete result in a particular way.

These characterizations confirm the abstract nature of the claims. "Automatically perform UI generation" and "extracting data model details" are classic information collection and processing activities. These are merely labels for conventional database operations. The claimed advance of automating UI generation for "any arbitrary database" does not actually show an advance. Nowhere has plaintiff pointed to a task that was not done in the prior art. Instead, Plaintiff points to the automation of those tasks for arbitrary databases.

## 2. The '801 Patent Claims Abstract Data Gathering and Display

Plaintiff argues the '801 patent provides "a defined set of rules that reliably enable a machine to find appropriate text" (Opp. at 9). But examining what these "rules" actually are again reveals their abstract nature:

- Look at column names
- Look at column datatypes
- Look at column constraints
- Look at column position

These are not technological innovations—they are basic heuristics that any database programmer would naturally consider when trying to identify descriptive text. *See Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016). The process of "determining where to look within a foreign table" and "locating enhancing text" describes abstract information gathering and processing. The fact that this is done automatically across variable database

structures does not add concreteness—it emphasizes the functional and abstract nature of the claims. This is analogous to *Content Extraction*'s rejected claims for collecting data items, extracting fields that matched a pattern, and storing them.

Plaintiff's analogy to *McRO* is inapt . In *McRO*, the claims recited specific rules that automated lip-sync animation in a way that was *different* from how human animators worked—using mathematical relationships between phonemes and facial expressions. 837 F.3d 1299, 1313-14 (Fed. Cir. 2016). Here, the '801 patent, at best, codifies the same considerations humans already used: looking for columns named "name" or checking datatypes. This is automation of human judgment, not a technological improvement.

### C. The Claims Lack Inventive Concepts Under Alice Step Two

#### 1. The '981 and '220 Patents Lack Inventive Concepts

Plaintiff identifies four "inventive concepts": 1) Extract embedded structure (database schema) for UI generation, 2) Limit generation to defined categories (four CRUD display modes), 3) Scaffold extracted structure in memory to drive automated display generation, 4) Present inter-table relationships through set of controls. (Opp. at 18). Plaintiff argues that these solve a "problem necessarily rooted in computer technology." But again, these alleged "inventive concepts" are abstract information processing steps, not technological improvements. Each concept involves conventional database operations: (1) reading a database schema is routine; (2) CRUD operations are fundamental database concepts; (3) storing data in memory is generic; (4) displaying relationships is conventional data presentation. The law requires more than labeling conventional steps as "inventive.

#### 2. The '801 Patent Lacks Inventive Concepts

Plaintiff contends that Mr. Kaufman "devised a set of rules for identifying pertinent enhancement data which...proved effective against arbitrary database structures." (Opp. at 19.).

7

But using database metadata (column names, datatypes, constraints) to enhance display is conventional database programming. The specification itself acknowledges these are standard database attributes. A "set of rules" for processing database information cannot constitute an inventive concept when the rules merely apply conventional database analysis techniques. The claimed benefit of user-friendly displays does not transform abstract information processing into patentable technology.

### 3. Using Database Schema Is Not Inventive

Plaintiff emphasizes the use of database schema as somehow inventive (Opp. at 18), but this is simply using data that already exists in every relational database. The patents themselves admit that database schemas were well-known: "every RDBMS incorporated a 'data dictionary' which encapsulated the structural organization (or 'schema') of the database." (Opp. at 3).

Using existing data for its intended purpose—understanding database structure—cannot constitute an inventive concept. *See BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept"). *Ancora Technologies* is distinguishable. There, the claims used the BIOS—a specific computer component—in an *unconventional* way to store license verification data. 908 F.3d 1343, 1348-49 (Fed. Cir. 2018). Here, the patents use database schemas exactly as intended: to understand database structure.

### 4. Rule-Based Processing Is Routine and Conventional

Plaintiff argues that the rule-based approach of the '801 patent provides an inventive concept but applying rules to data is a conventional programming technique. The specification itself acknowledges this conventionality by noting that developers already had "knowledge of how developers often structure such tables" (D.I. 1 ¶ 51).

      **D.**      <u>**No Factual Disputes Prevent Dismissal**</u>

Section 101 eligibility is a question of law that can be resolved at the pleading stage when claims on their face disclose abstract subject matter. *Aatrix Software* establishes that eligibility can be determined on a Rule 12(b)(6) motion when no factual disputes exist regarding claim scope. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Here, the specification itself establishes the conventional nature of the claimed elements by acknowledging prior art automated UI generation tools and conventional database operations. Plaintiff' contention aside, *Berkheimer* cannot create a blanket factual dispute that prevents early resolution of abstract claims.

**III.**      **CONCLUSION**

Plaintiff's opposition confirms rather than refutes the abstract nature of the Asserted Patents. The asserted patent patents automate what programmers previously did manually—creating user interfaces for databases. This is precisely the type of automation that courts have consistently found abstract.

The claims recite only functional results without any specific technological implementation, the length of the specification notwithstanding. They use conventional database data structures (schemas, tables, foreign keys) in conventional ways. No amount of attorney argument can transform these abstract ideas into patent-eligible inventions.

For these reasons, this Court should grant Zoho Corporation's motion to dismiss and hold all asserted claims invalid under 35 U.S.C. § 101.

| | |
|---|---|
| Dated: September 25, 2025 | */s/ Phillip J. Haack* |

                                              Ryan J. Marton (*pro hac vice* forthcoming)
Hector J. Ribera (*pro hac vice* forthcoming)
Carolyn Chang (*pro hac vice* forthcoming)
Phillip J. Haack (CA 262060, admitted W.D. Tex.)
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
Telephone: (415) 360-2515
Email: ryan@martonribera.com
hector@martonribera.com
carolyn@martonribera.com
phaack@martonribera.com

Darryl J. Adams (Texas Bar No. 00796101)
SLAYDEN GRUBERT BEARD PLLC
401 Congress Ave., Ste. 1650
Austin, TX 78701
Tel: 512.402.3562
Email: dadams@sgbfirm.com

*Counsel for Defendant Zoho Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing is being served on the counsel of record via the CM/ECF system on September 25, 2025.

By: /s/ *Phillip J. Haack*
Phillip J. Haack