**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

MICHAEL PHILIP KAUFMAN,

              Plaintiff,

    v.

ZOHO TECHNOLOGIES CORPORATION,

              Defendant.

Case No. 1:25-cv-001082-RP

**MOTION OF DEFENDANT ZOHO TECHNOLOGIES CORPORATION
TO DISMISS UNDER RULE 12(B)(6) FOR FAILURE TO ASSERT A
PATENTABLE CLAIM**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................... 1

II.    FACTUAL BACKGROUND .................................................................................. 1

III.   LEGAL STANDARD ............................................................................................ 5

     A.    A Claim for Relief Must Be Plausible ..................................................... 5

     B.    To Be Enforceable, a Patent Must Qualify for Patent Eligibility Under § 101 ....... 6

IV.   ARGUMENT.......................................................................................................... 7

     A.    The Asserted Patents Are Directed To Ineligible Subject Matter ........................ 7

          1.    The Claims of the '981 and '220 Patents are Directed to the Abstract Idea of Automating the Manual Process of Creating a Database User Interface. ....................................................................... 7

          2.    The Claims of the '981 and '220 Patents Add No Inventive Concept ........ 9

          3.    The Claims of the '801 Patent Are Directed to the Abstract Idea of Gathering Information for Display to a User.............................................. 10

          4.    The '801 Patent Lacks an Inventive Concept ........................................... 15

          5.    The Remaining Claims Do Not Alter This Analysis ................................. 16

     B.    The Court Should Dismiss Plaintiff's Claims with Prejudice .............................. 18

V.    CONCLUSION .................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121(Fed. Cir. 2018) .................6

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266 (Fed. Cir. 2016) ........................1

*Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) ......................6, 7

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371 (Fed. Cir. 2024) ...........................13

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014)....................................................6, 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................................5, 6

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266 (Fed. Cir. 2012) ....................8, 12

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) ..............................................................18

*Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359 (Fed. Cir. 2024)....................1, 13, 15

*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018) ......................................9, 15

*CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471,
    2020 WL 3564691 (Fed. Cir. July 1, 2020) ............................................................................13

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019)............................................8, 19

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019)................................9, 14

*Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352 (Fed. Cir. 2017) ...7, 10

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ............................................................................6, 7, 10, 17

*Data Scape Ltd. v. Western Digit. Techs., Inc.*, 816 F. App'x 461,
    2020 WL 3564683 (Fed. Cir. July 1, 2020) ............................................................................13

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)...................................1, 13

*Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369 (Fed. Cir. 2016) ..............................................6

*Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332 (Fed. Cir. 2017).....................14

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) ........................14

*Mortg. Grader v. First Choice Loan Servs. Inc.*, 811 F.3d 1314 (Fed. Cir. 2016)...................9, 15

*OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015)..........................................8

*TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020)..........................................6, 7

*Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084 (Fed. Cir. 2019) .......................18

*Ultramercial Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) ...................................12

*Voip-Pal.com, Inc. v. Apple Inc.*, 375 F. Supp. 3d 1110 (N.D. Cal. 2019) ...................19

*W. View Res., LLC v. Audi AG*, 685 F. App'x 923 (Fed. Cir. 2017)..............................13

## I.      INTRODUCTION

Plaintiff Michael Philip Kaufman alleges infringement of U.S. Patent Nos. 7,885,981 (the "'981 patent"), 10,025,801 (the "'801 patent"), and 10,977,220 (the "'220 patent") (the "Asserted Patents"), which generally relate to automatically generating user-friendly interfaces to databases.  *See* Dkt. 1 (Complaint), Dkt. 34 (First Amended Complaint, "FAC").  But the claims recite no specific technological solution.  Instead, they recite functional limitations and admittedly well-understood, routine, and conventional computing components and processes that only automate existing methods of generating these user interfaces.

Patents like these, which do not provide a specific technological solution for the problem they purport to solve—are ineligible for patent protection and invalid under 35 U.S.C. § 101 and a long line of Federal Circuit cases applying it.  *See Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1363 (Fed. Cir. 2024) (holding claims to automatically generating template-based interfaces from metadata ineligible under § 101).  The Court should therefore hold the Asserted Patents invalid under § 101 and dismiss Mr. Kaufman's claims with prejudice for failure to assert a patentable claim.

