UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| MICHAEL PHILIP KAUFMAN,<br><br>                    Plaintiff,<br><br>        v.<br><br>ZOHO TECHNOLOGIES CORPORATION,<br><br>                    Defendant. | Civil Action No. 25-cv-01082-RP |

**PLAINTIFF'S OPPOSING BRIEF ON MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    TECHNOLOGY BACKGROUND ................................................................................................1

II.    MANUFACTURED PREMISES OF ZOHO'S BRIEF ................................................................4

    A.    Premise that the claims "recite no specific technological solution"............................................4

    B.    Premise that these are mere "do it with a computer" claims ......................................................5

    C.    "Purely functional" as a dismissive label ..................................................................................6

III.    THE CLAIMS ARE NOT DIRECTED TO ABSTRACT IDEAS...............................................6

    A.    Zoho's motion fails to properly describe what the claims are "directed to"...........................6

    B.    What the claims are properly regarded as directed to ..............................................................6

        1.    '981/'220 Patents ...............................................................................................................6

        2.    '801 Patent ........................................................................................................................8

    C.    The claimed techniques for achieving the identified advances are not abstract ideas .............9

    D.    Zoho's Step One authorities are readily distinguished ............................................................12

    E.    Zoho's other abstract idea arguments fail................................................................................15

        (a)    Zoho's Argument that Claim Steps are "Purely Functional"...........................................15

        (b)    Zoho's "Shepards Citations" analogy..............................................................................17

IV.    THE CLAIMS EMBODY INVENTIVE CONCEPTS...............................................................17

    A.    '981 and '220 Patents (at Step Two) .......................................................................................18

    B.    '801 Patent (at Step Two).........................................................................................................19

V.    ISSUES OF FACT PRECLUDE GRANT OF THE MOTION .................................................20

VI.    CONCLUSION ..........................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) ............................................................................4, 20

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
   838 F.3d 1266 (Fed. Cir. 2016) ............................................................................4, 14

*Affinity Labs of Tex., LLC v. DirecTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) ...................................................................................6

*Alice Corp. v. CLS Bank Int'l*,
   573 U.S. 208 (2014) ...................................................................................*passim*

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016) ....................................................................... 17, 19

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018) .................................................................................10

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can. (U.S.)*,
   687 F.3d 1266 (Fed. Cir. 2012) .................................................................................15

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) ....................................................................... 19, 20

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) .................................................................................20

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
   113 F.4th 1359 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1924, 221 L. Ed. 2d 664 (2025) ........... 13, 14

*CardioNet LLC v. InfoBionic, Inc.*,
   955 F.3d 1358 (Fed. Cir. 2020) ...................................................................................6

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019) ....................................................................... 15, 20

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F. 3d 759 (Fed. Cir. 2019) ...................................................................................5

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014) .................................................................................14

*Contour IP Holding LLC v. GoPro, Inc.*,
   113 F.4th 1373 (Fed. Cir. 2024) ...................................................................................6

*Coop. Ent., Inc. v. Kollective Tech., Inc.*,
   50 F.4th 127 (Fed. Cir. 2022) .................................................................................20

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018) .................................................................................10

*Data Scape Ltd. v. W. Digit. Corp.*,
   816 F. App'x 461 (Fed. Cir. 2020) .................................................................................14

*DDR Holdings, LLC v. Hotels.com, L.P.,*
   773 F.3d 1245 (Fed. Cir. 2014) .................................................................................5, 11

*Elec. Power Grp., LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016) ............................................................................. 12, 13

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016) ...........................................................................5, 7, 11

*Intell. Ventures I LLC v. Cap. One Fin. Corp.,*
   850 F.3d 1332 (Fed. Cir. 2017) ...................................................................................15

*Intell. Ventures I LLC v. Erie Indem. Co.,*
   850 F.3d 1315 (Fed. Cir. 2017) ...................................................................................15

*Koninklijke KPN N.V. v. Gemalto M2M GmbH,*
   942 F.3d 1143 (Fed. Cir. 2019) ...................................................................................12

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
   837 F.3d 1299 (Fed. Cir. 2016) ...........................................................................*passim*

*Mentone Sols. LLC v. Digi Int'l Inc.,*
   No. 2021-1202, 2021 WL 5291802 (Fed. Cir. Nov. 15, 2021) ...........................................10

*Mortg. Grader v. First Choice Loan Servs. Inc.,*
   811 F.3d 1314 (Fed. Cir. 2016) ...................................................................................15

*OIP Techs., Inc. v. Amazon.com, Inc.,*
   788 F.3d 1359 (Fed. Cir. 2015) ...................................................................................15

*PowerBlock Holdings, Inc. v. iFit, Inc.,*
   146 F.4th 1366 (Fed. Cir. 2025) ........................................................................... 5, 7, 16

*TecSec, Inc. v. Adobe Inc.,*
   978 F.3d 1278 (Fed. Cir. 2020) ........................................................................... 6, 7, 19

*Thales Visionix Inc. v. United States,*
   850 F.3d 1343 (Fed. Cir. 2017) ...................................................................................11

