# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

MICHAEL PHILIP KAUFMAN,

       Plaintiff,

    v.

ZOHO TECHNOLOGIES CORPORATION,

       Defendant.

Case No. 1:25-cv-001082-RP

## ZOHO'S REPLY IN SUPPORT OF MOTION TO DISMISS UNDER RULE 12(B)(6) FOR FAILURE TO ASSERT A PATENTABLE CLAIM

Plaintiff's opposition brief cannot escape the fundamental problem with the Asserted Patents: the claims recite the abstract idea of automatically generating database user interfaces using functional, results-oriented language, without claiming any specific technological means of doing so.  Despite Plaintiff's attempt to recast the claims as technological improvements, they merely recite results-oriented functional language that could be implemented in countless ways using routine computer components.

Plaintiff criticizes Zoho for "doubl[ing] down" on its arguments "in this second iteration of its motion," but nothing has changed.  Plaintiff's Amended Complaint recites nothing new that would change the outcome at the motion to dismiss stage, and the deficiency inheres in the claims themselves.  Plaintiff's core strategy is to conflate the length of the specification with the scope of the claims.  But the § 101 inquiry is a claim-based inquiry that does not rely on the complexity of the specification.  The opposition's reliance on *Enfish*, *DDR Holdings*, and *McRO* is misplaced—each is distinguishable, and recent precedent reinforces that claims like Kaufman's are ineligible.

I.    **ARGUMENT**

A.    <u>**Plaintiff's Specification-Based Arguments Do Not Save the Claims**</u>

Plaintiff argues that 170 pages of source code and 35 pages of figures "absolutely negate" the contention that the patents provide no specific technological solution.  (Opp. at 4.)  This confuses the written description with the claims.  The § 101 inquiry concerns what the *claims* recite.  A specification might contain extensive implementation detail while the claims remain functionally drafted and fail to incorporate any technological innovation.  *See GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1065 (Fed. Cir. 2026) ("only features that are claimed, not unclaimed details that appear in the specification, can supply something beyond . . . an abstract idea.").  The Federal Circuit's recent decision in *Trustees of Columbia University v. Gen Digital*

*Inc.*, No. 2024-1243, 2026 WL 679620, at *5 (Fed. Cir. Mar. 11, 2026), is instructive.  There, the court reversed the district court's denial of a § 101 motion, holding that "supposed improvements are not what the claims are directed to, i.e., the supposed improvements are not required by the language of the asserted claims at all." *Id.*  The specification in *Columbia* described concrete improvements to virus scanning, but the claims recited only abstract data comparison, a similar gap as that between Mr. Kaufman's detailed Java specification and his functionally drafted claims. *Id.* at *7.

Plaintiff's attempt to distinguish *Broadband iTV* also fails.  Plaintiff contends that the claims in that case were merely directed to "arranging content in a particular order," whereas Kaufman's claims "recite constructing an operable mechanism to fully control the contents of a database." (Opp. at 14.).  But the *Broadband iTV* court held that claims organized around using metadata, even using templates and hierarchical structures, are abstract when they fail to recite "an improved structure or function of a user interface." *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1368 (Fed. Cir. 2024).  Kaufman's claims similarly organize and display a database interface based on schema metadata.  The alleged "improvement," that the UI is generated automatically, goes to the process of creating the UI, not the structure or function of the UI itself.  Nor does that automated process create an improved UI or do so in a novel way.

Likewise, the presence of source code in the specification cannot save claims that otherwise recite abstract concepts.  *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (recognizing that "the claim—as opposed to something purportedly described in the specification" must include "an inventive concept"); *American Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020).

2

**B.** **The Claims Are Directed to Abstract Ideas Under *Alice* Step One**

**1.** **The '981 and '220 Patents Are Directed to Automating Manual UI Creation**

At their core, the '981 and '220 claims recite: (a) examining a database structure, (b) extracting information about it, (c) building a representation of that structure, and (d) using that representation to generate a user interface with CRUD capabilities.  This is the process human programmers have always performed—examining schemas, understanding table relationships, and building UI screens—implemented on a generic computer.  Plaintiff's own complaint describes it accordingly: "in the prior practice, the UI routines had to be written and adjusted by hand, on a per-table basis, *to fully reflect the underlying database structure*."  FAC ¶ 13 (emphasis added).  The claimed advance over the prior art is "an automated process" for doing the same thing, scanning the database and "based on what was learned from that scan," constructing a UI that supports "all usual modes of interacting with the database."  FAC ¶ 14.

