**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| MICHAEL PHILIP KAUFMAN,<br><br>Plaintiff,<br><br>v.<br><br>ZOHO TECHNOLOGIES CORPORATION,<br><br>Defendant. | Case No. 1:25-cv-001082-RP |

# DEFENDANT ZOHO TECHNOLOGIES CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 1

II. THE ASSERTED PATENTS .......... 2

A. The Patents' Shared Specification .......... 2

III. LEGAL STANDARD .......... 4

IV. DISPUTED TERMS .......... 5

A. The Preambles of the Independent Claims Are Limiting – '981, '220, and '801 patents .......... 5

B. "automatically" terms – '981, '220, and '801 patents .......... 8

C. "data model" – '981 and '220 patents .......... 14

D. "scan[ning] said database" / "scanning the database" – '981 and '220 patents .......... 16

E. "apply[ing] a body of rules to determine the table structures, constraints, and relationships of said data model" – '981 patent .......... 17

F. "construct[ing] . . . a corresponding client application" – '981 and '220 patents .......... 18

V. CONCLUSION .......... 19

**TABLE OF AUTHORITIES**


*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ....................12

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004) ....................9

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) ....................5, 6, 7

*Chicago Bd. Options Exch., Inc. v. Int'l Secs. Exch., LLC*,
677 F.3d 1361 (Fed. Cir. 2012) ....................9

*Choon's Design, LLC v. Idea Vill. Prod. Corp.*,
776 F. App'x 691 (Fed. Cir. 2019)....................1

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
868 F.2d 1251 (Fed. Cir. 1989) ....................6

*Every Penny Counts, Inc. v. Am. Express Co.*,
563 F.3d 1378 (Fed. Cir. 2009) ....................4

*Forest Labs., LLC v. Sigmapharm Labs., LLC*,
918 F.3d 928 (Fed. Cir. 2019) ....................9

*Harris Corp. v. Fed. Exp. Corp.*,
502 F. App'x 957 (Fed. Cir. 2013) ....................17

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) ....................4, 9

*Key Pharms. V. Hercon Labs. Corp.*,
161 F.3d 709 (Fed. Cir. 1998) ....................13

*Lexion Med., LLC v. Northgate Techs., Inc.*,
641 F.3d 1352 (Fed. Cir. 2011) ....................1

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005) ....................19

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008) ....................4

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................4

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) ....................5, 6, 8

*Poly-America, L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ....................4

*Schindler Elevator Corp. v. Otis Elevator Co.*,
593 F.3d 1275 (Fed. Cir. 2010) ....................13

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................5

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007) ....................15

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ....................10

## I. INTRODUCTION

In this litigation, Plaintiff ("Kaufman") asserts infringement of three related patents: U.S. Patent Nos. 7,885,981 (the "'981 Patent"); 10,025,801 (the "'801 Patent"); and 10,977,220 (the "'220 Patent"). The three patents share similar specifications and relate to relational computer databases and more specifically to a system and method "for automatically generating without any custom programming a user interface for the database." *See* '981 patent at 2:23–27. The patents' specification makes clear that the object of the invention is to "provide a complete and fully functional user interface (UI) for any arbitrarily complex or large database schema, without any custom software programming." *Id.* at 3:9–12. To this end, the specification discloses software that automatically and dynamically builds an end-user interface for a relational database by scanning the database to deduce information about the database, using the result of the scanning to construct a representation of the database schema, and rendering a user interface with reference to the representation, all without any manual input. *See e.g.*, *id.* at 11:23–49.

Zoho thus proposes constructions that capture and are consistent with the specification's disclosures regarding how the automatic generation of user interface is done, keeping the patent claims true to the stated nature of the purported invention. Kaufman, on the other hand, proposes constructions or advocates for "plain and ordinary" meaning constructions that disregard the explicit teachings in the patents. Kaufman cannot hide behind a "plain and ordinary" meaning construction to escape what the patents clearly describe as the purported invention. Claims are to be given their plain and ordinary meaning ***in view of the intrinsic evidence***. *See Choon's Design, LLC v. Idea Vill. Prod. Corp.*, 776 F. App'x 691, 696 (Fed. Cir. 2019) ("[T]he specification . . . dictates a term's 'plain and ordinary meaning.'"); *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) ("The customary meaning of a claim term is not determined in a

vacuum and should be harmonized, to the extent possible, with the intrinsic record[.]"). Zoho's proposed constructions are the only ones that do so.

