# Exhibit F

**In the**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

**SALESFORCE.COM, INC.**
*Petitioner*,
v.
**MICHAEL PHILIP KAUFMAN**
*Patent Owner*.

---

Case IPR2021-00397

U.S. Patent No. 7,885,981

---

# PATENT OWNER PRELIMINARY RESPONSE

# TABLE OF CONTENTS

**I. THE PETITION FAILS TO SHOW A REASONABLE LIKELIHOOD THAT THE PETITIONER WOULD PREVAIL ON ANY CHALLENGED CLAIM 1**

A. Introduction . . . 1
B. *Fintiv* Factors Favor Deferral to the District Court . . . 6
C. Legal Standards . . . 9
D. Level of Ordinary Skill . . . 11
E. Claim Construction . . . 12

**II. THE ’981 PATENT 12**

**III. OVERVIEW OF THE ASSERTED PRIOR ART 14**

A. Yeager . . . 14
B. Cason . . . 14
C. Nadkarni . . . 15

**IV. YEAGER ALONE OR IN COMBINATION WITH NADKARNI FAILS TO MEET THE APPLICABLE THRESHOLD FOR *INTER PARTES* REVIEW 16**

A. The Petition Fails Adequately to Address the Arbitrary Size or Complexity Limitation with Respect to Yeager . . . 16
B. Yeager Cannot Handle a Database of Arbitrary Size or Complexity . . . 20

1. Yeager's Level structure . . . . . . . . . . . . . . . . . . . . . 21
2. The UI generation methods of Yeager rely on the foreknowledge that the target database structure represents a hierarchy of Levels, foreknowledge of what those Levels comprise, and foreknowledge of how those Levels are to be navigated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
3. Yeager's UI generation cannot handle database schemas that include RI circuits . . . . . . . . . . . . . . . 30

C. The Petition Fails Adequately to Address the Limitation that the Generated UI Must Incorporate into Each Mode Display Processes for Representing, Navigating, and Managing Relationships Across Tables . . . . . . . . . . . . 31

1. Representing relationships across tables . . . . . . . 31
2. Navigating relationships across tables . . . . . . . . . 32
3. Managing relationships across tables . . . . . . . . . . 35

D. Yeager's Application Fails to Observe and Enforce Relational Dependencies Among Data and Across Tables . . . . . . . . . . . . . . . . . . 36

**V. CASON ALONE OR IN COMBINATION WITH NADKARNI FAILS TO MEET THE APPLICABLE THRESHHOLD FOR *INTER PARTES* REVIEW** **37**

A. Cason Does Not Disclose the Scanning Limitation . . . . . . . . . . . . . . . . . . . . . . . . 37

B. Cason's UI Generation Relies on Database-Specific Elements and Thus Cannot Automatically Construct a UI for a Database of Arbitrary Size of Complexity or Make it Obvious How to Do So . . . . . . . . . . . . . . . . . . . . 40

**VI. CONCLUSION** **44**

# TABLE OF AUTHORITIES

## CASES

*Apple, Inc. v. Fintiv, Inc.*, Paper 11 (PTAB, Mar. 20, 2020) (precedential) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359 (Fed. Cir. 2015) . . . . . . . . . . . . . . . . . 10

*Cisco Sys., Inc. v. C-Cation Techs., LLC, Paper 12*, IPR2014-00454 (PTAB, Aug. 29, 2014) . . . . . . . . . . 11

*Edmund Optics, Inc. v. Semrock, Inc., Paper 50*, IPR2014-00583 (PTAB, Sep. 9, 2015) . . . . . . . . 10, 19

*In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364 (Fed. Cir. 2016) . . . . . . . . . . . . . . . . . 10

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359 (Fed. Cir. 2016) . . . . . . . . . . . . 10

*SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348 (2018) . . . . . . . . . . . . . . . . . . . . . . . 10

*Wasica Finance GMBH v. Continental Auto. Systems*, 853 F.3d 1272 (Fed.Cir. 2017) . . . . . . . . . 10

## STATUTES AND RULES

Code of Federal Regulations, Title 37

§ 42.104(b)(4)–(5) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 42.104(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 42.22(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 42.6(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

§ 42.65(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States Code, Title 35

§ 314(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

OTHER AUTHORITIES

Office Patent Trial Practice Guide, 77 Fed. Reg. 48756 (Aug. 14, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 9

| EXHIBIT LIST | |
|---|---|
| 2001 | IPR2017-01141, Paper 7, Non-institution Decision |
| 2002 | Scheduling Order from Parallel District Court Case |

# I. THE PETITION FAILS TO SHOW A REASONABLE LIKELIHOOD THAT THE PETITIONER WOULD PREVAIL ON ANY CHALLENGED CLAIM

## A. Introduction

Michael Philip Kaufman ("Patent Owner" or "Kaufman") submits this Patent Owner Preliminary Response with regard to the challenge by salesforce.com, Inc. ("Petitioner" or "Salesforce") to U.S. Patent No. 7,885,981 (the "'981 patent").

The '981 patent concerns the process of creating applications for working with the data in relational databases. It supplants the prior art as it existed in 1999-2000, which involved manual or partially automated development of end user database applications. Instead, the '981 patent provides systems and methods that automatically generate an entire, fully functional end user application, based on an automated interrogation of the database itself. Thus, it could automatically retrofit an existing database with a fully capable application, tailored to the database. This improved on the prior methods, which always required developers to act as middlemen in outfitting end users with the software for working with such databases.

The patent's approach proceeds by scanning the database to determine the layout of all of its data tables and their interrelationships, and, from that information, automatically constructing a user interface (UI) adapted to fit the database, doing so regardless of the size or complexity of the database, and thus with no limit on the number of tables or extent

or depth of cross-table relationships. Significantly, the generated UI is fully cross-table aware, in that the software automatically creates and inserts all UI controls needed to represent, navigate, and manage the data for all cross-table relationships.

The generated application as claimed in the ’981 patent thus does considerably more than a mere “table editor” or “form generator” as was known in the prior art (*see* ’981 patent 2:53-64). Such prior art utilities could figure out the columns in a table and provide an editor for the table based on the derived column layout. However, the generated application, as claimed, includes embedded abilities in the generated displays: to *represent* to the user that cross-table relationships to and from the table being viewed exist in the database, and what the related tables are, as well as the significance of each such record relationship (*i.e.* by importing descriptive information from those records in lieu of cryptic “key” references); to provide for *navigational elements* in the table display to traverse inter-table links to visit the related tables (and be able to perform the same types of operations from the tables reached by such navigation); and to provide UI controls to *manage* inputs of data that is linked to related tables to ensure consistency; while *observing and enforcing relational interdependencies* (rather than hiding them and confounding efforts to apply changes at the intended scope). A generated application that does not provide such capabilities, for any database it might encounter, does not meet the objects of the invention or the literal claim limitations.