## II.     FACTUAL BACKGROUND

Mr. Kaufman filed the original complaint on July 11, 2024 and the FAC on February 25, 2026.  Dkt. 1, Dkt. 34.  He alleges that Zoho's CRM product infringes "at least" three claims[1]—

---

[1] The FAC does not identify any other asserted claim and does not map any limitations of any other claim to Zoho's accused product.

claim 5 of the '981 patent, claim 5 of the '801 patent, and claim 14 of the '220 patent.  *Id.* ¶¶ 20, 49, 59.

The Asserted Patents, all of which are expired, are from a single family.  The '220 patent is a continuation of the '801 patent, which is a continuation of several applications tracing back to a divisional of the '981 patent.  Unsurprisingly, the '801 and '220 patents share a nearly identical specification; the '981 patent primarily varies in that it includes excerpts of source code for a "reference implementation" otherwise identified by file name in the other patents.  *See* '981 patent at 3:34-40; *see also id.* at col. 27-373.  The '981 patent is titled "System And Method For Generating Automatic User Interface For Arbitrarily Complex Or Large Databases," and the other patents are titled "Systems And Methods For Automatically Generating User Interface Elements For Complex Databases."  *See* '981 patent at Cover, '801 patent at Cover, '220 patent at Cover.  All of the patents claim priority to an October 31, 2000 application and a March 16, 2001 provisional application.  *Id.*

The Asserted Patents are generally directed to automatically creating a user interface for accessing a relational database.  In such databases, users interact with the "front-end" through a user interface, allowing them to view, use, and manipulate data in a database stored on the server in the "back-end."  *Id.* at 2:18-26.  The patents acknowledge that such interfaces existed in the past, but state that they were manually created by a computer programmer.  *See, e.g.*, '981 patent at 2:23-3:4.  This process was time-consuming and required updating if the database structure changed.  *Id.*  The asserted patents purport to improve on the prior art systems by automatically generating a user interface for interacting with the database.  *Id.* at 2:65-3:67, claim 1.  The asserted claims of both the '981 and '220 patents, for example, each recite a computer-readable storage medium containing instructions for a general purpose computer for automatically

2

generating a user interface for working with data within a relational database, in which the database is first scanned, after which a "corresponding client application" is constructed.  *See* '981 patent at cl. 5, '220 patent at claim 14 (reciting similar limitations).

| '981 Patent, claim 5 | '220 Patent, claim 14 |
|---|---|
| 5. A *computer-readable storage medium containing a set of instructions for a general purpose computer*, for *automatically generating an end-user interface for working with the data within a relational database*, wherein said relational database comprises a *plurality of tables, constraints and relationships* in accordance with a data model comprising said tables and their column-complements and datatypes, said constraints, and the relationships across said tables, and wherein said relational database may be of any arbitrary size or complexity, said set of instructions comprising: | 14. A non-transitory *computer-readable storage medium containing a set of instructions for a general purpose computer, for automatically generating a user interface for working with the data within a relational database*, wherein the database is described by a data model comprising a *plurality of tables, constraints, and relationships*, said set of instructions comprising: |
| (a) a routine for providing a user interface paradigm comprising a set of modes for interacting with a given database table, said modes comprising *create, retrieve, update and delete, and a corresponding display format for each mode*; | (a) a routine for *scanning the database to determine the tables, constraints, and relationships of the data model*; |
| (b) a routine for *scanning said database and applying a body of rules to determine the table structures, constraints and relationships of said data model*, and for storing representations thereof; and | (b) a *routine for creating machine representations of the tables, constraints, and relationships*; and |
| (c) a routine for using said representations to *construct a corresponding client application*, wherein said client application provides a *connection to said database*, provides *displays of the table contents of said database for each of said modes in accordance with the display format*s of said paradigm, integrates into each said mode display processes for *representing, navigating, and managing said relationships across tables*, for selecting among said modes, and for navigating across said tables and interacting in accordance the selected mode with the data in the tables that are reached by said navigation, while observing and enforcing relational interdependencies among data across said tables. | (c) a routine for *constructing from the representations a corresponding client application* that provides: (i) a *connection to the database*; (ii) *displays for creating, retrieving, updating, and deleting data within one or more of the tables*; and (iii) mechanisms for *representing, managing, and navigating the relationships between data records across related tables*, wherein constructing the corresponding client application does not require any incremental human intervention on a per table basis. |

These claims recite purely functional steps for automatically constructing a user interface for a database by scanning the (already existing) database structure and using that structure to create a

user interface "client application" that corresponds to the database structure and data, which can create, retrieve, update and delete data in the database tables, and permits managing and navigating data in related tables.  That is, it "automatically and dynamically generates a fully functional user interface (UI) based upon, and connected directly to, an underlying data model." '801 patent at Abstract.