*Visible Connections, LLC v. Zoho Corp.,*
   No. 1:18-cv-859-RP, 2019 WL 2298704 (W.D. Tex. May 30, 2019)..............................4, 19

*Visual Memory LLC v. NVIDIA Corp.,*
   867 F.3d 1253 (Fed. Cir. 2017) ...................................................................................10

*W. View Res., LLC v. Audi AG,*
   685 F. App'x 923 (Fed. Cir. 2017) ...............................................................................15

**Statutes**

35 U.S.C. § 101.................................................................................................................*passim*

Kaufman's patents describe how a machine can, without human guidance, construct a working user interface (UI) for any arbitrarily complex relational database, based on extracting and transforming information within the low-level structure of the database itself, where the database structure can vary widely and is not known in advance, and therefore is not addressable by prefabricated solutions. The claims detail how to do this, by systematically extracting structural guides—such as metadata on tables, constraints, and inter-table relationships—from specialized locations within the database itself (*e.g.*, the database "schema" and foreign tables) and constructing the UI therefrom according to a generalized presentation paradigm comprising a core set of software components specifically fashioned to accommodate comprehensive management and navigation of any possible relational structure, without any need for domain knowledge or semantic context (unlike human programmers). As set forth in the claims and specifications (*see, e.g.*, '981 Pat., cl. 5; '801 Pat., cl. 5), this enables the automatic generation of navigationally enhanced user interfaces for any conceivable relational-database structures without human intervention, guidance, or design input, thus significantly improving computer functionality. These innovations integrate specific technical steps in a manner that confers patent-eligibility under the pertinent authorities as addressed herein.

## I.  TECHNOLOGY BACKGROUND

A *relational database* comprises a plurality of data layouts in tabular form ("tables") that describe (or "model") distinct types of items (aka "entities"). Each table comprises rows (aka "records" or "instances" of that entity-type) and columns (aka "fields" or "attributes" that describe each instance), as well as requirements ("constraints") for the contents of each column, and relations that may exist between the rows of different tables. Each row "relates" to its own table through a "primary key" (PK)—an ID that uniquely identifies that row within the table (and, thereby, within the entire database). For example, in a table of companies, each individual entity (Company) will have a unique ID, which is typically a value "intentionally devoid of intrinsic meaning." '981 Pat., 6:58-67.

Relationships among the data items are fundamental. An item within a given ("base" or "referencing") table may be related to (or "cross-reference") an item in another ("foreign") table when the base table includes a column that can only contain PKs from that foreign table. This foreign-table PK, when stored in the base-table column, is referred to as a "foreign key" (FK) for that base-table record. *Id.*, 6:33-44.

The '981 patent provides a sales-lead tracking database as a non-limiting, working example. This database comprises both a Company table and a People table (among others). *See, e.g.*, '981 Pat., Figs. 5D and 5E. People may be associated with the Company they work for because the People table includes a foreign-key (FK) column for Company. Setting the company FK field for a given person to the PK of a given company defines a "Cross-Reference" relationship from that person to that company. (The person's FK is then said to "point to" that company.) Conversely, the set of all People rows with the same company FK describes a "Master-Detail" relationship between that Company and the people who work for it. *See* '981 Pat., 6:34-45.

Table interconnection patterns may propagate throughout the database, resulting in an aggregate structure that can grow to arbitrary levels of size and/or complexity (*e.g.*, hundreds of tables, some with billions of entries, with thousands of cross-table interconnections).

Users need to perform four basic types of operations on database records—Create, Retrieve, Update, and Delete—which together are commonly referred to as "CRUD" operations. However, because professional relational database management systems (RDBMS) must maximize flexibility in the construction of context-specific database structures ("schemas"), and because best practices require that data is distributed ("normalized") across separate tables (by "entity", so that all attributes for a given entity can be tracked in exactly one row) which must then be reconstituted (denormalized) for end-user consumption, the RDMBS do not provide a user-friendly UI "out of the box" for end-user interactions. Instead, the creation of a usable CRUD UI has been relegated to a separate

application-development effort for each individual use-case.

Conventionally, these database-specific CRUD UIs would be implemented by human program-mers, both designing and coding the required screens, and providing the connectivity logic to "wire" their on-screen components to the corresponding data and functions within the underlying RDBMS. Because each database differed in its structure—and because the reconstitution of data for user in-teraction was potentially subject to context-sensitive interpretation—the programmers were required to hand-craft each new implementation (as well as any subsequent modifications required to accom-modate changes to the underlying schema). As such databases grow in complexity, such manual-cod-ing demands "become[] unwieldy." '981 Pat., 2:65-3:4.