This type of automation does not weigh in favor of eligibility.  *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1278-79 (Fed. Cir. 2012) (finding claims abstract where "the [claimed] computer simply performs more efficiently what could otherwise be accomplished manually"); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015).

Plaintiff contends these are not the steps a human programmer would have used but never identifies any meaningful difference.  (Opp. at 5.)  Plaintiff argues that the claimed process creates "machine representations" in memory and operates "without semantic awareness."  But creating in-memory data structures is simply how all software works—it is the inherent nature of computer implementation, not a technological innovation.  The question under *Alice* is whether

3

the claims recite specific technical means.  They do not.  *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019).

Kaufman characterizes the claims as a "universal database UI" that "conforms itself at run-time (on-the-fly) to any database structure."  (Opp. at 7.)  Putting aside that this "on-the-fly" characterization does not appear in the patent or complaint, Kaufman's characterizations confirm the abstract nature of the claims. "Automatically perform UI generation" and "extracting data model details" are classic information collection and processing activities.  These are merely labels for conventional database operations.  The claimed advance of automating UI generation for "any arbitrary database" does not actually show an advance.  Nowhere has plaintiff pointed to a task that was not done in the prior art.  Instead, Plaintiff points to the automation of those tasks for arbitrary databases.

The Federal Circuit's decision in *Columbia University* further confirms that automation-driven efficiency gains do not confer eligibility.  There, the claims aggregated data from multiple computers to build a behavioral model for faster anomaly detection, a process the district court had found to be a concrete technological improvement.  The Federal Circuit disagreed, holding the claims abstract because they recited "abstract idea of comparing data against a model . . . to determine if it is anomalous." *Columbia University*, No. 2024-1243, 2026 WL 679620, at *7 (Fed. Cir. Mar. 11, 2026).  The same analysis applies here.  Kaufman's claims recite the general idea of reading a database schema and generating a corresponding user interface.  That this process is automated, or that it works across "any arbitrary database," describes the *scope* of the abstract idea, not a concrete technological means of achieving it.

*PowerBlock Holdings, Inc. v. iFit, Inc.*, is inapposite.  That case involved a "mechanical invention . . . 'a concrete thing, consisting of parts, or of certain devices and combination of

4

devices'"—a weight adjustment mechanism for a lifting bar—not software claims reciting functional information processing.  146 F.4th 1366, 1372 (Fed. Cir. 2025).

Finally, Plaintiff invokes *Visible Connections, LLC v. Zoho Corp.*, 2019 WL 2298704 (W.D. Tex. May 30, 2019), for the proposition that this Court previously upheld similar claims against another Zoho entity.  (Opp. at 4, 19.)  But that case involved different patents with different claims.  The prior ruling does not establish that *these* claims survive § 101.  Each patent must be evaluated on its own terms, and Zoho's present motion provides the granular, claim-specific analysis that the claims require.

### 2.    The '801 Patent Claims Abstract Data Gathering and Display

The '801 claims are directed to replacing foreign key values with human-readable descriptions from related tables—the abstract idea of improving data presentation by substituting identifiers with descriptive text.  Plaintiff's opposition acknowledges that "humans do sometimes go through a process of finding data from elsewhere in a database to enhance the representation" of cross-references.  (Opp. at 8.)  The '801 claims add "rules" for selecting which column of a foreign table to use as descriptive text (column names containing "NAME," string datatypes, UNIQUE constraints, positional criteria).  (Opp. at 9.).  But these rules merely formalize the same intuitive judgment a human developer would apply—they describe what criteria to use, not a specific technical mechanism for applying them.