Accordingly, this Court should adopt Zoho's proposed constructions for each of the disputed claim terms.

## II. THE ASSERTED PATENTS

### A. The Patents' Shared Specification

The three asserted patents are related—claiming priority to the same application—and thus share nearly identical specifications. As the specification states, the patents relate to "relational computer databases, and to systems and methods for automatically generating without any custom programming a user interface for the database[.]" '981 patent at 2:23–27. The specification explains that when using relational databases, users interact with the "front-end" through a user interface, allowing them to view, use, and manipulate data in a database stored on the server in the "back-end." *Id*. at 2:18–26.[1] The patents acknowledge that such front-end user interfaces existed, but they had to be manually created by a computer programmer for each database. *See, e.g.*, '981 patent at 2:23–3:4. This process was time-consuming and also required the software to be constantly updated whenever the database structure changed. *Id*.

The asserted patents purport to improve upon this time-consuming custom programming of user interfaces for each particular database by "automatically generating without any custom programming a user interface for the database[.]" *Id*. at 2:25–27. The specification explains that the automatic generation allows for the creation of "a complete and fully functional user interface (UI) for any arbitrarily complex or large database schema, without any custom software programming." *Id*. at 3:8–12. Specifically, the patents explain that the purported invention does

[1] Citations to the '981 patent apply equally to the '801 and '220 patents.

not need to have any prior knowledge of the size or complexity of the database because "once a back-end schema has been designed and constructed within the RDBMS, the system [of the purported invention] can automatically 'interrogate' this schema, and 'absorb' its structure into an internal cache." *Id*. at 3:13–16. This allows the disclosed method to provide a UI that is "natural, powerful, and easy-to-use" for "managing complex data relationships and interactions." *Id*. at 3:26–32.

The claims of the asserted patents are directed to the overall method and system of automatically generating a user interface for any arbitrarily large or complex relational database. In the '981 and '220 patent claims, the user interface "comprise[s] a set of modes for interacting with a given database table, said modes comprising create, retrieve, update and delete, and a corresponding display format for each mode." *Id*. at cl. 1 (377:14–19). To automatically generate this user interface, the '981 and '220 patent claims require scanning the database described by a data model, applying a set of rules to determine the "table structures, constraints, and relationships" of the database data model, creating and storing a representation of the data model, and using that stored representation to construct a client application that provides the user interface for connecting to the database. *See e.g. id*. at cl. 1 (377:20–27); '220 patent, cl. 1 (37:37–50). The client application "provides displays of the table contents of said database for each of said modes" and "integrates into each said mode display processes for representing, navigating, and managing said relationships across tables." '981 patent at cl. 1 (377:29–32).

The '801 patent claims relate to displaying an enhanced representation of a back-end database by leveraging conventional primary and foreign key relationships to generate a user-friendly representation of back-end database data. '801 patent at Abstract; cl. 1; 8:31–36. The '801 patent claims "automatically construct[ing] a representation of data from a row of the primary table

wherein all cross-table relationships are resolved so as to supplant internal key fields in the primary table with corresponding descriptive fields derived from the related tables." *Id*. at cl. 1. Rather than display a key value itself, which "is generally intentionally devoid of intrinsic meaning," a substitute value is used that is more readily understood by a user. *Id*. at 11:33–54.

## III. LEGAL STANDARD

The claim construction inquiry should always begin with the intrinsic record, including the claim language, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005). Extrinsic evidence may also be consulted, but must be considered "in the context of the intrinsic evidence." *Id*. at 1319. It is the Court's role to resolve disputes regarding the scope of the asserted claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). "[T]he court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury." *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

The specification "is the single best guide to the meaning of a disputed term," and where it reveals an intentional disclaimer, "the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1315–16. An inventor may disavow claim scope lacking a particular feature when the specification describes "the present invention" as having that feature. *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016); *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (repeated description of a component as part of "the present invention" throughout the specification limited the claims to that component). Likewise, a patentee's disparagement of an alternative approach in the specification, for example, by criticizing it as inferior, describing it as a problem to be solved, or characterizing the claimed invention as an improvement over it, can operate as a clear and unmistakable disavowal that narrows claim scope, even where the disparaged feature is not

expressly excluded by the claim language. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341–44 (Fed. Cir. 2001).