Salesforce's Petition proceeds as if the patent claims the very process of writing a database UI, calling that "a longstanding and well-established workflow." However, looking to the prior human process that the invention sought to replace does not get at the substance of the invention. The point is not simply to implement the prior human workflow, but to find a way for a machine to implement all of the claimed UI functionality, including the cross-table aspects, correctly and reliably, in a manner that can accommodate any topology of table and column interrelationships that might exist in a relational database. A person of skill in the art could write the desired interfaces manually, one-by-one, for databases that may be encountered in practice (which is how this job was typically done at the time). The object here, however, is to prescribe one general process that works automatically for *any* existing database, automatically scanning the database to learn its structure and using the scanned information to eliminate the repetitive human work in fully building the user interface with all requisite in-table and cross-table capabilities, for every table found in the database.

Salesforce alludes to "dynamic graphical user interfaces" in the prior art, but as the '981 patent itself explains, such tools existed, but they only automated limited parts of the process, such as form generation and table editing, requiring the assistance of a developer to figure out how to interconnect the forms for myriad individual tables, thus relying on human, per-table input to complete the UI creation task.

One such example of a prior art form generator was raised by Microsoft in a prior IPR challenge to the '981 patent, which was denied institution. IPR2017-01141. The challenge in the 1141 IPR was based on a reference concerning database development tools for Oracle (as well as a corresponding tool for Microsoft Access). For example, the Oracle tool (Oracle Designer) had limited ability to create a database UI, but among other shortcomings critically lacked the ability to do so based on "scanning" the database, as the Board in that case found. Ex. 2001 (prior noninstitution decision) at 16.

Salesforce asserts two grounds for this IPR, one based on Yeager *et al.* (Ex. 1005, US 5,950,190) as a primary reference, and the other based on Cason *et al.* (Ex. 1006, US 6,035,300) as a primary reference.

Yeager is already of record in the '981 patent. Yeager's downfall for the Petition's purposes is that (among other shortcomings) it assumes a given database structure and is not extensible to a database of arbitrary size or complexity. Yeager also combines data in a manner that conceals, rather than represents, inter-table relationships (which in turn introduces myriad opportunities for inadvertent data corruption). The UI also provides no way to navigate across tables, or to manage record relationships without corruption. The Petition's only suggestion to overcomes these deficiencies (at pages 19 and 47) is to say to "generalize" Yeager, but the Petition does not explain how that could be done, and indeed there is no straightforward way to overcome these severe limitations of Yeager's design.

Cason, just like the Atkins reference that failed in the hands of Microsoft (Ex. 2001 at 16), fails to teach the claim element of "scanning said database" to learn its data model. Cason relies on the human developer to provide this information instead.

Salesforce relies on the same secondary reference, Nadkarni, in both asserted grounds. There are threshold questions concerning Nadkarni, including its publication date and whether it qualifies as analogous prior art. However, with regard to the missing subject matter of Yeager and Cason as pointed out herein, the Petition makes minimal reference to Nadkarni. The Board need not spend much time on Nadkarni in evaluating the issues raised in this preliminary response, because the Petition does not even attempt to point to Nadkarni as filling the gaps identified with respect to the primary references, which gaps are in themselves dispositive.

In short, Patent Owner will make very clear herein that the primary references of the Petition fall short in ways that the Petition fails to adequately address, and as to which the Petition does not (and could not) seek help from Nadkarni.

Salesforce's stock answer as to everything that might be missing from its presentation is to point to its technical expert. The expert's declaration, however, simply mimics the bare conclusions of the Petition, either with the same words verbatim, or with a further qualified version that states even *less* than the Petition itself. The statute, however, requires a showing of where each limitation may be found in the cited

art. Petitioner's expert declaration is not prior art. It cannot create prior art where none has been brought to bear. The Petitioner is required to lay out in its petition at least the ingredients for the requisite *factual* underpinnings of an obviousness argument, and this Petition falls short.

The '981 patent has already survived two IPR challenges by Microsoft Corporation (IPR2017-01141 referred to above, as well as IPR2017-01142), which in some respects were strikingly similar to the present Petition. The validity of the '981 patent was also successfully tested in a jury trial against Microsoft that resulted in a substantial verdict, currently on appeal by Microsoft to the Federal Circuit. In addition, the currently pending related district court litigation against Petitioner is on a fast track toward a trial likely to take place well before any final written decision herein. Instituting review, especially in such a doubtful petition, would undermine the judicial process that is well along its course toward trial.

## B. *Fintiv* Factors Favor Deferral to the District Court

Attached as Ex. 2002 is a copy of the Scheduling Order from the parallel District Court case. It is reasonably clear that left on its current course, the District Court case will be tried before a final written decision would be rendered in this IPR.

The applicable factors under *Apple, Inc. v. Fintiv, Inc.*, Paper 11 (PTAB, Mar. 20, 2020) (precedential) are as follows:

**Whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted.** Salesforce has moved for a stay already (pre-institution), which has been fully briefed since February 23. The court has not ruled on the stay motion. The court did, however, stay the court's consideration of *Markman* issues pending resolution of the stay motion. Meanwhile, discovery has moved forward, and while the stay motion has been pending, the court adopted the attached scheduling order (Ex. 2002).

**Proximity of the court's trial date to the Board's projected statutory deadline for a final written decision.** According to the Scheduling Order the case will be trial-ready 282 days after a *Markman* ruling. *Markman* issues are fully briefed. If the court were to rule on *Markman* in June, the case would be ready for trial in April 2022, which would be several months prior to the Board's projected statutory deadline for a final written decision.

**Investment in the parallel proceeding by the court and the parties.** The parties have considerable investment in the parallel proceedings, having conducted substantial documentary discovery and begun third-party subpoenas, with fact discovery set to close on May 18. The court has *sub judice* a motion to dismiss, a motion to transfer, and the motion to stay, with *Markman* issues ripe for determination.

**Overlap between issues raised in the petition and in the parallel proceeding.** The parallel proceedings involve both patents challenged in this and the related IPR filed by Salesforce.

**Whether the petitioner and the defendant in the parallel proceeding are the same party.** Salesforce is the sole defendant in the parallel proceeding.

**Other circumstances that impact the Board's exercise of discretion, including the merits.** Patent Owner understands that, as to this last *Fintiv* factor, every Petitioner claims its petition is strong, and every patent owner will tend to characterize the petition as weak. Nevertheless, the Board can hardly fail to notice that this Petition follows a number of prior failed challenges to the '981 patent, and is suffers from a number of the same defects that caused the prior attacks to fail. In prior proceedings, Microsoft Corp. brought two IPR petitions against the '981 patent, both of which were denied institution. IPR2017-01141 and IPR2017-01142. Microsoft also unsuccessfully challenged the validity of the '981 patent in district court proceedings, and a multi-million dollar jury verdict in favor of Patent Owner (*Kaufman v. Microsoft Corp.*, Case No. 16-2880-AKH (S.D.N.Y.) is currently being challenged on appeal before the Federal Circuit, No. 2021-1634, 1691. In the instant Petition, the primary reference on the first Ground is already on the cover page of the patent and was considered during prosecution by the Examiner. As for the Petition itself, there is a failure in both Grounds,

insofar as there is a claim feature in each of them that even the combined references do not address, including some of the same features relied upon to deny institution of the prior round of IPRs by Microsoft.