Similarly, asserted claim 5 of the '801 patent requires a relational database with "a plurality of tables," and requires a specific "routines for displaying" data from the database "within a user interface."  '801 patent at cl. 5.

5.  A non-transitory machine-readable medium, on which there has been recorded machine-readable code for a program executable on a processor, said program comprising routines for displaying, within a user interface operating under control of a processor, an enhanced representation of data from a relational database, the relational database comprising machine-readable data representing a plurality of tables, constraints, and relationships and also operating under control of a processor, wherein the plurality of tables comprises a primary table and a foreign table, wherein each one of the primary table and the foreign table comprises at least one row, and wherein each row comprises a plurality of columns, the routines comprising:

[a] a routine to automatically construct a representation of data from a row of the primary table (primary-table row) by:

[1]  a routine to identify a foreign key (FK) value in an FK column in the primary-table row, wherein the FK column references the foreign table;

[2]  a routine to locate a row in the foreign table (foreign-table row) whose primary key (PK) value matches the identified FK value;

[3]  a routine to select a value from the foreign-table row other than the PK value based on at least one of the following attributes of the column in the foreign table that contains the selected value: column name; column datatype; at least one column constraint; or column position within the foreign table;

[4]  a routine to derive a description of the foreign-table row using the selected value; and

[5]  a routine to augment or supplant the FK value with the description in constructing the representation; and

[b]  a routine to display the constructed representation.

Like the other asserted claims, claim 5 of the '801 patent recites, in purely functional steps, a

process for automatically constructing an "enhanced" representation of the data in a database

row by [1] identifying a value in a primary table (a first location); [2] identifying the matching

value in a foreign table (a second location); [3]-[4] determining a description of the data in the

foreign table based on the standard attributes of the database, such as the column name or type;

[5]-[6] displaying the representation of data with the user-friendly description replacing or

supplementing the primary table value.  The specification describes the recited method in simple

terms: "[t]he UI [user interface] presentation resolves cross-table relationships so as to supplant

internal key fields from the primary table with corresponding descriptive fields derived from the

related tables."  '801 patent at Abstract; *see id.* at 8:31-36.  Like the other Asserted Patents, the

core of the '801 patent claims is the process of collecting and displaying relational database data

on a user interface.

## III.    LEGAL STANDARD

### A.    <u>A Claim for Relief Must Be Plausible</u>

A complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  "Facial plausibility" requires "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555.  Rather, it requires the plaintiff to allege facts that add up to "more

than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678; *see*

*Twombly*, 550 U.S. at 555.  Although the Court must accept Plaintiff's factual allegations as true

when ruling on a motion to dismiss under Fed. Civ. P. 12(b)(6), that tenet "is inapplicable to

legal conclusions [because] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

> **B.**   **To Be Enforceable, a Patent Must Qualify for Patent Eligibility Under § 101**

Patent eligibility under 35 U.S.C. § 101 is a threshold question of law that should be answered early "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Patent eligibility is routinely resolved at the pleading stage to prevent parties and courts from expending resources litigating ineligible patents. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion.").

Courts apply a two-step test to determine patent eligibility. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217–221 (2014). First, the Court must determine whether the claims at issue are "directed to" an abstract idea or other patent-ineligible concept. *Alice*, 573 U.S. at 217 (2014). This inquiry "calls upon [the Court] to look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257-58 (Fed. Cir. 2016). The "directed to" inquiry "depends on an accurate characterization of what the claims require and of what the patent asserts to be the claimed advance." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020). If the claim is directed to an abstract idea, the Court proceeds to step two and asks whether the claim elements recite an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217-18. This step-two analysis means an inventive concept cannot be

supplied by simply limiting an abstract idea "to a particular technological environment" or adding "well-understood, routine, conventional activities previously known to the industry." *Id.* at 222, 225.