The inventor here, Michael Kaufman, conceived of a solution whereby a comprehensive UI for any existing database, regardless of its size, complexity, or semantic context, could be generated au-tomatically, eliminating the tedious, error-prone, and time-consuming human work previously re-quired. Kaufman's solution was based on a fundamental insight: Though the databases the system would have to work with would vary widely, he knew that every RDBMS incorporated within it a "data dictionary" which encapsulated the structural organization (or "schema") of the database. He realized he could harness information that was already present, deep in the database, to solve his problem. By programmatically interrogating the schema and extracting its essentials into a represen-tation within machine memory, the system could construct therefrom corresponding table-manage-ment functionality. To arrive at a complete implementation that could iteratively reveal, manage, and navigate relationships across entities without any need for semantic awareness or human interpreta-tion, Kaufman further devised a generalized UI paradigm—including a common set of UI "con-trols" (hyperlinks, dropdowns, breadcrumbs, etc., *see* '981 Pat., 5:10-62)—that could be applied to the in-memory schema to support representation, navigation, and *enforcement* of these relationships throughout the table renderings. In this way, based only on the existing internal resources of the

target database, the system could present a fully-rendered CRUD UI that allows the user to navigate across tables and/or perform cross-table data management—without requiring *any* human programming.

Prior to Kaufman's invention, this was not possible. The Amended Complaint (D.I. 34) alleges (*e.g.*, at ¶¶ 13-14) how the claimed functionalities, with steps that differed from the human ones, represented major technological advances over existing practice, which allegations of advantages and inventive nature of the claims must be taken as true for purposes of this motion. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *Visible Connections, LLC v. Zoho Corp.*, No. 1:18-cv-859-RP, 2019 WL 2298704, at *5 (W.D. Tex. May 30, 2019).

## II.  MANUFACTURED PREMISES OF ZOHO'S BRIEF

### A.  Premise that the claims "recite no specific technological solution"

Any review of the asserted patents, including the 35 pages of detailed figures, and the 170 pages of complete and fully functional source code contained in the patent specification, *absolutely negates* Zoho's opening assertion that Kaufman's patents "do not provide a specific technological solution." D.I. 35 ("Br.") at 1. *See, e.g.*, '781 Pat., 9:40-52 (summarizing the functionality of the provided source code). The inherently technological nature of the solution that Kaufman provides is clear and unmistakable from the patent documents. Yet, by selective quotation, Zoho strips the technical details from Kaufman's implementation, hoping thereby to shortcut its task.

By contrast to *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) (cited at Br. 1) (streaming content generally, without reciting any mechanism), the patent claims here incorporate technical specifics to carry out a machine-performable implementation of their objects. They recite in concrete, machine-addressable steps how to generate a fully functional user interface for an arbitrary relational database without human coding. The '981 and '220 patents prescribe specific steps: scanning the database schema; creating machine representations of tables, constraints,

and relationships; and constructing a client application, based on specified rules and the types of cross-table relationships determined via schema interrogation, which enforces referential integrity across the tables and supports CRUD operations. '981 Pat., 4:63-9:7. The published disclosure itself incorporates the complete working source code for a reference implementation (*id.*, 4:25-30, 27:1-34:48, 347:1-376:32). This same code rendered the patent's actual illustrations, as explained at length in the written description (*id.*).

The '801 patent (which contains the same underlying written description and drawings) adds claims to machine-performable rules for deriving descriptive values from foreign tables that may exist in any number of formats, based on attributes such as column names, datatypes, and internal constraints. These are not aspirational results; they are detailed procedural steps that differ from human steps and enable a computer to perform what could previously be done only manually. Far from being abstract, the claimed methods leverage the internal structure of relational databases to achieve a technical improvement in computer functionality, aligning with leading authorities such as *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) and *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

### B. Premise that these are mere "do it with a computer" claims

Zoho treats the claims as bare directives to "automate" previously manual tasks. *See* Br. at 7–9. However, the present claims go not just to the *object* of automation, but detail *how* to do so. This differs markedly from, *e.g.*, Zoho's cited cases such as *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 770 (Fed. Cir. 2019) ("[T]he inventors here had the good idea to add networking capabilities to existing charging stations to facilitate various business interactions. But that is where they stopped."). By contrast, these claims also spell out *how* a machine can automate the process, with steps that differ from the manual ones as well. *See PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1372-73 (Fed. Cir. 2025) (claim, though broad, deemed "sufficiently focused" on specific improvements to

distinguish from "do it on a computer" patents).

### C.  "Purely functional" as a dismissive label

Characterizing claims at "an impermissibly high level of generality" (*see Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379-80 (Fed. Cir. 2024)) is what Zoho does when it uses "purely functional" as a rote categorization without specific support (*see* Br. at 1, 3, 5, 9, 10, and 15). These improper characterizations are part and parcel of the same approach by which Zoho would disregard the technical specifics of the claims (subsection A above) and the "how" of what the claims recite (subsection B above). It is a case of applying an abstraction filter in advance in order to argue that subject matter is "abstract."

## III. THE CLAIMS ARE NOT DIRECTED TO ABSTRACT IDEAS

### A.  Zoho's motion fails to properly describe what the claims are "directed to"

What the claims in question are "directed to" lies at the base of the "step one" analysis under *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). Zoho's motion purports to address "the focus of the claimed advance over the prior art." Br. at 6, 7 (citing *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016)). However, Zoho's characterizations of what the claims are directed to are highly generalized and divorced from what the claims actually require. Such failure is a frequent basis for denying a § 101 motion, or a reversal. *See, e.g., TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020) ("The accuracy of [step 1 'directed to'] characterizations is crucial."); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1370-71 (Fed. Cir. 2020) (reversing district court's assumption "that the claims are directed to automating known techniques … seems incongruous with the claimed subject matter").