Indeed, the specification refers to these as "generally accepted data-modeling conventions" available in extant database systems.  '981 Patent at 6:57-61.  The process of "determining where to look within a foreign table" and "locating enhancing text" describes abstract information gathering and processing.  The fact that this is done automatically across variable database structures does not add concreteness—it emphasizes the functional and abstract nature of the claims.  This falls within the well-established category of claims directed to

gathering and displaying information.  *See Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

###### C.      Plaintiff's Authorities Are Distinguishable

*Enfish* involved a fundamentally new *data structure*—a self-referential table that improved how a computer stores and retrieves data in memory.  822 F.3d 1327, 1336 (Fed. Cir. 2016).  Kaufman's patents claim no new data structure.  They claim a process for *reading existing* data structures (standard relational schemas) and generating UIs from them.  *Enfish*'s improvement was to database technology *itself*—eliminating the need for multiple tables.  Kaufman's claims operate *on top of* conventional database technology without changing it.  That is the difference between improving computer functionality and merely using it in its intended manner.

*DDR Holdings* concerned a problem "necessarily rooted in computer technology"—the specific problem of users being redirected away from a host website, which has no pre-Internet analog.  773 F.3d 1245, 1257 (Fed. Cir. 2014).  The problem Kaufman's patents address, the labor of building database UIs, is a problem of programming effort and cost, not a uniquely computer-rooted problem.

Plaintiff's reliance on *McRO* is also misplaced.  In *McRO*, the claims recited specific mathematical relationships between phoneme sequences and morph weight sets.  These "rules" were qualitatively different from how human animators worked.  837 F.3d 1299, 1313-14 (Fed. Cir. 2016).  By contrast, the "rules" in the '801 claims—look at column names, check datatypes, check constraints, check position—are the same heuristics a human developer would use.  They codify common sense, not a technical advance.  That humans also might have "semantic awareness" of the data does not change the fact that they could, and did, use the same schema

6

information to create the same kinds of user interfaces as claimed.  Unlike *McRO*, where the automated rules differed from the manual process, here the rules *are* the manual process, codified.  *See* 837 F.3d at 1314 (distinguishing claims where defendants could not provide any "evidence that the process previously used by animators is the same as the process required by the claims").

### D.    The Claims Lack Inventive Concepts Under Alice Step Two

#### 1.    The '981 and '220 Patents Lack Inventive Concepts

Plaintiff identifies four "inventive concepts" at *Alice* Step Two: 1) extract embedded structure (database schema) for UI generation, 2) limit generation to the four standard CRUD display modes, 3) "[s]caffold the extracted structure in memory to drive automated just-in-time display generation"[1], and 4) present inter-table relationships through a set of controls.  (Opp. at 18.)

But these are the same steps that define the abstract idea at Step One.  "[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept."  *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

Each element is individually conventional: (1) reading a database schema is routine; schema interrogation is what every RDBMS's data dictionary is for; (2) CRUD modes are the fundamental four operations defined by the relational model itself; (3) in-memory data modeling is standard in any application that processes structured data; (4) displaying relationships is a

---

[1] There is no apparent requirement in the claims for most of this allegedly claimed inventive step.  Mr. Kaufman cites claim 5 but points to the column and line numbers of claim 4.  *See* Opp. at 18, citing "'981 Pat., cl. 5, 378:8-10".  Regardless, neither claim recites any limitation requiring "scaffolding the extracted structure in memory" or "just-in-time" generation of a display.  The relevant limitations merely recite "using said representations to construct a corresponding client application" with the properties discussed elsewhere.

conventional data presentation and navigation controls (hyperlinks, dropdowns) are standard UI components.  The ordered combination of these steps—read schema, build model, generate screens—is the standard workflow for the human UI generation that the invention allegedly replaces.

Recent Federal Circuit authority confirms the conventionality of these components.  In *Rensselaer Polytechnic Institute v. Amazon.com, Inc.*, the court affirmed a finding of ineligibility for claims that processed natural language queries using a "metadata database."  Nos. 2024-1725, -1739, 2026 WL 506661, at *3-4 (Fed. Cir. Feb. 24, 2026).  The court held that the metadata database components were conventional and that the novelty of applying a known technique to a new field did not supply an inventive concept.  *Id.* (citing *Recentive Analytics v. Fox Corp.*, 117 F.4th 1374, 1380 (Fed. Cir. 2025)).  Kaufman's schema interrogation, data dictionaries, and in-memory representations of that data are the same type of conventional database components the Federal Circuit found insufficient in *Rensselaer*.