## IV. DISPUTED TERMS

### A. <u>The Preambles of the Independent Claims Are Limiting</u>

Zoho contends that the preambles of the asserted claims are limiting. The preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Thus, where the claim body relies on the preamble for antecedent basis or where the patentee clearly relied on the preamble during prosecution to distinguish the claimed invention from the prior art, the preamble is limiting. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Here, the preambles of the claims of the asserted patents all include recitations defining or delineating the system or method recited in the body of the claims. As such, each of the preambles are limiting.

Claim 1 of the '981 patent recites:

> A method for operating a server comprising a processor for automatically generating an end-user interface for working with the data within a relational database defined within a relational DBMS whose data is stored in machine-readable media and which is accessible to said server, wherein said relational database comprises a plurality of tables, constraints and relationships stored in said DBMS in accordance with a data model comprising said tables and their column-complements and datatypes, said constraints, and the relationships across said tables, and wherein said relational database may be of any arbitrary size or complexity, said method comprising: [(a)-(c)].

'981 patent at 377:2–13. This preamble—as well as the preambles of claims 4 and 5 and claims 1, 11, and 14 of the '220 patent—recite significant information that is relied on to give life and context to the remainder of the claims. First, the body of the claim depends on the preamble for antecedent basis throughout. For example, limitations (a) and (b) recite "said server," limitation (b) recites "said database," and "said data model," and limitation (c) recites "said database," "said

tables," and "relational interdependencies among data across said tables." *Id*. at cl. 1 (377:14–38). Each one of these terms is introduced for the first time in the preamble. Because the claim body cannot be understood or applied without reaching back into the preamble to identify what "said server," "said database," "said data model," and "said tables" refer to, the preamble and body work together to define the invention, which is itself sufficient to render the preamble limiting. *See Catalina Mktg.*, 289 F.3d at 808 ("[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope . . . .").

Second, the preamble recites that "said relational database may be of any arbitrary size or complexity," which is not a mere statement of intended use or field of application. Instead, it recites the essential problem the claimed method solves and is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes*, 182 F.3d at 1305. Unlike a preamble that simply labels a structurally complete invention for context, this limitation tracks the patent's title ("System and Method for Generating Automatic User Interface for Arbitrarily Complex or Large Databases") and is reinforced throughout the specification as the central "object of the invention." *See* '981 patent at 2:23–27, 3:1–4, 3:8–11, 3:20–22; *see also* Section IV.B, *infra*. Because the patentee has consistently and repeatedly identified being able to automatically handle databases of arbitrary size or complexity as the core object of the invention, the corresponding preamble language does not merely state a context or intended field of use and instead recites the essential character of the claimed invention. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) (preamble limiting where necessary to understand what the inventor actually invented).

Similarly, claim 1 of the '801 patent recites:

> A method for displaying, within a user interface operating under control of a processor, an enhanced representation of data from a relational database, the

> relational database comprising machine-readable data representing a plurality of tables, constraints, and relationships and also operating under control of a processor, wherein the plurality of tables comprises a primary table and a foreign table, wherein each one of the primary table and the foreign table comprises at least one row, and wherein each row comprises a plurality of columns, the method comprising: [(a)-(e)].

’801 patent at 36:20–29. As with claim 1 of the ’981 patent, the preambles of claims 1 and 5 of the ’801 patent are also limiting. The body cannot be read in isolation: “a row of the primary table,” “an FK column in the primary-table row,” and “the column in the foreign table” are all grammatically dependent on the preamble’s antecedent recitation that “the plurality of tables comprises a primary table and a foreign table,” that each “comprises at least one row,” and that “each row comprises a plurality of columns.” *Id*. at cl. 1. The claim body would be structurally meaningless without reaching back into the preamble to learn what a “primary table,” “foreign table,” “row,” and “column” even are. The preamble and body work together to define the invention, and the preamble limits the claim. *Catalina Mktg.*, 289 F.3d at 808.