### C. Legal Standards

*Inter partes* review may only be instituted where "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition." 35 U.S.C. 314(a). *See also* 37 C.F.R. § 42.108(c). The burden of showing that this statutory threshold has been met belongs to Petitioner. *See, e.g.*, Office Patent Trial Practice Guide, 77 Fed. Reg. 48756 (Aug. 14, 2012) ("The Board . . . may institute a trial where the petitioner establishes that the standards for instituting the requested trial are met . . . ").

A petition must include a "full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence," must identify "[h]ow the construed claim is unpatentable under the statutory grounds identified" and "where each element of the claim is found in the prior art patents or printed publications relied upon," and must "identify[] specific portions of the evidence that support the challenge." 37 C.F.R. § 42.22(a)(2); *Id.* § 42.104(b)(4)–(5). "The Board may exclude or give no weight to the evidence where a party has failed to state its relevance or to identify specific portions of the evidence that support the challenge." *Id.* § 42.104(b)(5). *See also Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir.

2016) ("[T]he expedited nature of IPRs bring with it an obligation for petitioner to make their case in their petition to institute."). *See also Wasica Finance GMBH v. Continental Auto. Systems*, 853 F.3d 1272, 1286 (Fed.Cir. 2017) (same).

The Petitioner is required to articulate in the Petition the theories that it argues for invalidity and the record support for those arguments. *See SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1355 (2018) ("Congress chose to structure a process in which it's the petitioner, not the Director, who gets to define the contours of the proceeding."); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (ruling out obviousness arguments that "could have been included" in the petition but were not); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367 (Fed. Cir. 2015) (holding that "a challenge can fail even if different evidence and arguments might have led to success").

To the extent that the Petition relies on an expert declaration, the opinion relied upon must be more than conclusory and must disclose the facts underlying the opinion. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *Edmund Optics, Inc. v. Semrock, Inc., Paper 50*, IPR2014-00583, Paper 50 at 8 (PTAB, Sep. 9, 2015) (affording little or no weight to "experts' testimony that does little more than repeat, without citation to additional evidence, the conclusory arguments of their respective counsel.").

Nor may the petition rely on the expert declaration to remedy any gaps in the petition itself. 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document"). The role of submissions by way of exhibits to the petition, including without limitation expert declarations, are to provide evidentiary substantiation for the facts marshaled within the petition to support the arguments presented therein. An expert declaration in which the expert simply signs his name to conclusory arguments copied verbatim from the petition amounts to a tautology that adds nothing of evidentiary value to the petitioner's presentation. Moreover, even if there *were* additional factual support within the expert declaration beyond what was provided in the Petition, it would be improper incorporation by reference. *See Cisco Sys., Inc. v. C-Cation Techs., LLC, Paper 12*, IPR2014-00454, at 9 (PTAB, Aug. 29, 2014) ("This practice of citing the Declaration to support conclusory statements that are not otherwise supported in the Petition also amounts to incorporation by reference.").

## D. Level of Ordinary Skill

The Petition recites ordinary software developer qualifications as the level of skill in the field for *Graham v. Deere* purposes. Petition at 7. Although the Petition does contain that bare-bones recitation, the present Panel could also say (as in the prior non-institution decision) that "the level of skill in the art is evidenced by the prior art of record." *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Ex. 2001 at 7, n.2. This formulation is particularly appropriate where, as

here, the shortcomings in the cited art concern the same types gaps in the technology that the patent itself pointed out existed in the prior art, which the technologists of the day likewise had failed to solve.

### E. Claim Construction

The challenged claims are to be construed in this proceeding in the same manner as they would in a district court.

Petitioner states that no constructions are necessary. It provides as Ex. 1010 the only court constructions to date, with which Patent Owner agrees. However, Petitioner also provides as Ex. 1025 its own slate of proposed constructions from Petitioner's pending district court case, which would eviscerate the patent in a number of respects, and which Patent Owner disputes. In particular, its proposed construction for "managing . . . said relationships across tables" makes no sense in light of the claim language and the specification. As will be further addressed herein, Petitioner's proposed "alternate" construction, that "managing . . . said relationships across tables" also includes UI elements deployed to *define or change* the relationships (as opposed to managing data in accordance with them), should be rejected.

## II. THE '981 PATENT

The original application in the family of the '981 patent was filed on October 31, 2000, by Michael Philip Kaufman, the first named inventor.

The '981 patent is titled "System and Method for Generating Automatic User Interface for Arbitrarily Complex or Large Databases."

Ex. 1001, [54]. The "software system automatically and dynamically generates a fully functional user interface (UI) based upon, and connected directly to, an underlying data model." *Id.* at [57]. The '981 patent describes generating the UI "from an automated interrogation of the RDBMS," and also integrating four modes, for all tables. *Id.* A full complement of mechanisms may be "integrated directly into the mode displays[] for representing, navigating, and managing relationships across tables." *Id.* A relational database contains a "schema" or "data model," describing a "complement of tables which store data, and the relational links between these tables," that defines the organizational structure of the database. *Id.* at 2:41–48. The '981 patent also includes in its specification the complete source code for the software that rendered the screenshot figures in the patent.

An objective of the '981 patent is "to provide a complete and fully functional user interface (UI) for any arbitrarily complex or large database schema, without any custom software programming." *Id.* at 3:9–12. To achieve that stated objective "once a back-end schema has been designed and constructed within the RDBMS, the system can automatically 'interrogate' this schema, and 'absorb' its structure into an internal cache." *Id.* at 3:13–16. This structure is used to develop "a comprehensive application through which the back-end can be operated, and through which all conventional database activities—searching, listing, adding, editing—can be supported, across all base-tables comprising the schema." *Id.* at 3:19–24. This application "reveals (and enforces) the re-

lational/hierarchical organization among the tables within the back-end via smoothly integrated UI mechanisms which are embedded directly into the base-table screen displays-providing a natural, powerful, and easy-to-use environment for managing complex data relationships and interactions." *Id.* at 3:26–32.

## III. OVERVIEW OF THE ASSERTED PRIOR ART

### A. Yeager

Yeager *et al.* (Ex. 1005) concerns software that came out of the space program, for an application used to manage an inventory of tools used by scientists aboard the International Space Station.