## IV.    ARGUMENT

### A.    <u>The Asserted Patents Are Directed To Ineligible Subject Matter</u>

#### 1.    **The Claims of the '981 and '220 Patents are Directed to the Abstract Idea of Automating the Manual Process of Creating a Database User Interface.**

Plaintiff alleges that Zoho infringes claim 5 of the '981 patent and claim 14 of the '220 patent.  FAC ¶¶ 2, 59.  As discussed below in sections IV.A.5.a and b, these claims are representative of the remaining claims because they "are substantially similar and linked to the same abstract idea."  *Content Extraction*, 776 F.3d at 1348; *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1359-60 (Fed. Cir. 2017).

The proper step one inquiry requires identifying "the focus of the claimed advance over the prior art."  *TecSec*, 978 F.3d at 1292; *Affinity Labs v. DirecTV*, 838 F.3d at 1257.  Here, the patents and the FAC make the focus unmistakable: the claimed advance is automating what human programmers previously did by hand.  The specification states that "current tools" required programmers to manually "associat[e] individual user-interface elements with specific back-end storage locations" and could at best "automatically generate the code for a simple UI display which manipulates a single underlying (back-end) data table."  '981 patent at 2:53-64.  The FAC itself confirms this: "in the prior practice, the UI routines had to be written and adjusted by hand, on a per-table basis, to fully reflect the underlying database structure … The Asserted Patents represented a major advance in technology, by providing an automated process."  FAC ¶¶ 13-14.

Walking through the claim language confirms the point.  Each step of claim 5 of the '981 patent (and the parallel claim 14 of the '220 patent) corresponds to a step that a human programmer

would take when building a database UI:  Step (a) defines a set of display modes for CRUD operations—the same create, retrieve, update, and delete screens that programmers have always built.  Step (b) scans the database to determine its structure—precisely what a programmer does when studying a database schema before coding a UI.  Step (c) uses those representations to construct a client application providing displays and navigation—the end product any programmer would deliver.  The only difference between the claimed process and the prior art is that a computer, rather than a human, performs these steps.  That is the definition of automating a manual process.

The Federal Circuit has been clear that this type of computer automation does not weigh in favor of eligibility.  *See Bancorp Servs.,* L.L.C. *v. Sun Life Assur. Co.*, 687 F.3d 1266, 1278-79 (Fed. Cir. 2012) (finding claims abstract where "the [claimed] computer simply performs more efficiently what could otherwise be accomplished manually"); *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019), *cert. denied* 140 S. Ct. 907 (2020) ("[T]he need to perform tasks automatically is not a unique technical problem."); *OIP Techs., Inc. v. Amazon.com, Inc*., 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible").

Nor does any other aspect of the claims reflect that the claimed solution provides a technical improvement rather than simply automating a previously manual process.  Rather, as discussed below in connection with the *Alice* step two analysis, the claims of the '801 and '220 patents use purely generic computer components as a means for carrying out the claimed abstract information gathering-and-displaying process.  Moreover, neither the claims nor the specification ever suggest that any of the components used to carry out the abstract process are "improved from a technical perspective" or "operate differently than [they] otherwise could."  *ChargePoint,*

*Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019).  Thus, Claim 5 of the '981 patent and claim 14 of the '220 patent are directed to an unpatentable abstract idea under the first step of *Alice*.

 **2.**     **The Claims of the '981 and '220 Patents Add No Inventive Concept**

The limitations of the claims of the '981 and '220 patents, considered individually or in combination, lack an inventive concept that would transform them into a patentable invention under the second step of *Alice*.  The elements of the claims include only generic functional steps directed to the abstract idea (*e.g.*, scanning a database structure, generating user interface elements corresponding to aspects of that structure that permit known database operations) and generic computer elements (*e.g.*, "routines" executed by a "processor," a "user interface," and a "relational database").  Neither functional steps that are part of the abstract idea nor generic computer elements can provide an inventive concept.  *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept"); *Mortg. Grader v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) ("[T]he claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database.' These generic computer components do not satisfy the inventive concept requirement.").