### B.  What the claims are properly regarded as directed to

#### 1.  '981/'220 Patents

Zoho's position is simply that "the claims are directed to the abstract idea of automating the

manual process of creating a database user interface." Br. at 7. This is an over-abstraction. *See TecSec*, 978 F.3d at 1294 ("[T]hat characterization … is materially inaccurate. To arrive at it, Adobe had to disregard elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements."); *PowerBlock*, 146 F.4th at 1373 ("Courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") (cleaned up).Zoho's "human steps" argument is unsupported attorney argument that must be ignored by the Court in favor of well-pled allegations on a motion to dismiss. In particular, Zoho's characterizations (*see, e.g.*, Br. at 7-8) completely expunge the patents' advance over the prior art —that is, providing a series of specified operations that enable a machine to automatically perform UI generation, in a *general manner*, for *any arbitrary database* (*i.e.,* one whose structure will not be known in advance, and could be of any size or relational complexity), with no human intervention. They also fail to address the claims taken as a whole. To disregard the express claim elements is to proceed at "a high level of abstraction" that is "untethered from the language of the claims" and "overgeneraliz[es] claims." *Enfish*, 822 F.3d at 1337.

The '981 and '220 patent claims recite an automated solution that differs radically from the manual process of creating a database user interface. They effectively describe a highlyscalable "universal database UI" which conforms itself at run-time (on-the-fly) to any database structure,  applying an innovative UI paradigm to render referentially-aware CRUD capabilities for any given table and incorporate navigational elements for traversing relationships from table to table. Where a human developer begins by building a set of displays finely-tuned to a target workload, the patent claims sacrifice flexibility in screen design and screen/table mapping in favor of a unified and consistent table-level UI that directly corresponds to the underlying (and necessarily pre-existing) database schema. Where the human programmer aims to please a specific user-base, the patent claims aim to "scaffold" instantly available, continuously adjustable, and ultra-scalable CRUD access to the entirety of

any database.

### 2. '801 Patent

Zoho's statement of what the '801 claims are "directed to" is: "'generating a UI that … augment[s] or supplant[s] (and then display[s]) the referenced foreign key value in a table' with a description *from elsewhere* in that table, thus creating an 'improved representation of intertable relationships.'" Br. at 11 (emphasis added). This formulation recites the ultimate result, but fails to capture the claims' differentiating aspect, which lies in their directions as to how to achieve the specified end. Specifically, it misses that the claims also provide a defined and reproducible technical mechanism that a machine can use to determine specifically *where* to look within a foreign table of variable structure to find the enhanced description, as opposed to the vague "elsewhere" (*id.*) or "one of several options" (*id.* at 11) in Zoho's formulation.

While humans do sometimes go through a process of finding data from elsewhere in a database to enhance the representation of raw (numeric or "pointer") cross-references, the human works with one relationship at a time, on a table of a given structure, where this determination is performed on a one-off basis, and with semantic awareness. What Kaufman devised was a *generally applicable* approach so that a *machine* could usefully locate the enhancing text on its own—not just for one table within a particular database, but for *any* table (regardless of their differing structures) in *any* database that happens to be presented, using technical criteria such as constraints and datatypes—without having to rely on human tagging, contextual interpretation, or other interventions of any kind. Being able to do this in a generally workable yet algorithmic manner would immensely improve an automatically-generated UI that would otherwise be limited to displaying cryptic cross-references throughout, including within dropdowns ("picklists"), and would make entering or updating such cross-references impractical at best. Without the benefit of the claimed process, a machine-generated CRUD interface would be virtually unusable, dragging down Kaufman's entire automated-UI

approach. This is not envisioning a better "presentation" (Br. at 10)—it is, rather, describing a new automation technology that can provide it.

The '801 claims thus specify additional rule-based steps to select enhancement text within an arbitrary related (foreign) table, finding one or more appropriate source columns based on at least one of the following: column names (*e.g.*, if the column heading includes the word "NAME"), column datatypes (*e.g.*, character or string), their constraints (*e.g.*, UNIQUE), and their position within the table (*e.g.*, whether it is the first or left-most column, or is next to that table's PK column). *See* '801 Pat., 11:55-61. A human developer, being semantically aware, does not (and does not need to) work this way; they will instead review the table contents and instinctively select columns that "look like" suitable row labels. The types of rules claimed here, however, are essential for a corresponding machine process (which again, will not resemble the conventional human approach). Applying the set of rules specified in these claims significantly improves the quality of both FK-column and dropdown-selection displays throughout automated renditions of complex databases by consistently supplanting cryptic FK identifiers with more meaningful row descriptions. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016) (likewise, an automated rule-based approach to a process (lip-syncing of 3D animation), previously performed manually, found "not directed to an abstract idea").