### 2.    The '801 Patent Lacks Inventive Concepts

The '801 patent claim limitations, considered individually or in combination, lack an inventive concept.  The elements of claim 5 include only generic functional steps directed to the abstract idea (identifying a value in a primary table, locating a row in a foreign table, and displaying a representation) and generic computer elements ("routines" executed by a "processor," a "user interface," and a "relational database").  *See BSG Tech*, 899 F.3d at 1290; *Mortg. Grader*, 811 F.3d at 1324-25.  The specification acknowledges these functions were well-known in the prior art, and the only purported novelty is the automation of the process.  *See* '801 Patent at 5:65-6:67.

Plaintiff contends that Mr. Kaufman "devised a set of rules for identifying pertinent enhancement data which...proved effective against arbitrary database structures."  (Opp. at 19.)

8

But using database metadata (column names, datatypes, constraints) to enhance display is conventional database programming. A "set of rules" for processing database information cannot constitute an inventive concept when the rules merely apply conventional database analysis techniques. *Ancora Technologies*, relied upon by Plaintiff, is distinguishable. The claims in *Ancora* survived Step Two because they repurposed a known computer component, the BIOS, for an unconventional function: storing license verification data in a memory area not designed for that purpose. 908 F.3d 1343, 1348-49 (Fed. Cir. 2018). The inventive concept lay in the unexpected use of an existing component. Kaufman's claims do the opposite. They use database schemas, data dictionaries, and metadata for precisely the purpose those components were designed to serve: describing database structure so that applications can interact with it. There is no unconventional repurposing.

### E.    No Factual Disputes Prevent Dismissal

Section 101 eligibility is a question of law that can be, and routinely is, resolved at the pleading stage. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Plaintiff invokes *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), for the proposition that conventionality is a factual question precluding dismissal. (Opp. at 20.) But *Berkheimer* does not create a blanket bar to § 101 dismissals on the pleadings. Where the patent's own specification and the claims themselves establish that the asserted advance consists of conventional, known techniques, no factual dispute exists. The Kaufman patents' specifications describe the prior art of manual UI creation and the known availability of schema interrogation. The claimed advance—automating that process—does not create a genuine factual dispute about conventionality. The FAC's conclusory allegations that the claimed steps represent "major technological advances" (FAC ¶¶ 13-14) are legal conclusions that need not be accepted as true on a motion to dismiss.

## II.    CONCLUSION

The length of Mr. Kaufman's specification and the fact that it includes source code examples does not alter the fundamental § 101 analysis.  The claims recite the abstract idea of automating database UI creation, describe their methods in functional terms, and rely on conventional computing techniques.  Specification detail cannot save functionally drafted claims. The Court should grant the motion to dismiss.


Dated: April 2, 2026                            */s/ Phillip J. Haack*
                                                Ryan J. Marton (*pro hac vice*)
                                                Phillip J. Haack (CA 262060, admitted W.D. Tex.)
                                                MARTON RIBERA SCHUMANN & CHANG LLP
                                                548 Market Street, Suite 36117
                                                San Francisco, CA 94104
                                                Telephone:  (415) 360-2515
                                                Email:      ryan@martonribera.com
                                                            phaack@martonribera.com

                                                Darryl J. Adams (Texas Bar No. 00796101)
                                                SLAYDEN GRUBERT BEARD PLLC
                                                401 Congress Ave., Ste. 1650
                                                Austin, TX 78701
                                                Tel: 512.402.3562
                                                Email: dadams@sgbfirm.com

                                                *Counsel for Defendant Zoho Technologies*
                                                *Corporation*

10

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing is being served on the counsel of record via the CM/ECF system on April 2, 2026.

By:  /s/ *Phillip J. Haack*
Phillip J. Haack