The preamble also does not merely recite a field of use or intended application. The preamble’s stated object (displaying an “enhanced representation”) and the body’s final act (displaying “the constructed representation”) are two halves of the same limitation. This is confirmed throughout the specification, which consistently describes the invention’s core contribution as the automatic enhancement of raw foreign-key data into meaningful display values. *See* ’801 patent at Abstract, 8:31–36 (“[A]spects of the disclosure include” “techniques for automatically constructing a representation of any database table, wherein all cross-table relationships are resolved so as to supplant internal key fields in the primary table with corresponding descriptive fields derived from the related tables.”); 11:45–54 (foreign-key fields “are automatically ‘resolved’ for display purposes, so as to substitute a corresponding (and, presumably, more meaningful) ‘name’ field from the foreign table record in lieu of the key value

itself.”). This one-to-one correspondence confirms that the preamble’s “enhanced representation” is not mere context but a restatement of the specification’s characterization of the invention’s essential contribution, entitled to weight. *Pitney Bowes*, 182 F.3d at 1305 (preamble limiting where “necessary to give life, meaning, and vitality” to the claim).

Accordingly, the Court should find the preamble of the asserted claims to be limiting.

**B. “automatically” terms – ’981, ’220, and ’801 patents**

| Zoho’s Proposed Construction | Kaufman’s Proposed Construction |
|---|---|
| “automatically generating an [end-] user interface” - generating an end user interface without any custom software programming or any other user intervention by performing steps (a), (b), and (c) after an end user trigger (’981 patent, claims 1, 4, 5; ’220 patent, claims 1, 11, 14)<br><br>“automatically construct [a representation of data from a row of the primary table]” - construct without any custom software programming or any other user intervention (’801 patent, claims 1, 5) | No separate developer input is required |

Claims 1, 4, and 5 of the ’981 patent and claims 1, 11, and 14 of the ’220 patent recite “automatically generating an [end-] user interface” and claims 1 and 5 of the ’801 patent recite “automatically construct[ing] a representation of data.” The parties first dispute whether “automatically” should be construed to exclude “any custom software programming” (as Zoho proposes) or simply that “no developer input is required” (as proposed by Kaufman). While Kaufman proposes a vague definition untethered to the teachings in the specification, Zoho’s proposal is taken straight from the specification’s description of the invention.

The specification explicitly states that the purported “invention relates . . . to systems and methods for automatically generating ***without custom programming*** a user interface for the database[.] ’981 patent at 2:23-26. Where the patentee describes the “present invention,” that

"limits the scope of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019); *Honeywell*, 452 F.3d at 1318 ("the present invention" justified a limiting claim construction because "[t]he public is entitled to take the patentee at his word").

The specification goes on to explain that in the prior art, "the construction of front-end applications is generally undertaken using conventional third- or fourth-generation computer languages, which require by-hand coding at a very low level of functionality." '981 patent at 2:53–56. These methods were time consuming and expensive. *Id*. at 2:65–67 ("considerable work remains in building a complete, fully-functional UI for a back-end schema of any appreciable size or complexity"); 3:1–4 ("And as enterprise-scale data models continue to grow, the attendant explosion of manual-coding requirements quickly becomes unwieldy [sic]—and eventually, untenable."). The patents purport to solve these deficiencies by generating a user interface "automatically and dynamically ('on-the-fly')" and "without the need for custom programming." *Id*. at 11:23–29; 20:21–26; 2:21–27. Where statements in the specification are used to distinguish or disparage prior art, the claims should be construed to circumvent the criticized art. *See, e.g.*, *Chicago Bd. Options Exch., Inc. v. Int'l Secs. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012) (The specification's "repeated derogatory statements about the [prior art] reasonably may be viewed as a disavowal of that subject matter from the scope of the Patent's claims.").

Additionally, the "Summary of the Invention" reinforces that the invention is done without custom software programming: "It is an object of the invention to provide a complete and fully functional user interface (UI) for any arbitrarily complex or large database schema, without any custom software programming." '981 patent at 3:8–12. Statements in the "Summary of the Invention" routinely limit claim scope. *See, e.g.*, *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) (giving weight to statements in the Summary of the Invention because

"[s]tatements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term"); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1317–19 (Fed. Cir. 2014) (construing a claim term to require a feature in the Summary of the Invention as the feature was "repeatedly and consistently used to characterize the invention," thus "strongly suggest[ing] that it should be read as part of the claim"). Therefore, the specification is clear that the invention is one that does not use any custom software programming.