Yeager is already of record in the '981 patent. As will be explained herein, Yeager's technological solution was tied and limited to a specific type of database application, organized as a hierarchy of "Levels," in which the UI was rendered by the expedient of "joining" tables, and the solution taught was not extensible to providing all of the UI claimed features of the '981 patent claims for any database of arbitrary size or complexity.

### B. Cason

Cason *et al.*, Ex. 1006 concerns "generating a working user interface . . . from the entities, attributes and relationships *of a data model*." Ex. 1006 1:9-11 (emphasis added).

The method taught by Cason, however, starts from an "entity, attribute, relationship (EAR)" or similar data model. Ex. 1006 2:1-3.

The EAR model is described as something that the user creates with a separate tool, and there is no suggestion in Cason that the creation of its EAR model is automated. Cason fails to teach the process of "scanning" the database as recited in each of the '981 patent claims. This is the same failure previously cited by the Board on declining to institute based on the Atkins reference cited by Microsoft in IPR2017-01141. *See* Ex. 2001, Non-institution Decision at 16. Cason also depends on the presence of other database-specific metadata to guide its application creation.

### C. Nadkarni

Both asserted Grounds of invalidity rely on Nadkarni as a secondary reference. Nadkarni concerns generating UI elements for an Entity-Attribute-Value (EAV) database, which is not a relational database structure.

However, for the purpose of ruling on institution the Board need not engage in extensive obviousness analysis with regard to Nadkarni because the Petition fails to invoke Nadkarni at all with respect to numerous limitations, the absence of meeting any one of which would preclude institution. Patent Owner reserves more detailed discussion of Nadkarni (including its prior art status) to such time, if ever, as Nadkarni might become relevant.

## IV. YEAGER ALONE OR IN COMBINATION WITH NADKARNI FAILS TO MEET THE APPLICABLE THRESHOLD FOR *INTER PARTES* REVIEW

Yeager concerns a database application design developed under NASA funding for the International Space Station (ISS), to handle the station's inventory of tools for use by scientists during a mission. Ex. 1001 2:23-3:10. The object of the design is framed in terms of managing the ISS tool inventory and "other commercial applications which exhibit parallels to the ISS." Ex. 1001 2:45-46. There are reasons for this modest indication of scope: Yeager's implementation is closely coupled to the spatial arrangement of the ISS facilities, resulting in assumptions and limitations that significantly restrict the extensibilty of the implementation to more general database structures.

### A. The Petition Fails Adequately to Address the Arbitrary Size or Complexity Limitation with Respect to Yeager

The ability to handle a database of arbitrary size or complexity is expressly claimed, and is also articulated in the patent's critique of the prior art and its statement of the objects of the invention.

The challenged claims all recite that "said relational database [*i.e.*, the one for which the UI is being generated] *may be of any arbitrary size or complexity*." Ex. 1001 col.:line (emphasis added).

The specification directly addresses this aspect of the invention:

> Current tools for easing the development burden are limited to fairly specific (and, still, fairly low-level) uses—among them, providing more-sophisticated or "richer" controls for

> manipulating individual data elements; associating individual user-interface elements with specific back-end storage locations; or—at best—offering "form generator" or "wizard" facilities to automatically generate the code for a simple UI display which manipulates a single underlying (back-end) data table.
>
> Even with such tools, considerable work remains in building a complete, fully-functional UI for a back-end schema of any appreciable size or complexity—especially where industrial-grade performance and reliability is required. And as enterprise-scale data models continue to grow, the attendant explosion of manual-coding requirements quickly becomes unwieldy—and eventually, untenable.
>
> . . .
>
> It is an object of the invention to provide a complete and fully functional user interface (UI) for any arbitrarily complex or large database schema, without any custom software programming.

Ex. 1001 2:56-3:12.

The Petition has very little to say with regard to the "arbitrary size or complexity" point with regard to Yeager. What little it does say is set forth entirely on pages 18-19.

The Petition conclusorily claims that "Yeager's RDBMS may be of any size or complexity." Petition at 18. It starts this point by arguing (at the bottom of page 18) that Yeager builds a UI on top of an Oracle database, and since the reference implementation in the '981 patent is

also built on Oracle, and the '981 patent claims to handle databases of any arbitrary size or complexity, it must follow that Yeager can do so as well. (Of course, this does not at all follow—the fact that software is built on Oracle does not mean that the software can handle any Oracle database.)

Further down page 18, the Petition claims that "Yeager's dynamic UI is generally able to accommodate *any* modifications to the structure of the database." (Emphasis added.) The actual quote from Yeager itself does not go this far, however. In actuality, Yeager only states that "[t]he graphical user interface recognizes modifications to the structure of the database tables and regenerates the graphical windows to accommodate such modifications" (Ex. 1001, Abstract). The referenced Abstract thus notably lacks the word "any," which the Petition overgenerously attributes to it. As detailed in the discussion under the next point, Yeager cannot in fact accommodate "any" database structure, nor "any" changes thereto—including, for example, the vast majority of databases which do not model a "Level"-based storage hierarchy as in Yeager, or the common case of databases whose schema graphs include FK "circuits" or "loops" among tables. The Yeager patent in fact does not even purport to provide a general solution capable of rendering such schemas.

The Petition (now at the top of page 19) then goes on to what appears to be its real contention in this regard: "To the extent Yeager does not explicitly state that its database may be any size or complexity [and it does not], it would have been obvious for a POSITA to apply

Yeager's techniques to databases of any size or complexity." The alleged reason it would have been obvious to do so is because it just would have been "obvious" to "generalize the solution." *Id.* However, no support is offered in the Petition for the assertion that Yeager's techniques *can* be (automatically) applied to databases of any size or complexity, nor that it would have been obvious *how* to generalize from Yeager, other than the Petitioner's expert declaration—which only echoes the bare conclusions of the Petition itself, verbatim, citing nothing whatsoever in support of those conclusions. Ex. 1002 ¶ 73.

Neither the Petition nor the expert address what is missing from Yeager that causes it to fall short of providing an automatic solution for any relational database of arbitrary size or complexity, or what would be necessary in order to "generalize" Yeager as the Petition suggests. Nor do they provide any rationale for how or why it would have been obvious for a POSITA to do so. The expert's version of this assertion (Ex. 1002, ¶ 73), which is purely conclusory *and* entirely duplicative of the Petition, is exactly the type of unsupported expert testimony that is entitled to "little or no weight." *Edmund Optics*, at 8. As will be detailed herein, "Yeager's techniques" are not in fact "applicable to databases of any size or complexity." One reason Yeager falls short in this regard is that it bases its use of referential-integrity (RI) constraints for UI generation solely on "joining" tables related tables, and as will be addressed, such a technique is not generally extensible in a manner compatible with the '981 claim limitations.

Further, while the asserted ground is based on Yeager in view of Nadkarni, the Petition does not even attempt to argue the arbitrary size or complexity limitation based on any help from Nadkarni. Indeed, Nadkarni is tied to an entirely different kind of database (an EAV database), so it can provide no such assistance in any case.