Indeed, the specification of the Asserted Patents acknowledges that there is nothing inventive about the recited computer elements and function, describing them as "general[]" traits of modern databases.  In the section titled "Description of the Related Art," the '981 patent admits that conventional databases are "generally composed of a 'back-end' relational database management system (RDBMS)" and "a 'front-end' presentation layer or user interface, which mediates the end-users' work with the back-end data."  '981 patent at 2:29-40; *see id.* at 26:29-

9

52.  In the same section, the patent characterizes the recited functions as well-known in the prior art, stating that "[c]urrent tools for easing the development burden" include those that "associat[e] individual user-interface elements with specific back-end storage locations" or "automatically generate the code for a simple UI display which manipulates a single underlying (back-end) data table." *Id.* at 2:53-64.  The specification further concedes that user interface functions enabled by the claims are "conventional database activities" that can be implemented in a "conventional client-server or native-GUI system."  *Id.* at 3:19-25, 26:29-34.

### 3.    The Claims of the '801 Patent Are Directed to the Abstract Idea of Gathering Information for Display to a User

Plaintiff alleges that Zoho infringes at least claim 5 of the '801 patent.  FAC ¶ 20.  As discussed below, *infra* IV.A.5.c, claim 5 is representative of the remaining claims because they "are substantially similar and linked to the same abstract idea."  *Content Extraction*, 776 F.3d at 1348; *Cleveland Clinic Found.*, 859 F.3d at 1359-60 (Fed. Cir. 2017).

Applying the proper "directed to" analysis, the focus of the claimed advance in the '801 patent is replacing cryptic foreign key values with human-readable descriptions—a presentation improvement, not a technological one.  Claim 5 recites, step by step, a functional routine for constructing a data representation [a] by: identifying a foreign key value [1]; locating the matching row in a foreign table [2]; selecting a descriptive value based on column attributes like name, datatype, constraints, or position [3]; deriving a description using that descriptive value [4]; and substituting it for the foreign key [5]; then displaying the result [b].  Each of these steps corresponds to what a human analyst would do when preparing a report from a relational database—look up a code in a reference table, find a meaningful description, and substitute it.  The only difference is that a computer performs these steps.

In Plaintiff's words, the claims of the '801 patent are directed to "generating a UI that . . . augment[s] or supplant[s] (and then display[s]) the referenced foreign key value in a table" with a description from elsewhere in that table, thus creating an "improved representation of inter-table relationships." FAC at ¶¶ 50-51. Notably, Plaintiff never alleges any improvement to computer technology. Rather, Plaintiff describes the claims only as an improvement in the representation of database data in a user interface, taking advantage of known ways of using database metadata, i.e. "the fact that descriptive material may be found in nearby columns having, e.g., a 'character' or 'text' datatype," along with "knowledge of how developers often structure such tables." FAC ¶ 51.

This is similar to other well-known methods of handling tabular data that people have handled for decades, with or without computers. As an example, consider a report of departmental expenses prepared for an executive. When compiling the information for the report, the executive's team might prepare an initial chart itemizing expenses by department number (*e.g.,* 106)—the format the expenses are maintained in the expense database. But for the report, the executive's team prepares a more user-friendly chart replacing the department number with one of several options from a separate chart. The team uses one or more attributes of the data in the department chart (e.g., a column name of "Department Name" or the fact that one column is a number and the name is text) to select a value ("Accounting") from the chart. The team then substitutes this user-friendly value as a description for each department in the final report.

This information gathering process, which could easily be performed via pen and paper, falls squarely within the scope of the '801 patent. Plaintiff recognizes as much, alleging that the claimed invention covers "replacing what would have been an unintelligible alphanumeric