The '801 claims may therefore be regarded as directed to: providing a defined set of rules that reliably enable a machine to find appropriate text for the enhanced representation of cross-table relationships within an arbitrary database whose structure is not known in advance. This goes considerably beyond a mere abstract idea.

**C. The claimed techniques for achieving the identified advances are not abstract ideas**

As discussed, the subject claims are "directed to" specific UI generation methods that automatically adapt to any arbitrary database. Such technological measures, fashioned to adapt to or to

overcome differences in the subject matter to be automated, are not mere abstract ideas. *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1256-57 (Fed. Cir. 2017) (citing claims "allow[ing] different types of processors to be installed with the [same] subject memory system without significantly compromising their individual performance"); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018) (claim upheld based on its uses of "specific and unique characteristics of [computer's] BIOS," comparable to Kaufman's use of database schema here); *Mentone Sols. LLC v. Digi Int'l Inc.*, No. 2021-1202, 2021 WL 5291802, at *2-4 (Fed. Cir. Nov. 15, 2021) (shifting timeslots for signaling "to allow configurations that would otherwise be impossible due to insufficient turnaround time"); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362-63 (Fed. Cir. 2018) (among other improvements, claim provided unconventionally for previewing app data in unlaunched state).

Significantly, the automated process claimed here *differs in its steps* from its manual counterpart. The manual process "require[d] by-hand coding at a very low level," or "at best" was done with tools that still only generated code to "manipulate[] a single … table" at a time ('981 Pat., 2:53-62), and it had to be done in advance for every table. By contrast, the claims provide a generalized solution that is automated for any table. The claimed methods create an in-memory model that drives the entire UI generation. The claimed steps execute systematically from metadata, rather than from bespoke code manually crafted per table. They use the same basic source code (*see, e.g.*, '981 Pat., 27:1-61:42 (AddEditForm.jsp), 65:10-103:16 (BrowseForm.jsp)) for this generation, regardless of the table being addressed, and they do so on the fly, accessing relevant extracted schema data from the in-memory model for each individual screen display only as needed, responsive to the user's real-time table browsing, navigation, and other input activity. The above-cited code in the patent shows that the source modules work in a standard but self-adapting process to generate those display screens in a manner corresponding to the schema data, and then to insert likewise adaptable controls (as

claimed) to implement the cross-table relationships. This is *not* "do the same thing faster."

*McRO*, 837 F.3d at 1314-15, expressly relied on this difference between manual and automated processes to distinguish the same argument made here by Zoho: that of allegedly taking a manual process and merely doing the same thing with a computer. *See also Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1348-49 (Fed. Cir. 2017) ("unconventional choice" reflected in the claims, to separate motion sensors on tracked object and moving platform, provided technical benefit of being able "to more accurately calculate the position and orientation of an object" and therefore did not constitute an abstract idea).

*Enfish* reflects where step one may be satisfied by an improved software-based approach to a problem. In *Enfish*, the court held that claims directed to a self-referential table (where schema metadata is used as actual table data, to enable what was previously stored in several tables to be fully represented in one) were patent-eligible because they expanded database capability in a manner not previously available, even though they used generic hardware. 822 F.3d at 1336. Just as *Enfish* improved database operation by using schema to create a universal table structure, thus eliminating the need to manage multiple tables, Kaufman's claims improve computer functionality by using schema metadata as data to create a universal UI—thus eliminating manual coding.

In *DDR*, the court upheld claims that solved a problem "necessarily rooted in computer technology" by altering the conventional behavior triggered by a hyperlink click. 773 F.3d at 1257. Instead of sending the user to the linked site, the claimed system generated a hybrid page that combined content from the linked site with the "look and feel" of the host site. *Id.* at 1248-50. This was not a standard use of the Internet; it was a specific technical solution that selectively merged content across web sites, much as Kaufman's '801 claims, contrary to the default "normalization" (table separation), selectively merge content across database records. *Id.* at 1258-59.

There is no principled distinction between compositing two web pages in *DDR,* and replacing a

cryptic FK in one table with a human-intelligible descriptor from an off-screen table in the '801 patent. Both approaches override the system's default behavior to achieve a technical result that improves usability. Likewise, *McRO* is highly analogous on the '801 patent, as it similarly involved a rule-based approach to automating a process previously performed manually—in that case, determining morph-weights for facial feature animation based on analysis and timing of speech phoneme sequences. *McRO*, 837 F.3d at 1306. Also relevant is *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143 (Fed. Cir. 2019), where the claims concerned devices for data transmission that would regularly permute the bits in a check-data generation algorithm, as specified in the claim, to resolve an error that, under a fixed generation algorithm, would have systematically evaded detection. The claims passed review at step one because, like the claims here, they (1) specifically recited how the data is permuted (*i.e.*, modified for different data blocks), and (2) they provided a technical advantage (in that case, by catching previously undetectable systematic errors). *Id.* at 1153.

## D.  Zoho's Step One authorities are readily distinguished

Zoho relies extensively on *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), but this reliance is misplaced. The *Electric Power* decision itself limited its holding to claims that "do not go beyond requiring the collection, analysis, and display of available information in a particular field, [which] stat[e] those functions in general terms, *without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology*." 830 F.3d at 1351 (emphasis added). "[T]he advance [the claims] purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions." *Id.* at 1354.