Zoho's proposed construction, unlike Kaufman's, also makes clear that the "automatically" applies to each of the steps recited in the claims for generating an end-user interface. The specification describes the purported invention as automatically generating an end-user interface for a database of any size or complexity by interrogating the database schema to absorb its structure into an internal cache to present an end-user interface, as recited in steps (a), (b), and (c) of the claims. '981 patent at 3:8–25. The specification explains that the purported invention does this automatic generation by first interrogating or scanning the database, applying a body of rules to interpret the data model of the database, building an in-memory representation of the data model, and then referencing the representation to render the user interface so that "appropriate components for depicting and traversing all cross table links are ***automatically*** included in the resulting display." *Id*. at 11:23-49 (emphasis added).

The applicant made clear during prosecution that the invention performs all the recited steps automatically, reiterating that the invention automatically analyzes the database structure and creates a user interface based on the analyzed structure. Specifically, during prosecution of application number 10/428,209, the applicant explained that "[t]he present invention addresses the problem of automatically generating an end-user interface for a given relational database

comprising a plurality of tables, constraints and relationships." *See* Ex. A, Response to Non-Final Office Action at 11 (Mar. 14, 2005). And during prosecution of the application leading to the '220 patent: "the present application teaches how an end-user application can automatically 'understand' a(n already) normalized database structure and apply that knowledge to present a comprehensible user interface for everyday access to the data therein." Ex. B, Response to Non-Final Office Action at 17–18 (Nov. 16, 2020). The applicant made similar arguments during prosecution of the application that led to the '801 patent:

> In effect, ***the present application teaches how an end-user program can automatically understand a(n already) normalized database structure and apply that knowledge to present a comprehensible user interface*** for everyday access to the data therein. ***The present application*** provides support for applying formal data structure rules and/or naming conventions to ***automatically determine default constructions*** for foreign-table row descriptors, derived from the contents of one or more foreign-row fields . . . in order to augment or supplant the actual foreign key (FK) field values within display representations of primary table data.

Ex. C, Response to Non-Final Office Action at 13 (Mar. 6, 2018) (emphasis added). Both the specification and prosecution history explicitly tie "the invention" to an automatic process.

Kaufman avoided institution of *Inter Partes* Reviews of the '981 patent by relying on the claims reciting "an automated solution for what was previously a tedious and error-prone manual process of database application creation." Ex. E, Patent Owner Preliminary Response, *Microsoft Corp. v. Kaufman*, IPR2017-01142, at 2 (P.T.A.B. July 6, 2017). Kaufman explained that "the claimed subject matter will automatically generate an end user application adapted for the database and equipped to perform all essential operations that the application needs to perform with the database[.]" *Id*. Kaufman also explained that point of the invention is "to find a way for ***a machine to implement*** all of the claimed UI functionality, including the cross-table aspects, correctly and reliably, in a manner that can accommodate any topology of table and column interrelationships that might exist in a relational database." Ex. F, Patent Owner Preliminary Response,

*SalesForce.com, Inc.. v. Kaufman*, IPR2021-00397, at 3 (P.T.A.B. Apr. 14, 2021) (emphasis added). Further, "[t]he object here, however, is to prescribe one general process that ***works automatically*** for any existing database, automatically scanning the database to learn its structure and using the scanned information to ***eliminate the repetitive human work*** in fully building the user interface with all requisite in-table and cross-table capabilities, for every table found in the database." *Id*. (emphasis added). Kaufman's focus on the automatic feature of the claims to argue that the claims were patentable in the two IPRs challenging the '981 patent amounts to disclaimer that limits the meaning of "automatically." *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) ("Extending the prosecution disclaimer doctrine to IPR proceedings will ensure that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers.").

Even Kaufmann himself agreed that "automatically" applies to the all the recited steps of the claims. In prior litigation against Microsoft involving these patents, *Kaufman v. Microsoft Corp.*, No. 1:16-cv-02880-AKH, at 10 (S.D.N.Y.), Kaufmann proposed a construction that makes "explicit that 'automatic' means that the specific claim steps recited all take place 'automatically' after being triggered by the user, without requiring further intervention by the user in order to complete the generation of the UI." Ex. D, Plaintiff's Opening Claim Construction Brief, *Kaufman v. Microsoft Corp.*, No. 1:16-cv-02880-AKH, at 10 (S.D.N.Y. Nov. 8, 2016). Thus, "automatically" should be construed as Zoho proposes to make clear that each of the recited steps of the claim are done "automatically."