In sum, the Petition does not point to where Yeager addresses the ability to handle a database of "arbitrary size or complexity"; Yeager's disclosure will not accommodate arbitrary size or complexity; Nadkarni has nothing to offer on this (nor does the Petition suggest that it does); and trying to work around these shortcomings would necessitate a complete redesign of the primary reference. The Petition fails to acknowledge these shortcomings or suggest any specific, non-conclusory approach to overcome them. All it does is suggest without any specific explanation the bare conclusion that a hypothetical alternative or unspecified "generalization" would have been "obvious," and this is not a sufficient rationale.

### B. Yeager Cannot Handle a Database of Arbitrary Size or Complexity

Yeager's disclosure concerns an application domain organized in "Levels" and the construction of the application is tied at every step to

that Level concept. It provides no solution for a system that is not so organized.

#### 1. Yeager's Level structure

The database used to illustrate Yeager defines objects (various containers) corresponding to the location of the tools—which tray the tool is located in, where the trays exist in drawers and racks, and where the racks are located in the various modules (rooms) of the spaceship.

This spatial arrangement is described in the specification as a "Level" structure:

> [R]elational database 24 defines *five organizational levels* as follows: Level 1 representing the overall space station; Level 2 representing the different modules of the space station; Level 3 representing the different racks within each module, Level 4 representing the different trays within each rack; and Level 5 representing the individual inventory objects contained within each tray. Of course, more or fewer levels may be established for other inventory environments.

Ex. 1001 9:21-28 (emphasis added). While the specification as quoted above recites that the database "defines" the referenced Levels, the Levels are *not* defined by any disclosed relationships reflected in the database schema. Rather, the Level structure is imposed by and defined at the application level of the design.

The structural layout defined for Yeager's application is depicted as follows (down to Level 4—Fig. 11 depicts two drawers (Level 4) within a rack (Level 3)):




Fig. 9




Fig. 10




Fig. 11

As far as actual *database* relationships are concerned, each "Level" table maintains the set of *individual objects* which currently exist at that level, and may have an associated "Catalog" table defining the *types* of objects that may exist at that level. Ex. 1 17:47-53. The table arrangement for tracking inventory item contents at Level 5 is depicted in Fig. 1:




*Fig. 1*

It can be seen that the Level 5 Catalog table 26 is related (30) by the Partno key to the table for Level 5 (25), which lists all inventory items (pliers, wrenches, cameras, etc.) available on the spaceship. In other words, PARTNO is a foreign key in table 25, and a primary key in table 26, which can thus be considered a "master" catalog for table 25's "detail" listing of inventory items—a typical "master-detail" relationship for a relational database.

A typical screen from the application that Yeager generates for this database is as follows:




Fig. 7

Fig. 5




At run time, the extant choices available for insertion into a given field upon pressing its associated Edit button (Barcode, Partno, Description, etc.) are presented within a "choices" window such as in Fig. 5 on the right, above. According to the specification, the choices window in this example is populated from the combined contents of the DESCRIPTION column of tables 25 and 26. Ex. 1001 10:60-63.

Yeager describes what, on a casual review, might appear to be a general approach to generating an end-user application to work with a relational database. This approach is reflected in Fig. 13:




***Fig. 13***

As reflected in Fig. 13, the approach is to iterate over all tables in the database. For each table, the software determines the columns and their attributes and constraints, and builds both search and edit windows.

The edit window can also be launched with blanks (as shown above) so as to double as a UI for adding new records, and can also be used to delete records (*see* Ex. 1005, Fig. 7), so that the Edit window, along with the search window, appears to provide full create-retrieve-update-delete (CRUD) capability.

But there is a fundamental problem that lies in "Build Edit Window" 162 in Fig. 13. The problem is that the "build" process for the Edit window is tied to the Level structure of the Yeager application domain and provides no way to handle data that is organized differently.

**2. The UI generation methods of Yeager rely on the foreknowledge that the target database structure represents a hierarchy of Levels, foreknowledge of what those Levels comprise, and foreknowledge of how those Levels are to be navigated.**

The single biggest red flag in the Petition is its footnote 4 on page 32, which acknowledges that the *only* implementation that Yeager discloses for *any* UI feature that utilizes relationship information from the schema is to "join" related tables, so as to expose the fields of the combined tables to user views. The footnote states: "Yeager states that all tables *at an equivalent level* are 'typically' joined by following referential integrity constraints, Yeager at 10:4-8." (Petition at 32, n.4, emphasis added.) What the Yeager specification actually states on this point is as follows:

> *Once a search level has been specified*, the DGUI [Dynamic GUI] typically joins *all the tables of the same level* (e.g., table 25 and 26) by following the referential integrity constraints 30 defined within the data dictionary. In this manner, the DGUI identifies all possible parameters which may be relevant to a user's search at the specified level.

Ex. 1001 10:4-8 (emphasis added). The behavior that results from a join as thus described is seen in Fig. 7, the "Inventory Object Edit Window." Because of the "join," Fig. 7 includes all the fields of table 25, plus the additional field "Description" from table 26. Nothing on the display itself reveals that Description comes from a different table, but we know this is the case because the Yeager patent shows us the underlying schema

and that Description is in a separate table. Description appears in the display because the display algorithm as shown in in the flowchart of Fig. 18 simply operates on the joined table structure, to put all joined table columns on the same edit screen. That is the *only* feature throughout the entire disclosure of Yeager that associates data from different tables in the UI (though it does so in a manner that gives rise to numerous problems and limitations).

Thus, joining tables is absolutely central to the UI construction in Yeager. It therefore becomes crucial to determine *which* tables to join. Yeager does not teach or suggest any way of doing this as a result of scanning the database schema.

In order to join all tables within a "Level" for a generated application that, as claimed in the '981 patent, proceeds from "scanning" the database schema, the database structure itself would have to reflect these Levels. But it does not.

Instead, a "Level" appears in Yeager as an application-domain construct, which is necessarily dependent on *both* dedicated Level-oriented program logic *and* an embedded understanding of how to interpret the instant database structure in this context. Yeager does not disclose any way for a process to identify features outside of the database schema—such as the Level concept that is central to Yeager—based on scanning the database schema itself, nor is it evident how it could.

The Yeager system knows to expect a Level hierarchy. It also knows, specifically, as reflected in its hard-coded Location strings (as

seen in Fig. 1., *e.g.,* "LAB1_S4_A3") how Levels have been represented within the plurality of tables in the particular target database. This mechanism, which exists apart from the database, allows the application to "silo" or "partition" the database schema into multiple subsets ("Levels") which are more amenable to brute-force joining for the disclosed application.