"pointer" value (without intrinsic meaning) with a more human-friendly description derived from the second table." FAC ¶ 53 (p. 23); *see id.* at ¶ 54. Plaintiff describes the claims as only an improvement in the representation of data in a user interface, taking advantage of known ways of using databases, i.e. "the fact that descriptive material may be found in nearby columns having, e.g., a 'character' or 'text' datatype," along with "knowledge of how developers often structure such tables." FAC ¶ 51. That is, the purported improvement in the claims is taking well-known relational concepts and applying them to conventional database technology. Similar methods have been implemented with pen and paper since before the advent of computers. For instance, many information repositories have used a unique but not intelligible key value, e.g., banks have long used account numbers internally but routinely augmented or replaced those numbers with more user-friendly descriptions, like "Checking Account." And every lawyer or law student above a certain age went through the process of "Shepardizing" cases by finding subsequent authority by scanning a table of unique alphanumeric citations that each corresponded to a human-readable case name. Applying generic computer components to this concept does not remove the '801 patent from the realm of abstract ideas. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) ("Using a computer to accelerate an ineligible mental process does not make that process patent-eligible."); *Ultramercial Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible."). The solution claimed in the '801 patent merely cross-references information from two tables to locate descriptive information to display to a user. *See* '801 patent at Abstract; *id.* at 8:31- 36. This is the kind of human process that constitutes an abstract idea under step one of *Alice*.

12

The Federal Circuit has repeatedly held ineligible claims directed to simply gathering and displaying information. *See, e.g.*, *Broadband iTV*, 113 F.4th at 1363 (holding claims to automatically generating template-based program guides from hierarchical metadata ineligible, finding that "hierarchical structures, metadata, and templates were all seen as routine and conventional practices"); *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024) (finding ineligible claims related to creating user-friendly views of complex stored data and noting that "the steps of obtaining, manipulating, and displaying data, particularly when claimed at a high level of generality, are abstract concepts"); *Data Scape Ltd. v. Western Digit. Techs., Inc.*, 816 F. App'x 461, 2020 WL 3564683, at *2 (Fed. Cir. July 1, 2020) (finding ineligible claims related to "selective data storage, transfer, and processing"); *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 2020 WL 3564691, at *3 (Fed. Cir. July 1, 2020) (finding ineligible claims related to "collecting, analyzing, and displaying data"); *W. View Res., LLC v. Audi AG*, 685 F. App'x 923 (Fed. Cir. 2017) (finding ineligible claims related to "receiving or collecting data queries, analyzing the data query," retrieving and generating a response, and "generating a visual or audio response to the initial data query").

For example, in *Electric Power Group, LLC v. Alstom S.A.*, the Federal Circuit considered claims directed to "systems and methods for performing real-time performance monitoring of an electric power grid." 830 F.3d 1350, 1351 (Fed. Cir. 2016). The method claimed in that case called for receiving data from various sources, detecting and analyzing events from the data, displaying the results of that analysis, updating the results in real time, and deriving a reliability indicator based on those measurements and other metrics. *Id.* at 1351-52. The Federal Circuit held that the claims were directed to a "familiar class" of patent-ineligible concepts—"the combination of th[e] abstract-idea processes … of gathering and analyzing

13

information of a specified content, then displaying the results." *Id.* at 1353-54.  Claim 5 of the

'801 patent is analogous; it recites identifying a foreign key ("receiving data" in *Electric Power*),

locating corresponding content and selecting a value ("detecting and analyzing events"), and

deriving and displaying a description ("displaying the event analysis results").  Claim 5 is thus

similarly abstract as the claims at issue in *Electric Power*.  *See also Intell. Ventures I LLC v.*

*Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (holding claims which recited

creating a "dynamic document" using content from multiple electronic records ineligible under §

101).

 The specification and Plaintiff's allegations confirm that the claimed invention of the

'801 patent is directed not to a technological improvement but to automating a function that was

known to be completed manually.  '801 patent at 5:65-7:34 (describing the problem in the prior

art as requiring "hand coding" by programmers); *see also* FAC ¶¶ 13-14.  Nor does any other

aspect of the claims reflect that the claimed solution provides a technical improvement rather

than simply automating a previously manual process.  *ChargePoint*, 920 F.3d at 768.  Thus,

Claim 5 of the '801 patent is directed to an unpatentable abstract idea under the first step of

*Alice*.

 Cases such as *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir.

2016), do not require otherwise.  In *McRO*, the Federal Circuit found claims patent-eligible where

they recited specific rules for automating a lip-sync animation that used mathematical relationships

between phoneme sequences and morph-weight sets—rules that were qualitatively *different* from

how human animators worked.  837 F.3d at 1314-15.  The "rules" in the '801 patent for selecting

descriptive text—look at column names, datatypes, constraints, and position—are *the same*

*heuristics* a human developer would use when building a database UI.  The specification confirms

as much, describing these as standard characteristics of relational databases. '981 patent at 2:29-52. *McRO* relied on the fact that the automated rules differed from the manual, human, process; here, the rules are indistinguishable from it.