By contrast, the claims here *do* limit the solution to specific technical means—schema interrogation, in-memory modeling, and rule-based UI generation—that enables a computer to generate a fully functional CRUD application without human coding. This is not merely "displaying" data; it is

a machine-implementable process that launches a new form of machine activity. *See McRO*, 837 F.3d at 1315 ("automation goes beyond merely organizing existing information into a new form ….claimed process uses a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results") (cleaned up).

Likewise, the '801 patent does not merely "update" a display. It formalizes a series of strategies and criteria by which a machine-directed process should prefer non-PK foreign-key columns in sourcing text to enhance the display automatically, thereby transforming what was previously an *ad hoc* human judgment into a reproducible process that is applicable across arbitrary schemas. Nothing in *Electric Power* addresses this type of technical solution.

*McRO*, which involved specific rules to automate speech animation (vs. specific rules, here, to automate database UI generation) is remarkably similar to the instant case. Zoho's attempt to distinguish between automated mathematical rules and human animation methods only underscores the eligibility of the claims at issue here. Zoho merely points to certain types of data which would be consulted by either a human or a computer when building a database UI. But like the defendants in *McRO*, Zoho is unable to provide any evidence "that the process previously used by [human UI programmers] is the same as the process required by the claims" (837 F.3d at 1314)—a claim it doubles down on in this second iteration of its motion, with no more support than it had the first time around. *See* Br. at 7, 10 (reciting but disregarding steps which, though ultimately accomplishing functions that a human might, nevertheless do so in a way that bears no resemblance to the approach a human would take, such as using machine representations of extracted schema structures to configure application functionality on the fly and without the benefit of semantic comprehension).

Zoho also cites *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1924, 221 L. Ed. 2d 664 (2025), where the claims at issue are superficially similar, insofar as they relate to display generation. However, that is where the similarities end. Indeed, the *Broadband*

- 13 -

*iTV* decision itself explained that its claims were "not directed to an improved structure or function of a user interface." *Id.* at 1368. Rather, they were merely directed to "arranging content in a particular order," which the Federal Circuit found was "not a sufficient technological solution to a technical problem." *Id.* In contrast, these claims recite constructing an operable mechanism to fully control the contents of a database. They are directed to applying an inventive UI paradigm, and corresponding display functionalities, to dynamically implement an interactive user application for representing, navigating, and managing any possible relational scenario as may be discovered through metadata interrogation, and manipulating the data contained therein. This advances computer functionality by moving the work of conforming a CRUD UI to a particular database structure—both initially, and on a continuing basis as that structure evolves over time—entirely into the computer.

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014) concerned collecting data items, extracting fields that matched a pattern, and storing them. The claims here, however, only *start* at extracting the database schema and storing a representation of same. Unlike that case (and similar cases, such as *Data Scape Ltd. v. Western Digital Corp.*, 816 F. App'x 461 (Fed. Cir. 2020) cited at Br. 13), the actual focus of the present claims further comprises what to *do* with the extracted schema data, in a manner a machine can implement—including creating views of the data in specified "display modes," and creating and inserting into those display modes a set of standardized UI mechanisms for "for representing, navigating, and managing" cross-table relationships as defined in the schema. Indeed, the *reason* for extracting the schema data was not simply to look at it, but to use it (and again, with instructions on *how* to use it) for the actual goal of automated UI generation. The added dimension of *using* the extracted data in a specified technical manner goes far beyond *Content Extraction* (or anything that can be considered merely "abstract"). Unlike Zoho's citation of *Affinity Labs-Amazon,* 838 F.3d at 1269 (Br. at 1), the claims here "provid[e] limiting detail that confines the claim to a particular solution to an identified problem."

- 14 -

They disclose a "particular mechanism" (*id.*) for the result brought about. The further cases Zoho cites to this effect are of no avail. *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017), found claims for using XML tags to build an index to search a database were abstract because, unlike Kaufman's claims, "[t]he claims are not focused on *how* usage of the XML tags alters the database in a way that leads to an improvement in the technology of computer databases." (emphasis in original). In *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017), the claims did not recite "particular features to yield [the asserted] advantages" in handling incompatible XML documents, as they did not "indicate what steps are undertaken to overcome the stated incompatibility problems with XML documents to propagate [the claimed] modifications into the XML document." Finally, Zoho cites *West View Research, LLC v. Audi AG*, 685 F. App'x 923 (Fed. Cir. 2017) with a conclusory squib (Br. at 13), adding nothing to its argument.

Further cases Zoho cites for merely automating a manual process are likewise distinguishable. *E.g.*, *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (automated the same set of steps as human, only faster); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019) (merely substituting wireless for prior wired connection); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015) ("offer-based price optimization" was a "fundamental economic concept" of the type the Supreme Court had found to represent abstract ideas); *Mortg. Grader v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) (pure mental steps of credit grading and lender selection).