Finally, the parties dispute whether "automatically" should be construed to make clear that the generation of the end-user interface is done without custom programming or "any other user intervention." Again, Kaufman himself agreed in the *Microsoft* litigation that the purported

invention precludes any other user intervention, telling the court that Microsoft's construction should be rejected because it allowed "some user intervention." *Id*. at 10–11. There is no reason this term should be construed differently in different cases. Kaufman should be held to his previous position.[2]

Even without Kaufman's previous arguments, the specification supports Zoho's construction. Steps (a), (b), and (c) relate to a particular way of generating an end-user interface. The user cannot interact with the generated user interface until steps (a), (b), and (c) are completed. As the specification describes, the "'front-end' presentation layer or user interface" mediates the "end-users' work with the back-end data." '981 patent at 2:39–40. A user could trigger the creation of the interface, but the patent does not contemplate any way for an end user to interact with the database until the interface exists. Therefore, the user cannot provide any additional user intervention until the user interface is automatically generated.

Kaufman's proposed construction is inconsistent with the specification and introduces unnecessary confusion. First, it is unclear what "developer input" means. "Developer input" is not used in the specification or the claims. Second, it opens the possibility that input from some other non-developer is permitted in direct contrast to the specification's teaching. Third, it is unclear what the "developer input" must be "separate from." Assuming Kaufman's construction is

---

[2] Kaufman later reached agreement with Microsoft on an agreed construction of "automatic" for trial, but Judge Hellerstein did not formally construe the term. Nevertheless, this Court should still consider the plaintiff's prior position as probative to the correct claim construction. *Key Pharms. V. Hercon Labs. Corp.*, 161 F.3d 709, 714–15 (Fed. Cir. 1998) ("We find highly questionable Hercon's assertion on appeal that the trial court erred when it adopted the very construction Hercon urged upon the court through the testimony of [its expert]."); *Schindler Elevator Corp. v. Otis Elevator Co*., 593 F.3d 1275, 1282 n.1 (Fed. Cir. 2010) (refusing patentee's request to modify a claim construction that it had previously urged the court to adopt).

intended to exclude developer input that is separate from the automatic generation process, there is no such hybrid process described in the specification.

The same reasoning applies to the "automatically construct" phrase in the ’801 patent, and both parties propose a similar construction for that phrase. The construction of the data representation is "automatic" because it is done without any custom software programming or any other user intervention, consistent with the primary innovation described in the shared specification of the ’981 and ’801 patents. ’801 patent at 5:59–64 ("The present disclosure relates to . . . systems and methods for automatically generating without any custom programming a user interface for the database.").[3] Additionally, foreign key columns are "automatically ‘resolved’ for display purposes." *Id.* at 11:45–54. No custom software programming or user intervention is employed because there is a uniform default paradigm "for determining this name field within the foreign table record." *Id.* at 11:55–62. A system administrator can adjust the rules applied by the paradigm, but this is simply setting a configuration value, rather than "custom software programming," and a system administrator is not a user. *Id.* at 12:8–13. The ’801 patent does not describe any instance where an end-user may intervene to alter how foreign key columns are displayed.

### C. <u>"data model" – ’981 and ’220 patents</u>

| Zoho’s Proposed Construction | Kaufman’s Proposed Construction |
| --- | --- |
| "organizational structure for the complement of tables, their columns and datatypes, constraints and relationships used by the backend (i.e. the RDBMS) for storing data" (’981 patent, claims 1, 4, 5; ’220 patent, claims 1, 11, 14) | Plain and ordinary meaning as set forth in the claim: "a data model comprising tables and their column-complements and datatypes, constraints, and the relationships across tables" |

[3] While the ’801 patent uses the phrase "the present disclosure" instead of "the present invention," cannot operate to change the described and claimed invention where the ’801 patent is a continuing application of the ’981 patent.