Note that the flowchart (Fig. 18) for generating the Edit Window referenced in Fig. 13 makes no mention of table joins. Step 240 (24:49 and Fig. 18) prescribes a series of steps to be taken "For each Column in the Table." In fact, the table for which it is generating an Edit Window must actually be an "updatable view" that already joins all tables at its Level, because this is the only way a Description button as shown in Fig. 7 could have been incorporated into the the Edit Window that accesses table 25 (which itself lacks a Description column). The algorithm thus treats all joined tables at a given level as a single "table" (consistent with what Yeager says it does, at 10:4-8). The Edit Window generation for table 25 incorporates the Description column from table 26 because tables 25 and 26 have already been joined on their common Partno field.

Conspicuously, Yeager does not disclose how the computer (as opposed to a human) determines which tables are at the same "Level" as table 25, and to join only tables 25 and 26, but no others. If the subject database were to present some other structure that was not so neatly organized (in advance) into "Levels," the system would not know where to start or what to do and would have no way to derive this information

from the database schema, because no such information is included in a database schema. The only conceivable alternative would be to join *all* related tables, but that would denormalize the database into a flat-file spreadsheet, defeating the purpose of having a relational database to begin with.

The referenced footnote in the Petition, apparently recognizing these problems, seeks to qualify the Level join approach described in Yeager based on the word "typically," as if Yeager also proposed an alternative. This does not save the situation for the Petition. All "typically" means in context is that the application may not bother to join the tables at a given level, or do so but join fewer than all of them. Indeed, the only join illustrated in Yeager is at Level 5 (of tables 25 and 26). In particular, the word "typically" as used in these passages (10:4-8 and 12:2-6) cannot fairly be read to suggest that there is some *alternative* method to generate the DGUI, other than through the use of table joins, and there is certainly no teaching as to any such alternative. The Petition footnote goes on to say that "it would have been obvious . . . that foreign key columns could be displayed." But the Petition fails to note that Yeager *already* displays a foreign key column, Partno—it just does nothing with it. The Petition does not address what could be done with this foreign key to overcome the shortcomings of Yeager or how any alternative could be obvious. The "typically" and "add a foreign key column" suggestions in footnote 4 of the Petition do not express any coherent rationale for an obvious alternative to Yeager's highly limited table join methodology.

### 3. Yeager's UI generation cannot handle database schemas that include RI circuits

Another of the many problems that result from Yeager's table-join methodology arises where there is a "circuit" (or "loop") in the chain of cross-table relationships at a "Level," (*e.g.,* an FK in table A points to table B, an FK in table B points to table C, and an FK in table C points back to table A), then the UI construction as described in Yeager will crash and burn.

Columns from table A will be added to the display until the FK to table B is encountered, at which point all of the (non-PK) fields from table B will be added to the display, until the FK to table C is encountered, at which point all of the (non-PK) fields from table C will be added to the display, until the FK back to table A is encountered, at which point *another* set of columns from table A will be added—and this pattern will repeat indefinitely (unless and until a null FK is encountered, which is not guaranteed). The result is an infinite loop: The system will never complete construction of the display, but will instead recurse indefinitely and crash, either hanging until it is forcibly terminated, or exhausting available memory and being terminated by the operating system.

Note that this problem cannot be resolved simply by introducing a rule that prevent such recursion (by stopping display construction if any table is encountered a second time), because the resulting UI would be unable to represent or (attempt to) manage the data relationships

thus truncated. Since this would violate another claim limitation, such a rule would not enable Yeager to support such a database.

While this may seem like an unlikely or rare situation, such relational constructs are not at all uncommon. In fact, even self-referential tables (where table A points directly back to itself) are easily encountered. Consider a personnel table, for example, which includes an FK back to the same personnel table in order to indicate each employee's designated covering contact (in case of absence). Even if people might seek to avoid tight loops (such two people pointing directly to each other), it's not difficult to see where coverage for large departments would ultimately tend to fold back upon itself.

### C. The Petition Fails Adequately to Address the Limitation that the Generated UI Must Incorporate into Each Mode Display Processes for Representing, Navigating, and Managing Relationships Across Tables

#### 1. Representing relationships across tables

The Petition on page 31 takes the position that the disclosure in Yeager of a UI for adding a column to a table, where the column added includes an FK constraint, satisfies the claim limitation of "representing . . . relationships across tables." Although the Yeager specification does not even demonstrate nor enable a UI where such FK constraints can be added, we can nevertheless dispose of Petitioner's claim.

The very nature of Yeager's "join all tables" approach means that the resulting UI actually obscures even the *existence* of separate tables

(within a Level). Were the user to add a new FK column to a table, the resulting screen displays would merely merge all the columns across all the related tables into one big list. For example, if the user added a CountryCode column to table 25, which was a foreign key to a (previously unseen) COUNTRY table with another column named CountryName, this would result in the addition of both CountryCode and CountryName button-and-edit-field pairs to the Fig. 7 Edit Window. Yet, just as with the Description column already present Fig. 7, there would be no visual representation of data relationships existing between the TRAKVU_L5, TRAKVU_L5C, and COUNTRY tables. Fig. 7 doesn't reveal and enforce these relationships at all; rather it hides their very existence (along with the very existence of the three separate tables). While the display would incorporate data from multiple tables, it would be impossible to distinguish which fields were sourced from which tables, or where they existed in the source table. Relationships are in no way "represented" in the generated UI of Yeager.

### 2. Navigating relationships across tables

At page 32, the Petition addresses "navigating . . . said relationships across tables." The *entirety* of the Petition's argument on this limitation consists of the following short paragraph:

> The DGUI client application integrates into each mode display processes for navigating relationships across tables. Detecting a foreign key or referential integrity constraint in a viewed table and then *switching to view the referenced table* involves "navigating . . . relationships across tables." *Id.* ¶ 97.

Petition at 32 (emphasis added).

The "*id.*" citation in the foregoing is to Petitioner's expert. The expert makes the same completely conclusory statement as the Petition, verbatim: "Similarly, it is my opinion that detecting a foreign key or referential integrity constraint in a viewed table and then *switching to view the referenced table* involves 'navigating ... relationships across tables.'" Ex. 1002 ¶ 97 (emphasis added). This is the entirety of what the Petition *and* the expert declaration have to say about Yeager's alleged ability to "integrate into each . . . mode display processes for . . . navigating . . . relationships across tables."

The court's construction of this term in Ex. 1010 is "moving from one display of data to a related display of data." Ex. 1010 at 4. The Petition talks about detecting a foreign key in a viewed table and then "switching" to view the referenced table. Yet, looking at Fig. 7 (or Fig. 8), there is nothing at all in the display to indicate that Partno is a foreign key. We only know that Partno is a foreign key because Yeager's specification says so, but there is nothing on the screen generated by Yeager that reveals this. There is also no moving from one display of data to a related display. The Description entry is on the same display as the foreign key, and there is no switching from a viewed table to a referenced table. There is a Choices Window that can pop up with values from one column of the foreign table, but no navigation from one table-record to a related record in another table.