In contrast, the Federal Circuit's recent decision in *Broadband iTV* is analogous. There, claims directed to "automatically generat[ing] template-based program guides" from hierarchical metadata were held abstract because they recited the familiar process of organizing and displaying information. 113 F.4th at 1363-65. The court rejected the argument that generating interfaces from structured metadata was a specific technological solution, holding instead that "hierarchical structures, metadata, and templates were all seen as routine and conventional practices." *Id.* at 1365. The same reasoning applies here: generating database UI elements from database schema metadata using standardized display components is a routine use of well-known metadata, a practice like that found ineligible in *Broadband iTV*.

### 4.    The '801 Patent Lacks an Inventive Concept

The '801 patent claim limitations, considered individually or in combination, lack an inventive concept that would transform them into a patentable invention under the second step of *Alice*. The elements of claim 5 include only generic functional steps directed to the abstract idea (*e.g.*, identifying a value in a primary table, locating a row in a foreign table to match the identified value, and displaying a representation of a value in the primary table) and generic computer elements (*e.g.*, "routines" executed by a "processor," a "user interface," and a "relational database"). Neither functional steps that are part of an abstract idea nor generic computer elements can provide an inventive concept. *See BSG Tech*, 899 F.3d at 1290; *Mortg. Grader*, 811 F.3d at 1324-25.

As discussed above, the specification acknowledges that there is nothing inventive about the recited computer elements and "general[]" traits of modern databases. *See* '801 patent at

5:65-6:67; *see id.* at 31:4-28.  These functions were well-known in the prior art, and the only purported novelty is the automation of the process.  *See id.* at 7:14-26, 7:48-54, 31:4-9.  And the recited "foreign key (FK) value" and "primary key (PK) value" relied upon by the claims operate entirely as expected—as cross-references between database tables.  *Id.* at 11:45-48 ("Foreign-key fields occurring within a table-that is, fields which contain 'keys' that uniquely identify cross-referenced records from secondary (a.k.a. 'foreign', or 'referenced') tables…").  Again, this is congruent with the patent's focus on automating a well-known process previously performed by hand.

Nor is there anything inventive about "using a processor to derive a description of the foreign-table row using the selected value."  *Id.* at cl. 5.  The specification confirms as much, indicating that fields in the primary table are replaced "with corresponding descriptive fields derived from the related tables."  *Id.* at 8:31-36.  The specification goes on to describe that "'deduc[ing]' relational interdependencies between tables" amounts to no more than "compar[ing] field-names and associated attributes across tables, so as to identify columns which (for instance) are identically named."  *Id.* at 28:62-29:7; *see also id.* at 12:20-26.  In light of these facts, there is nothing inventive in claim 5 of the '801 patent (or the patent generally) to render it patent eligible.

### 5.    The Remaining Claims Do Not Alter This Analysis

Although Plaintiff does not allege that Zoho infringes any other claim that the three independent claims described above, as explained below, the other claims of the Asserted Patents do not materially alter the analysis.

### a.    The '981 Patent

The '981patent recites 6 claims, three of which are independent—claims 1, 4, and 5. Claims 1 and 4 are mirror method and computer readable medium claims.  Like claim 5, they are

for "automatically generating an end-user interface for working with the data within a relational database." Each recites steps of providing an "output stream for user display and input devices" (i.e., a user interface) that define a user interface for interacting with a database table in the same create, retrieve, update and delete display formats as described in claim 5. They also recite a step of scanning the database to determine its structure and using that structure to "construct a corresponding client application," that includes the same requirements as in claim 5. These claims "recite little more than the same abstract idea" as claim 5, rendering them ineligible. *Content Extraction*, 776 F.3d at 1348.

The dependent claims add little: claim 2 adds the requirement that the UI also display and enforce database constraints; claim 3 requires that "relational interdependencies are embodied in referential-integrity constraints within the underlying database," a "generally accepted data-modeling convention, '981 patent at 4:55-59; and claim 6 requires that the claimed computer instructions be are integrated with the database system ("an RDBMS also provided in machine-readable form"). *Id.* cl. 6.