### E. Zoho's other abstract idea arguments fail

#### (a) Zoho's Argument that Claim Steps are "Purely Functional"

The "purely functional" characterization is to say that a claim only recites its operations in terms of their results, without providing or requiring any specific way of achieving them, and is thus inherently abstract. Such claims would cover *any way* of performing the specified function, rather than a

particular manner or process. As addressed above, however, Zoho gets to this characterization only through wholesale disregard of express claim limitations. While Zoho does argue the procedural limitations themselves (alleged "manual steps" etc., fully addressed herein, separately), "purely functional" is an outright mischaracterization. Given the substance of those limitations in the applicable technical domain, they simply cannot be written off out-of-hand, as Zoho would do, for being claimed in "purely functional terms."

Zoho now adds some additional language (*e.g.*, Br. at 7-8, 10) but still fails to address claim language as a whole. For example, the claims recite an operation to "provide an output stream," but one that "defin[es] a user interface paradigm comprising a set of modes for interacting with a given database table, said modes comprising create, retrieve, update and delete, and a corresponding display format for each mode"—which Kaufman identified as a minimum set of screens needed to provide a fully functional CRUD UI. They say to "scan the database," but go on further to spell out what to scan for ("the table structures, constraints and relationships of said data model"). They say to "use said representations [of the data model] to construct a corresponding client application," but again, this is coupled with a substantive description of what the application does: it provides "a connection to the database," "displays of the table contents of said database for each of said modes in accordance with the display formats of said paradigm," and "integrates into each said mode display processes for representing, navigating, and managing said relationships across tables." These recitals spell out in technical detail the functionality to be built into the generated application, sufficient for it to perform its intended task, which is to provide a robust CRUD application for the database in question. To call these prescriptions "purely functional" is to completely ignore the provided technical directions. *See PowerBlock,* 146 F.4th at 1371-73 (forcefully rejecting the district court's assessment that claim failed to provide "any particular system or method" for achieving its claimed function, where it specifically provided for adjusting weights by moving a selector to couple or decouple

weights from a lifting bar).

### (b)  *Zoho's "Shepards Citations" analogy*

Zoho analogizes these claims to Shepardizing a case citation, where Shepards provides a list of forward citations for the cited case reference. A human looks up each of the forward cites in another tabulation, in this case the referenced Reporter volume.

The problem with this analogy is that the "system" comprised of Shepard's Citations and the Reporter system has a *fixed schema*. The Shepards cites are always found in the same source, and always look the same; the reporters they cite are likewise in relatively fixed formats, where the case decisions are reproduced in sequence, and are always headed by a caption that contains the relevant additional information. A relational database, by contrast, can be organized in countless ways with varying table structures, orders, names, and relationships. The '801 patent claims deal with such variability, and overcome technical problems that the legal researcher does not face.

## IV. THE CLAIMS EMBODY INVENTIVE CONCEPTS

*Alice*'s "step two" can be confounding, especially in how it relates to step one. *See, e.g., Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016) ("Recent cases … suggest that there is considerable overlap between step one and step two … the two stages involve overlapping scrutiny of the content of the claims ... [and] there can be close questions about when the inquiry should proceed from the first stage to the second.") (cleaned up).

Per *Alice*, an "inventive concept" is something extra that transforms a "claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217, 221. It cannot be the abstract idea itself. *Id.* at 221-22. Nor can it be the concept of the same abstract idea simply applied in a routine and conventional manner. *Id.* at 223. In any case, the patents-in-suit easily pass step two, should there be any need to reach it.

**A.  '981 and '220 Patents (at Step Two)**

The patents themselves tell us what the prior human procedure was, again as noted above: to manually "synchronize" a "front-end" structure (the UI programming) with a corresponding "back-end" database system (containing a schema designed for a specific use-case), "requir[ing] by-hand coding at a very low level of functionality", or perhaps the use of basic "'form generator' or 'wizard' facilities to automatically generate the code for a simple UI display [to manipulate] a single [specific] underlying (back-end) data table," one table at a time, and without any relational awareness of or connection to the rest of the database. *See* '981 Pat., 2:45-64.

What the present claim language actually addresses is how to move beyond manual, table-specific software development and provide a *generally applicable technique* by which a machine can automatically perform UI generation on an entire "relational database … of any arbitrary size or complexity"—and not for just one selected target scenario, but for any given database.

This involves numerous distinct yet cumulative inventive concepts, over and beyond merely the opening directive to "create[e] a user interface for interacting with a database:"

1.  Extract an already embedded structure (the database schema) for use as a foundation for UI generation, *e.g.*, '981 Pat., cl. 5, 377:5-8.
2.  Limit generation to defined categories of views deemed necessary: four CRUD display modes, *e.g.*, '981 Pat., cl. 5, 377:58-378:4.
3.  Scaffold the extracted structure in memory to drive automated just-in-time display generation, *e.g.*, '981 Pat., cl. 5, 378:8-10.
4.  Present inter-table relationships through a set of controls, including links for navigation and dropdowns to constrain valid inputs and enforce referential integrity, *e.g.*, '981 Pat., cl. 5, 378:14-21.