The parties dispute whether "data model" requires a "complement" of tables, columns and data types, constraints, and relationships (as proposed by Zoho) or merely requires any tables and their associated columns, datatypes, constraints, and relationships (as proposed by Kaufman). Zoho's construction is correct because it is consistent with the definition of "data model" in the specification.

The specification expressly defines "data model" as "the organizational structure to be used by the back-end for storing data (that is, the ***complement of tables*** which store data, and the relational links between these tables)." '981 patent at 2:41–45 (emphasis added). An express definition reflects a patentee's attempt to define a term. *See Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) ("The term 'controlled amount' is set off by quotation marks—often a strong indication that what follows is a definition.").

The claims recite that the relational database "comprises a plurality of tables, constraints and relationships ***stored in [the claimed relational] DBMS in accordance with a data model*** comprising said tables and their column-complements and datatypes, said constraints, and the relationships across tables." '981 patent, claims 1, 4, 5 (emphasis added). Therefore, the data model defines how data is stored in the relational database. The specification further describes how the system "generates . . . a fully functional UI system, based upon, and connected directly to, the underlying data model (as instantiated within an Oracle8i SQL RDBMS)." *Id.* at 3:36–41; *see id.* at 11:25–28. Therefore, the specification's definition of "data model" is consistent with how the data model is used in the purported invention.

Kaufman's construction ignores the explicit definition set forth in the specification. The data model cannot be any collection of tables, constraints, and relationships. Instead, it must be those that define how the data is stored in the claimed relational database.

### D. <u>"scan[ning] said database" / "scanning the database" – '981 and '220 patents</u>

| Zoho's Proposed Construction | Kaufman's Proposed Construction |
|---|---|
| "read[ing] through the data model of the RDBMS without using preexisting knowledge of its structure"<br>('981 patent, claims 1, 4, 5; '220 patent, claims 1, 11, 14) | Plain and ordinary meaning. |

As part of "automatically generating" the user interface, the independent claims of the '981 and '220 patents require "scan[ning] said/the database." The reason the database is scanned is to enable the generation of a user interface where the system has no previous knowledge of the structure of the database. *See, e.g.*, '981 patent at 3:13–18; 11:23–29. Zoho's construction reflects the context of the claim and the teachings in the specification while Kaufman's construction does not.

The claims make clear that the scan is accomplished without preexisting knowledge of the data model structure. For example, claim 1 of the '981 patent recites that the scan is "***to determine*** the table structure, constraints and relationships of said data model." (emphasis added). Claim 1 of the '220 patent is similar. Therefore, the characteristics of the data model are discovered by scanning and are not previously known. This makes sense because the point of the invention is to generate a user interface for a database that "may be of any arbitrary size or complexity." *Id.* at cl. 1; 3:8–12. A system that must work on any such database necessarily cannot be supplied in advance with knowledge of that database's structure. Instead, it must discover the structure for itself. And that is what the specification describes: "once a back-end schema has been designed and constructed within the RDBMS, the system can automatically 'interrogate' this schema, and 'absorb' its structure into an internal cache." *Id.* at 3:13–18; *see also id.* at 3:41–43. Zoho's proposed construction includes that requirement expressly. This "object of the invention" is not reflected by Kaufman's proposal to apply the plain and ordinary meaning of this term.

Additionally, when this phrase is read in the context of the claims, "scanning said database" must refer to scanning the data model of the database. For example, claim 1 of the '981 patent recites "causing said server to scan said [relational] database and apply a body of rules to determine the table structures, constraints and relationships of ***said data model***, and store representations thereof in machine-readable media accessible to said server." (emphasis added). And claim 1 of the '220 patent recites "scanning the database to determine the tables, constraints, and relationships of ***the data model***." (emphasis added). The specification reinforces this understanding by explaining that "[i]n order to generate the UI, the RDBMS is first interrogated or scanned by this software, applying a body of rules to interpret ***the data model***." '981 patent at 11:29–31 (emphasis added).

### E. <u>"apply[ing] a body of rules to determine the table structures, constraints, and relationships of said data model" – '981 patent</u>

| Zoho's Proposed Construction | Kaufman's Proposed Construction |
|---|---|
| "interpret[ing], with a body of rules, all table structures, constraints, and relationships of the data model of the RDBMS"<br>('981 patent, claims 1, 4, 5) | Plain and ordinary meaning |

Claim 1 of the '981 patent recites "apply[ing] a body of rules to determine ***the*** table structures, constraints and relationships of said data model." (emphasis added). This is part of the process of the system learning the structure of the data model to automatically generate a user interface. Zoho's construction clarifies what it means to "apply a body of rules" and on what information the body of rules is applied while Kaufman's construction fails to provide this clarity.