In short, the Yeager UI does not integrate *into a mode display* functionality that allows the user to "detect[] a foreign key or referential integrity constraint," and it provides no process for navigating to another table in accordance with that key or constraint. And as discussed above, the separate functionality around the LOCATION field is not relationally driven at all; instead, it effectively implements a linked-list manager that operates wholly independently of any RI constraints and relies on external (and human-supplied) knowledge about how the tables are intended to signify Levels. Furthermore, this LOCATION mechanism is not integrated into any mode displays, nor is any rationale provided as to why it would have been obvious to do so.

The '981 claims separately recite that the mode displays must integrate processes "for navigating across said tables and interacting in accordance [with] the selected mode with the data in the tables that are reached by said navigation." The Petition at 36 invokes the Search Window. However, this is just a report from a query, not a database table, and it certainly provides no integrated mechanism for CRUD interaction with any table reached by such search. The Search Window (Fig. 6) provides View and Edit buttons, but these are same-table operations, not related-table operations. Yeager does not navigate "across said tables" in any way.

The Petition does not reference Nadkarni for any of the "representing" or "navigating" limitations.

### 3. Managing relationships across tables

The Petition also fails to explain how managing relationships across tables, per Ex. 1010, and "avoiding insertion of inappropriate data in and across tables" (Ex. 1010 at 4), is integrated into the mode displays. The underlying database (*e.g.*, Oracle) may of course police data insertion to some extent (as the Petition suggests at page 33), and Yeager may rely on that, but that is not the same as integrating this functionality into the mode displays for creating or updating records, which Yeager does not teach. The Petition invokes the text entry validation feature of Nadkarni, but this is garden variety text entry validation with at most a calculation ("eval") based on the entry. There is nothing in Nadkarni suggesting validation enforced by the UI based on referential integrity.

The Petition argues in the alternative that adding new columns is in itself "managing", under an alternate construction that it urges the Board to adopt.

First, the court that rendered the constructions in Ex. 1010 explicitly rejected Petitioner's alternate construction. *See* Ex. 1025, Item 7 at 3 and compare with Ex. 1010 at 4. The claim says "managing *said* relationships across tables" (emphasis added), where the antecedent for "said" is the relationships that the server process scanned from the (existing database), not creating a *new* relationship. Petitioner's alternate construction is plainly wrong. Moreover, there is nothing corresponding to it in the '981 specification, which takes the existing database schema as a given throughout.

Second, Yeager's Design Window does not go beyond the ability to add a new column to an existing database. This is described beginning at col. 14, line 15. The examples are new columns for additional attributes, such as the borrowing date for an inventory item. There is not a single suggestion that a new column might be a foreign key, which to be useful would also require joining a new table, which Yeager clearly does not provide for. Merely adding a new data attribute in the form of a new column does not add a new relationship, even if adding a new relationship constituted "managing said relationships across tables"—which it does not.

### D. Yeager's Application Fails to Observe and Enforce Relational Dependencies Among Data and Across Tables

The Petition, at 36, addresses this limitation with the same recitation it provided for the "managing" limitation.

However, this limitation addresses something more. It says "relational interdependencies" and not just "referential integrity (RI) constraints."literally recites, that for all of the specified operations that the generated application performs, it does so "while observing and enforcing relational interdependencies among data across said tables."

Yeager's UI, by putting related data into a single display with no indication of which table the data comes from, fails to "observe" relational interdependencies among the displayed data, not differentiating anything in the display based on the underlying dependencies that exist

among the data. Rather than observing the existing interdependencies, the mode display is oblivious to them. The user as well cannot see any "line" that separates the data from one table from the data in a related table, and has no mechanism to prevent the user from unintentionally committing data changes to the foreign record, for example simply as a result of editing the foreign key in the primary table and writing all the data from the prior foreign table record wholesale to different record corresponding to the updated key.

The Petition does not deal with what this limitation actually says, and Yeager discloses nothing that meets it. Given Yeager's reliance on a "join" technique for dealing with related table data, without teaching of any alternative, exposure to serious data entry errors like inadvertently scrambling the entire foreign table record as a result of one entry (as above) becomes inevitable.

## V. CASON ALONE OR IN COMBINATION WITH NADKARNI FAILS TO MEET THE APPLICABLE THRESHHOLD FOR *INTER PARTES* REVIEW

### A. Cason Does Not Disclose the Scanning Limitation

The title of Cason is "Method and apparatus for generating a user interface *from the Entity/Attribute/Relationship model* of a database." Ex. 1006 1:1-4 (emphasis added). The title plainly specifies that the process proceeds "from the [EAR] model", and not as a result of scanning the database itself. The description, throughout the disclosure, is consistent with what is presented directly in the patent's title: the UI

build process starts from an EAR model, with no teaching of scanning the database.

The Petition claims, with regard to Cason, that "[t]he server system runs an 'application generator' process that scans its pre-existing database to build a meta data file. *Id.* at 8:25-9:6." Petition at 41. It also cites some curiously vague verbiage from the Cason patent (referring to "file 217 (or 216?) [sic]"),[1] and then cites its expert's declaration to conclude that "Cason's server scans its database and uses a body of rules to determine table structures, constraints, and relationships." Yet the expert himself is considerably more tentative, stating only that in his opinion "Cason discloses this limitation, *or in the alternative renders it obvious*" Ex. 1002 Bederson Dec. ¶ 136 (emphasis added).

The expert, however, fails to articulate any rationale or even any other disclosure for the bare conclusion that "in the alternative" Cason renders the scanning limitation obvious. Petition thus stakes its ground, without any articulated hedge, on the proposition that, as a matter of fact, Cason discloses the "scanning" limitation.

The Petition is wrong, however, because it elides (whether intentionally or not) this key distinction: Nowhere does Cason disclose any

[1] Though this disclosure in Cason is imprecise, files 216 and 217 are sufficiently similar in nature—both comprising separate data files that are used in the process of application generation—the distinction makes no material difference to this discussion.

process for extracting information from the subject database *itself*. Instead, it clearly and consistently features its reliance on the availability of pre-existing metadata (in the form of a user-provided EAR model), and does not provide any guidance that would make it obvious how to automatically generate or derive this metadata.

Petitioner's expert has it that "Cason's server scans *its* database" (¶ 136, emphasis added), meaning the *server's* "database"—*not* the target database that actually contains the data, but rather a completely separate Entity-Relationship model that resides on the application generation server, as reflected in "user custom table 217" and "meta data file "216." Table 217 and file 216 are *not part of the target database*. Rather, file 216 comprises metadata describing what is *in* the target database, and file 217 specifies "custom" user information, including pointers enabling the UI to fetch *data* (and *not* metadata) from the target database, 218. "User custom table 217" is further described as a "file" of "data needed to initialize" the user interface generation system. Ex. 1005 9:27-29.