### b.    The '220 Patent

The '220 patent recites 16 claims, of which claims 1, 11, and 14 are independent. The independent claims mirror one another, differing only in form (method, system, computer-readable medium). These are ineligible for the same reasons as claim 14. The dependent claims add the requirement that the client application not include table-specific code (claims 2, 12, 15) or database-specific code (claims 3, 13 and 16). Claims 4-7 require that the application not depend on a particular the data structure for the analyzed database, claims 8 and 9 require that each table be rendered the same and support the same functionality, and claim 10 requires that the client application preserve and enforce referential integrity, as with claim 2 of the '981

17

patent. Again, none of these added limitations change the abstract nature of the claims, nor do they rely on anything more than conventional database and computer technology.

### c.    The '801 Patent

The '801 patent recites 22 claims, only two of which are independent—claims 1 and 5. Claim 1 is a mirror method claim. *See* '801 patent, cls. 1 and 5.

The dependent claims also fail to include limitations beyond the abstract idea: dependent claims 2-4 and 6-8 recite additional instructions for deriving the description for display; claims 9-13 and 16-20 limit the value-selection step to particular attributes. Using different rules to determine what to display does not alter the eligibility analysis. *See Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) ("As a general rule, the collection, organization, and display of … information on a generic display device is abstract.").

### B.    The Court Should Dismiss Plaintiff's Claims with Prejudice

Although *Alice* step two may implicate fact issues in some cases, *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018), here there is no such factual dispute that would preclude resolution of patent eligibility. The specification itself establishes the conventionality of every claim element. Specifically:

- Database schemas and data dictionaries are described as a "generally accepted data-modeling convention." '981 patent at 4:55-59.

- CRUD operations (create, retrieve, update, delete) are characterized as "conventional database activities." *Id.* at 3:19-25.

- Prior art tools already "automatically generate the code for a simple UI display which manipulates a single underlying (back-end) data table." *Id.* at 2:53-62.

- The recited UI functions can be implemented in a "conventional client-server or native-GUI system." *Id.* at 26:29-34.

- Foreign keys and primary keys operate entirely as expected as cross-references between tables. '801 patent at 11:45-48.

Where, as here, the specification on its face establishes that each claim element is well-understood, routine, and conventional, there is no genuine factual dispute.  Mr. Kaufman's FAC alleges no facts that would create such a dispute; it alleges only that the patents were "a major advance in technology," FAC ¶ 14—a legal conclusion, not a factual allegation.  *See Cellspin Soft*, 927 F.3d at 1317 (holding that "any allegation about inventiveness, wholly divorced from the claims or the specification," cannot defeat a motion to dismiss) .

For the same reason, the Court should not permit Plaintiff to further amend his complaint. Because no amendment could change the abstract nature of the asserted claims, any amendment would be futile.  *See, e.g., Voip-Pal.com, Inc. v. Apple Inc.*, 375 F. Supp. 3d 1110, 1145 (N.D. Cal. 2019), *aff'd sub nom. Voip-Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020) ("[A]ttorney argument in the complaint cannot save the claims because the purported improvements have not been captured in the claim language.").

## V.    CONCLUSION

For these reasons, the Court should hold the claims of the Asserted Patents invalid for failure to claim patent-eligible subject matter under § 101 and dismiss Plaintiff's claims with prejudice for failure to state a claim under Rule 12(b)(6).

Dated: March 12, 2026

*/s/ Phillip J. Haack*
Ryan J. Marton (admitted *pro hac vice*)
Phillip J. Haack (CA 262060, admitted W.D. Tex.)
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
Telephone:  (415) 360-2515
Email:        ryan@martonribera.com
                  phaack@martonribera.com

Darryl J. Adams (Texas Bar No. 00796101)
SLAYDEN GRUBERT BEARD PLLC
401 Congress Ave., Ste. 1650
Austin, TX 78701
Tel: 512.402.3562
Email: dadams@sgbfirm.com

*Counsel for Defendant Zoho Technologies
Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing is being served on the

counsel of record via the CM/ECF system on March 12, 2026.


By:     <u>/s/ *Phillip J. Haack*</u>
             Phillip J. Haack