Any one of these is an inventive concept that meets step two. In combination, the application of these concepts as claimed solves the problem, "necessarily rooted in computer technology," of how to generate a fully functional CRUD interface for any relational database without human coding. No prior art disclosed a general-purpose, machine-executable method for doing so.

Even if the Court were to conclude at step one that the claims are directed to an abstract idea,

the above features also supply the inventive concept at step two because in combination, they represent a novel, non-conventional arrangement of elements that operate together to achieve an improvement in computer functionality. In fact, this Court has held as much on a prior § 101 motion by Zoho itself. *See Visible Connections,* 2019 WL 2298704, at *5 (upholding the challenged claims at step two, criticizing Zoho's oversimplification of the claims in that prior case: "*Zoho's characterizations of the claims at issue elide their allegedly inventive aspects*" (emphasis added)); *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) (where the inventive step of moving content filtering to a remote server, in combination with the capability to identify users from TCP/IP protocols and using specific per-user filtering rules, reduced dependence on prior inflexible local filtering schemes); *see also Amdocs*, 841 F.3d at 1300-01 (holding claims patent-eligible at step two because they recited a non-conventional distributed architecture that processed network accounting data close to its source in order to reduce congestion, thereby improving system scalability); *TecSec*, 978 F.3d at 1296. Likewise, the claims here feature an inventive combination that includes harvesting existing metadata, generating a defined set of displays based on that metadata, and devising a small set of controls insertable therein that generally work to implement cross-table processes, which together provide the power to automatically fit a fully functioning CRUD UI to an arbitrarily structured database.

### B. '801 Patent (at Step Two)

With regard to the '801 claims, Kaufman devised a set of rules for identifying pertinent enhancement data which, in combination, proved effective against arbitrary database structures encountered in practice, conveying a massive benefit to users as compared with simply utilizing raw FK values themselves throughout the UI.

It was inventive for Kaufman to recognize and apply the insight that, even within an arbitrary database layout, strong guidance on which columns of a related foreign table to look to for

descriptive text may exist in: the name(s) the schema designer chose to give to the foreign-table columns; the specified datatypes for the columns; the existence of column constraints (such as UNIQUE), and/or the order of appearance of columns within the table definition. Even if this approach provided enhancement in only a majority of instances, it would add great value to the overall solution. *See, e.g.*, *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127 (Fed. Cir. 2022) (traceroute segmentation of content to improve speed of P2P distribution plausibly alleged as inventive); *BASCOM*, 827 F.3d at 1349-50 (combination of allegedly "conventional pieces" in "non-generic arrangement" that enabled the elements to achieve an additional benefit held as inventive for step two).

## V.  ISSUES OF FACT PRECLUDE GRANT OF THE MOTION

Whether schema interrogation and generalized UI-control generation were "well-understood, routine, and conventional" is a factual question. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-70 (Fed. Cir. 2018). Zoho cites various discussions of the prior art in the specifications and jumps to the conclusion that the technological solution offered by the claims at issue must also be conventional (Br. at 18). Not so. The record does not establish conventionality; to the contrary, the patents describe these steps as a departure from prior art. The complaint plausibly alleges technical claim features that provide a technological benefit, and inventive techniques to implement them. Dismissal under Rule 12(b)(6) is therefore improper. *See also Coop. Ent.*, 50 F.4th at 133; *Cellspin Soft*, 927 F.3d at 1316-17 (complaint sufficiently raised factual issue that claimed combination was not routine, nor conventional); *Aatrix Software*, 882 F.3d at 1128 (factual disputes on improvement bar dismissal).

## VI. CONCLUSION

These patent claims provide substantial technological advantages and recite how these benefits are achieved with specified technical steps. The claims' technological approach—which automate processes that could not previously be automated—do not constitute abstract ideas. Accordingly, the Court should deny Zoho's motion at step one of *Alice* and, if not, at the very least at step two.

Date:  March 26, 2026

Respectfully submitted,

*/s/ Ronald Abramson*
Ronald Abramson (*pro hac vice*)
New York Bar No. 1457126
ron.abramson@listonabramson.com
David G. Liston (*pro hac vice*)
New York Bar No. 2642049
david.liston@listonabramson.com
Ari J. Jaffess (*pro hac vice*)
New York Bar No. 4621397
ari.jaffess@listonabramson.com
Alex G. Patchen (*pro hac vice*)
New York Bar No. 4246021
alex.patchen@listonabramson.com
M. Michael Lewis (*pro hac vice*)
New York Bar No. 4467007
michael.lewis@listonabramson.com
Gina K. Kim
Texas Bar No. 24097937
gina.kim@listonabramson.com
**Liston Abramson LLP**
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
212-257-1630

Wasif H. Qureshi
Texas Bar No. 24048155
wqureshi@jw.com
**Jackson Walker LLP**
1401 McKinney, Suite 1900
Houston, Texas  77010
Telephone: (713) 752-4521

**COUNSEL FOR PLAINTIFF MICHAEL PHILIP KAUFMAN**

- 21 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing is being served on the counsel of record via the CM/ECF system on March 26, 2026.

Dated: March 26, 2026

By: */s/ Gina K. Kim*
Gina K. Kim