Using "the" in reference to the list of items means that it applies to all items in the list. *See Harris Corp. v. Fed. Exp. Corp.*, 502 F. App'x 957, 962–63 (Fed. Cir. 2013) (ruling that the term "transmitting the accumulated, stored generated aircraft data" should be interpreted as "transmitting all the aircraft data that has been accumulated or stored or generated"). Thus, this

phrase should be read as "apply[ing] a body of rules to determine ***all the*** table structures, ***all the*** constraints and ***all the*** relationships of said data model." This is consistent with the specification which, while only mentioning a "body of rules" once, describes that the disclosed software generates a fully functional UI system by "applying a body of rules to ***interpret*** the data model (comprising ***its tables; their column-complements, datatypes, and constraints; and relationships across tables***)." '981 patent at 11:31–33 (emphasis added). By interpreting the data body using the body of rules, the software "correlate[s] same [i.e., the data model] to the UI paradigm . . . by ***building an in-memory representation, or 'cache,' of said data model***, and by automatically deriving enhanced back-end 'views' of ***all tables***." *Id.* at 11:33–37 (emphasis added); *see id.* at 3:41–43. Building the in-memory representation of the data model and deriving the views of all tables requires using the body of rules to interpret all table structures, constraints, and relationships of the data model, as proposed in Zoho's construction.

### F. <u>"construct[ing] . . . a corresponding client application" – '981 and '220 patents</u>

| Zoho's Proposed Construction | Kaufman's Proposed Construction |
|---|---|
| "generate[-ing] a corresponding front-end program without any custom software programming"<br>('981 patent, claims 1, 4, 5; '220 patent, claims 1, 11, 14) | Plain and ordinary meaning |

"[C]onstruct[ing] . . . a corresponding client application" is part of the three steps recited for automatically generating the user interface in the independent claims of the '981 patent and the '220 patent. The purported innovation claimed in the '981 and '220 patents is that a user interface is automatically generated without the use of any custom software programming. *See* Section IV.B, *supra*. Therefore, the corresponding client application must be constructed without any custom software programming, consistent with the construction of "automatically generating . . . ." Zoho's

construction is consistent with the claim language and the specification while Kaufman's construction is not.

The specification teaches that "[t]he present invention relates to . . . methods for automatically generating ***without any custom programming*** a user interface for the database, ***and/or a complete application utilizing the database***." '981 patent at 2:23–27 (emphasis added). The specification also disparages making applications with "by-hand coding," which creates "development burden," especially as data models grow and create an "explosion of manual-coding requirements [that] quickly become[] unwieldy—and eventually, untenable." *Id*. at 2:53–64, 3:1–4. The claims should not be construed to cover ways of constructing a client application that are repeatedly criticized in the specification and that the patentee distinguished from the invention. *See LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1343–44 (Fed. Cir. 2005) ("[I]t would be peculiar for the claims to cover prior art that suffers from precisely the same problems that the specification focuses on solving.").

## V. CONCLUSION

For the reasons stated above, Zoho requests that the Court adopt its proposed claim constructions.

Respectfully submitted,

Dated: September 3, 2026

*/s/ Valerie K. Barker*

Ryan J. Marton (admitted *pro hac vice*)
Phillip J. Haack (CA 262060, admitted W.D. Tex.)
Valerie K. Barker (Texas Bar No. 24087141)
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
Telephone: (415) 360-2515
Email: ryan@martonribera.com
phaack@martonribera.com
valerie@martonribera.com

Darryl J. Adams (Texas Bar No. 00796101)
ADAMS IP LAW
12600 Hill Country Blvd.
Suite R130-235
Austin, TX 78378
Telephone: (512) 296-3198
Email: adamsiplawyers@gmail.com

*Counsel for Defendant Zoho Technologies Corporation*

## CERTIFICATE OF SERVICE

I certify that on September 3, 2026, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Valerie K. Barker*
Valerie K. Barker