Indeed, the specification is also clear that the metadata file 216 is built from an "entity table definition." Ex. 1006 9:7-21. This (labeled as Table Definition 304) is turn is part of the EAR model as shown in Fig. 9. It is clearly not part of the database, and there is no disclosure of any process to obtain this information by scanning the database.

The resulting situation parallels IPR2017-01141, whose reference, Atkins, also failed to disclose any the scanning process, or using the

results of such a scan to build the UI. The Board, in that case, declined institution precisely on the basis of this failure by the reference to meet the scanning limitation:

> Although the Design Capture, Design Editor, and WebServer work from the repository, Petitioner has also not established how the information in the repository are the claimed "said representations," which are the in-memory representations of the "table structures, constraints and relationships of said data model" scanned from "said database." Based on the cited record evidence, Petitioner has not established how Atkins and WebServer cause the server to scan the database and apply the body of rules, as claimed, to store representations for later use in constructing a corresponding client application.

Ex. 2001 at 16. In this case, Cason likewise discloses working from an EAR model, but the Petition here fails to establish how the EAR model constitutes in-memory representations of table structures, constraints and relationships scanned from "said database," or how it might have been otherwise obvious to work directly from the database. Institution must therefore be denied on the Cason ground as well.

### B. Cason's UI Generation Relies on Database-Specific Elements and Thus Cannot Automatically Construct a UI for a Database of Arbitrary Size of Complexity or Make it Obvious How to Do So

Another independent reason to deny institution on the Cason ground concerns Casons reliance on database-specific elements rendering it unable to deal with a database structure of arbitrary size

or complexity unless supplied with the database-specific information in advance (*i.e.*, other than be deriving it from simply scanning the database).

Fig. 10 of Cason is "a block diagram . . . of the method of . . . generating a graphical user interface from a[n EAR] model." While Fig. 10, and the related description at starting at 9:21 and continuing to the end of col. 10, describe *behaviors invoked in response to* the manipulation of various UI controls within user screens such as those depicted in Fig. 1, however, they do *not* describe how such screen displays are actually constructed. Fig. 1 depicts one exemplary pair of displays with particular layouts and database-specific labels, but Cason does not disclose a generalized process for *creating* such displays. How does it handle different or more complex layouts?

In fact, we are told that a file 206 contains "screen layouts" which are used to generate the UI screens, such as the "record edit interface 220."

Significantly, the specification does not explain where file 206 comes from, or how it is created. But it *does* say that "[s]creen layout & bitmpas [sic] file 206 *is unique to each data base 218*, and provides the bitmaps *and screen information* required." Ex. 1006 9:31-33 (emphasis added). This passage is even quoted in the Petition, at 55-56.

Thus, according to the specification, and as shown in Fig. 10, the UI construction process disclosed in Cason relies on the existence and availability of screen layouts that are unique to each database. No

description is provided as to how these layouts are created, nor how they could be automatically generated. In fact, unlike files 216 and 217, the specification does not even address how file 206 could be derived *from the EAR model*, much less from any scan of the database. Once one has the layout file 206 needed to create screens for a particular database, Cason addresses a process for building, for example, the record edit interface 220. But this dependency on database-specific configuration information is explicit in the Cason specification. As such, this requirement for externally-supplied and advance knowledge of the target-database structure directly contravenes any claim to an automated process for generating a UI for a database of any arbitrary size or complexity.

The essential disclosure of how to create the screen layouts in file 206 is clearly missing from Cason. The Petition does not acknowledge that this inormationis missing, or explain how (or even assert that) developing a solution to fill this gap would have been obvious.

The Petition's entire discussion of Cason with regard to the arbitrary size or complexity limitation is confined to page 47. It is 100% conclusory, and exactly mirrors the same conclusory statement made with respect to Yeager: first, the bare conclusion (without any support) that Cason "generally" teaches this limitation, and then second, (again) conclusorily stating that in any event it would have been obvious to "generalize" the provided solution. The Petition fails to address that the specification expressly relies on the provision of database-specific

resources in order to deliver the required UI screens. It fails to explain how Cason could be used to construct a UI for any arbitrary database without pre-possessing such resources, or how it could be obvious how to do so. It makes no attempt to bring in any disclosures from Nadkarni on this point. In sum, the Petition's presentation here is plainly conclusory, wholly lacking of any specifics, and provides no basis on which the Board could find obviousness.

Similarly, with regard to the limitation "causing said server to use said representations to construct a corresponding client application," the Petition actually cites "[s]creen layout & [bitmaps] file 206," which, as the Petition itself recites (but does not deal with) is "unique [*but external*] to each data base 218." Petition at 55-56. But "said representations" refers to the results of "scanning said database"—see Ex. 2001 (prior non-institution decision) at 10 ("the claim language in each of claims 1, 4, and 5, is clear—it is 'said representations' first derived from scanning the database that are stored and then used to construct a corresponding client application. The representations are derived by application of a body of rules that determine three elements: the table structures, constraints, and relationships of said data model."). There is no teaching or suggestion in Cason that file 206 is derived from any scan of the target database, or how it could be. The Petition on page 56 does invoke Nadkarni, but only for the general, overarching proposition of constructing a client application, and does not address how this construction process might create screen layouts simply by scanning

the database. The Petition again fails to acknowledge or address this issue, or to make any argument as to obviousness, other than to allege the obviousness of the entire application generation process: this would simply assume away the entire invention, which claims and supports a specific method by which such an application can be generated. Cason, which fails to explain this aspect of its implementation, does not make the implementation obvious, nor does the Petition make any case that it does.

## VI. CONCLUSION

For the foregoing reasons, the Board should deny institution.

Respectfully submitted,

*/Ronald Abramson/*
Ronald Abramson, Reg. No. 34,762
Ari J. Jaffess, Reg. No. 74,558

Dated: April 14, 2021

LISTON ABRAMSON LLP
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
Telephone: (212) 257-1630

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 CFR § 42.24(d), the undersigned hereby certifies that the word count for the foregoing Patent Owner Preliminary Response totals 9,592, which is within the 14,000 allowed under 37 CFR §§ 42.24(a)(1)(i); 42.24(b)(1).

*/Ronald Abramson/*
Ronald Abramson

Dated: April 14, 2021

## CERTIFICATE OF SERVICE

Pursuant to 37 CFR § 42.6(e), the undersigned certifies that on April 14, 2021, a complete and entire copy of this Patent Owner Preliminary Response was provided to the Petitioner by filing through the PTAB E2E System and via email to *qe-kaufman-salesforce@quinnemanuel.com*, *rayzado@quinnemanuel.com*, *mglass@quinnemanuel.com*, *samstake@quinnemanuel.com*, *gavinsnyder@quinnemanuel.com*, and *richardlowry@quinnemanuel.com* as authorized in Petitioner's mandatory notices.

/*Ronald Abramson*/
Ronald Abramson

Dated: April 14, 2021