UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MICHAEL PHILIP KAUFMAN<br><br>Plaintiff,<br><br>v.<br><br>ZOHO TECHNOLOGIES CORPORATION,<br><br>Defendant. | Civil Action No. 25-cv-01082-RP |

**PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**


I. BACKGROUND ........ 1

II. CLAIM CONSTRUCTION PRINCIPLES ........ 3

III. AGREED CONSTRUCTIONS ........ 5

IV. DISPUTED TERMS ........ 5

1. Preambles ........ 5
2. "automatic(ally)" / "automatically generating" / "automatically construct" ........ 6
3. "data model" ........ 10
4. "scan[ning] said database" ........ 12
5. "apply[ing] a body of rules to determine the table structures, constraints and relationships of said data model" ........ 14
6. "construct a corresponding client application" ........ 15

## TABLE OF AUTHORITIES

### Cases


*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997) ........................................... 11

*Harris Corp. v. Fed. Exp. Corp.*, 502 F. App'x 957 (Fed. Cir. 2013) ..................................... 14

*Invitrogen Corp. v. Biocrest Manufacturing, L.P.*, 327 F.3d 1364 (Fed. Cir. 2003)................ 11

*Kaufman v. Microsoft Corp.*, 34 F.4th 1360 (Fed. Cir. 2022) .............................................. 8-9

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ................................................ 3

*Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369 (Fed. Cir. 2004) .......................................... 10-11

*Mynette Techs., Inc. v. United States*, 139 Fed. Cl. 336 (Fed. Cl. 2018) ................................ 11

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................................... 3-4

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337(Fed. Cir. 2001) ........................................................................................................................ 11

*Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012).......................... 4, 8

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...................................... 4

The Kaufman patents-in-suit address a process of taking any relational database and, based on the database's self-description ("schema"), automatically creating a fully functional end-user application tailored to the database, which performs a full set of user operations needed to create, retrieve, update, and delete data from the database.

Zoho seeks to import from the specification of the patents-in-suit language directed to a "backend" relational database manager. Kaufman believes this is an attempt to evade infringement, with a view to future arguments about the identity of Zoho's database. Zoho's arguments conflict with the constructions issued by another court, in which case Kaufman went through a successful trial and appeal against Microsoft Corporation. They are also improper under controlling rules of claim construction and contrary to the claims of the patents-in-suit, as shown below.

## I. **BACKGROUND**

The patents-in-suit are U.S. Patent Nos. 7,885,981 (the "'981 patent"), 10,977,220 ("the "'220 patent"), and 10,025,801 (the "'801 patent"), of which Michael Philip Kaufman ("Kaufman") and Micah Philip Silverman are the inventors. Kaufman holds full title. He accuses Defendant Zoho Technologies Corporation ("Defendant" or "Zoho") of infringing claims 1-2 and 4-5 of the '981 patent, claims 1-15 of the '220 patent, and claims 1 and 5 of the '801 patent (the "Asserted Claims").

The '981 and '220 patents disclose and claim systems and methods for generating an automatic user interface for arbitrarily complex or large databases, and specifically for relational databases, which are collections of data organized into sets of interrelated tables. Each table describes a particular type of item (or "entity"), wherein each row (or "record") of the table can be cross-referenced by (or "related to") any number of other records, from any of the tables

(entity types) within that database. For example, a table of departments might be related to a table of employees which includes “pointers” (cross-references) to each employee’s department.

The ’801 patent is based on the same disclosure as the ’981 and ’220 patents, but claims one aspect of the overall implementation. Under the ’981 and ’220 patents, one claimed feature of the generated end-user interface concerns “representing” table data within a user display (a “base” table) that includes cross-references to data in another, off-screen table (a “foreign” table). This representing may be done in a manner that incorporates more descriptive information from the referenced foreign-table records in place of the mere cross-references (or “keys”) that are actually contained in the base table, which are typically just numbers (or other values) that are intentionally devoid of intrinsic meaning (*e.g.*, the number “7,” which points to the “Accounting” record within the Department table). The claims of the ’801 patent concern specific mechanisms for determining, from the structure and data of the foreign table, how to automatically supplant these cryptic key values, such that the department identified by “7” (for instance) can instead be rendered as “Accounting.”

The prior art for creating database applications was largely manual. Traditionally, human programmers have hand-written code that is custom-tailored to provide a user interface for working with the data within a specific database. As noted in the ’981 patent (*e.g.*, at 2:56-64), some parts of the process were later automated to assist with limited aspects of this development work, such as providing displays to view and edit data within a single database table (commonly referred to as “table editors”) without regard to the significance of any key values. But the ’981 and ’220 patents disclose and claim taking a pre-existing database and automatically generating a fully functional user application for working coherently with all of the data as distributed across all the tables in that database (*i.e.,* creating, retrieving, updating, and deleting data, including

cross-referenced data). The automatically created application can display and edit enhanced views of the records within these tables, traverse relationships (or "navigate") to view related records in other tables, and add, edit, or delete items reached through such traversal. Throughout these operations, the application constrains inputs and enriches displays so as to reflect and maintain the referential integrity of the database, *i.e.*, it prevents insert, update, and delete operations from violating table-to-table relationships (references) defined by the database. The common specification of the patents-in-suit further includes programming source code that provides a working example of various aspects of the disclosed subject matter.[1]

The parties dispute a limited set of terms from the Asserted Claims (the "Disputed Terms"), as addressed herein by Kaufman.

## II. CLAIM CONSTRUCTION PRINCIPLES

Construction of patent claims is a matter of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). This is true even where the construction issues have evidentiary underpinnings on which the District Court must make factual determinations. *Id.* at 390.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal quotations omitted).

In construing a term, the "objective baseline" is the "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13. "There are only two exceptions to this general rule

[1] The '981 patent includes the full source code in its own specification (*see* '981 patent, columns 27-340), whereas the '220 and '801 patents incorporate this disclosure by reference. *See* '220 patent, 2:4-10; '801 patent, 2:6-12.

[that the words of a claim are given their ordinary and customary meaning]: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (*citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996))

"[T]he best source for understanding a technical term" is a patent's intrinsic evidence, which includes the patent and its prosecution history. *Phillips*, 415 F.3d at 1315 (internal quotations omitted). The specification and the prosecution history "provide[] evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. However, because the prosecution history represents an "ongoing negotiation … rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

"Extrinsic evidence," such as expert and inventor testimony, dictionaries, treatises, and other evidence external to the patent and prosecution history may also be considered in claim construction. *Id.* However, caution must be exercised with regard to accepting and relying on extrinsic evidence, because extrinsic evidence (including without limitation testimonial evidence) is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotations omitted). A court may rely on extrinsic evidence "in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n.6.

n

## III. AGREED CONSTRUCTIONS

Plaintiff and Defendant agree on the construction of the following terms and respectfully request that the Court adopt them:

| Claim Term | Agreed Construction |
|---|---|
| database | An organized collection of data. |
| relational database | A database having multiple tables where a relationship specifies how a field in one table relates, explicitly or by implication, to a field in another. |
| database table | A collection of data about a subject arranged in columns and rows, where the columns (fields) identify characteristics for the subject of the table, and rows (records) represent data values for each field for an instance of that subject. |
| "create" mode | A mode of user interaction through which a user may insert a new record (row) into a database table. |
| "retrieve" mode | A mode of user interaction through which a user may call up one or more records from the database. |
| "update" mode | A mode of user interaction through which a user may modify (edit) the data within a record of a database table. |
| "delete" mode | A mode of user interaction through which a user may eliminate a record from a database table. |

## IV. DISPUTED TERMS

### 1. Preambles

Kaufman does not dispute that the preambles are limiting.[2]

[2] Kaufman notes that Zoho did not raise the preamble issue in any pre-briefing exchanges.

**2. "automatic(ally)" / "automatically generating" / "automatically construct"**

| Kaufman's Proposal | Zoho's Proposal |
|---|---|
| "No separate developer input is required." | "automatically generating an [end-] user interface" - generating an end user interface without any custom software programming or any other user intervention by performing steps (a), (b), and (c) after an end user trigger ('981 patent, claims 1, 4, 5; '220 patent, claims 1, 11, 14)<br><br>"automatically construct [a representation of data from a row of the primary table]" - construct without any custom software programming or any other user intervention ('801 patent, claims 1, 5) |

Plaintiff's proposed construction makes explicit that "automatic" means that the specific claim steps recited all take place "automatically" after being triggered by the user and that "no separate developer input is required." This is the definition that Judge Hellerstein adopted for this term in the *Microsoft* case for the Asserted Claims of the '981 patent (Exhibit 1 to the Declaration of Ronald Abramson in Support of Plaintiff's Responsive Claim Construction Brief)[3], which was also adopted by the Federal Circuit, and it is appropriate here, for the use of "automatic(ally)" in the Asserted Claims of the '981, '220, and '801 patents.

In distinguishing other systems that are not automatic and require developer input for the claimed steps, the specification makes clear that "the construction of front-end [database] applications is generally undertaken using conventional … computer languages, which require by-hand coding at a very low level of functionality." ('981 patent at 2:53-56.) Then-available

[3] Note that only the '981 patent was asserted in the *Microsoft* case, not the '801 or '220 patents, which issued after the *Microsoft* case was filed.

tools for easing development were "limited to fairly specific (and, still, fairly low-level) uses—among them, providing more-sophisticated or 'richer' controls for manipulating individual data elements" and sometimes "offering 'form generator' or 'wizard' facilities to automatically generate the code for a simple UI display which manipulates a single underlying (back-end) data table." ('981 patent at 2:57-64.) "Even with such tools, considerable work remain[ed] in building a complete, fully-functional UI for a back-end schema of any appreciable size or complexity." ('981 patent at 2:65-67.) [4]

The most fundamental issue with Zoho's proposed construction here is that it would severely narrow this term by stacking three separate requirements, including the overly broad negative limitations of "without *any* custom software programming or *any other* user intervention" (emphasis added).

In the first of Zoho's requirements, "custom software programming" is roughly similar in scope to Kaufman's proposed "developer input," but there is a major difference between the two positions because Kaufman's proposal further specifies that "automatically" means that "separate" developer input is not "required," whereas Zoho would rule out any custom programming whatsoever, whether required or not, for the claimed user interface creation.

Kaufman asserts that the construction from the prior litigation is correct, and more particularly that the "separate" and "required" aspects of that construction (no "*separate* developer input is *required*") are important. There can be custom programming or developer input apart from the steps of the claims of the '981 and '220 patents, each of which are themselves performed automatically, as recited in the Asserted Claims of the '981 and '220

---

[4] The '981 and '220 patents share a common specification and for simplicity, Kaufman's cites herein to the '981 patent specification will not include separate, parallel cites to the '220 patent.

patents. [5] The presence of custom programming not tied to the actual claim steps should be of no moment.

Zoho's construction strays even further where it seeks to inject additional verbiage that would also require a lack of "*any other* user intervention" (emphasis added). To argue this, Defendant Zoho Technologies Corporation's Opening Claim Construction Brief (D.I. 42) (hereinafter "Zoho's brief") at page 13 conflates use of an application with constructing that application, in an effort to manufacture and append an additional claim requirement that simply does not fit what the claims recite.

Zoho's "any other" wording here would create another unbounded negative limitation. This insertion would exclude anything involving user action, whether connected to application construction or not, and would improperly restrict the claim. Stringing together disparate arguments from prior briefing, as Zoho's brief does on page 12, would create extra limitations out of thin air, and none of those arguments are lexicographic or a clear disavowal of claim scope that would alter the customary and ordinary meaning of "automatic" or "automatically." *See Thorner*, 669 F.3d at 1365 (emphasizing the "clear and unmistakable" requirements for disclaimer).

Microsoft, in the prior litigation "itself concede[d] that it is permissible under the claim for at least some steps to be taken by the developer, such as steps that involve placing the desired database before the user-interface-generating software." *Kaufman v. Microsoft Corp.*, 34 F.4th

---

[5] Kaufman also notes that Zoho separately attempts to add "without any custom programming" to its definition of the term "construct a corresponding client application," as discussed below in Section 6, purportedly because the "construct" term is "part of the three steps recited for automatically generating the user interface" in the Asserted Claims. Zoho's brief at 18. But Zoho, in that instance, ignores its own language of "without … any other user intervention," which inconsistency and omission tends to show that this "user intervention" language is improper and should not be part of a definition of the "automatic" term, or any other term discussed herein.

1360, 1371 (Fed. Cir. 2022) (regarding claim 1 of the ’981 patent). This “concession confirms that the claim language allows humans to take steps needed to produce the user interface.” *Id.*

As the Federal Circuit stated:

> Notably, the preamble does not say that the entire “method” of creating a final user interface must be automatic…. the words do not preclude human activities to configure the processor for the desired generation, which must then be automatic, and they do not define “generating” as leaving no room for minor final human adjustments, after the processor has done its work, to produce the final onscreen interface. Similarly, the scanning limitation … language permits at least some pre-scanning human actions.

*Id.* So Zoho’s “without … any other user interaction” definition flies in the face of the Federal Circuit’s treatment of this very term in claim 1 of the ’981 patent, which Zoho fails to address at all.

“Automatic” / “automatically” means that steps (a), (b), and (c) in the ’981 and ’220 patents’ Asserted Claims are carried out upon being triggered by a user, without requiring separate developer input. The ’981 and ’220 patents detail steps that would be taken by a user to set up the automated process. *See* ’981 patent at 344:62-345:4. Developer input—or custom programming, or user interaction—may be used for other, unclaimed steps or aspects of these claims, but for the claimed, automatic steps, no separate developer input is required.

Automatic, in the Asserted Claims of the ’801 patent, means that the representation of data is constructed without separate developer input. The software performs this step in Asserted Claim 1 of the ’801 patent and performs the routine in Asserted Claim 5 of the ’801 patent without separate developer input.

This is the construction adopted by Judge Hellerstein in the Microsoft case and it remains the proper construction today.

**3. "data model"**

| Kaufman's Proposal | Zoho's Proposal |
|---|---|
| Plain and ordinary meaning as set forth in the claim:<br>"a data model comprising tables and their column-complements and datatypes, constraints, and the relationships across tables" ('981 patent, claims 1, 4, 5)<br><br>"a data model comprising a plurality of tables, constraints, and relationships" ('220 patent, claims 1, 11, 14) | "organizational structure for the complement of tables, their columns and datatypes, constraints and relationships used by the backend (i.e. the RDBMS) for storing data" ('981 patent, claims 1, 4, 5; '220 patent, claims 1, 11, 14) |

Zoho seeks to import "backend (i.e. the RDBMS)" as a requirement of the claims, to create an escape hatch for itself. The added limitation is unwarranted.

"Data model" is defined within the claims of the '981 patent. Namely, claims 1, 3, and 5 each recite

> a data model comprising [said/a plurality of] tables and their column-complements and datatypes, said constraints, and the relationships across said tables

'981 patent at 377:9-11 (claim 1); 377:52-54 (claim 3); 378:27-29 (claim 5).

"Data model" is also defined within the claims of the '220 patent. Namely, claims 1, 11, and 14 each recite

> a data model comprising a plurality of tables, constraints, and relationships

'220 patent at 37:33-34 (claim 1); 38:16-18 (claim 11); 38:38-49 (claim 14).

That is what a data model is in the context of these claims.

The word "comprising" in patent law has a very specific meaning. It is consistently regarded as inclusive and open-ended and does not exclude additional, unrecited elements or method steps. *See, e.g.*, *Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004) ("[L]ike the

term 'comprising,' the terms 'containing' and 'mixture' are open-ended."); *Invitrogen Corp. v. Biocrest Manufacturing, L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."); *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("Comprising" is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.). "Comprising," on its own, is not further limiting beyond the recited elements in the claims themselves. Each of the phrases in the '981 patent's Asserted Claims and the '220 patent's Asserted Claims recites "comprising," followed by the definition of the term within the respective claim.

Zoho, for its part, is trying to improperly limit this term by adding the phrasing "used by the backend (i.e. the RDBMS) for storing data," clearly an impermissible exercise of seeking to import limitations from the patent specification. *See Mynette Techs., Inc. v. United States*, 139 Fed. Cl. 336, 347 (Fed. Cl. 2018) ("importing limitations from the specification into the claims [is] 'one of the cardinal sins of patent law'") (*quoting SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

There is nothing in the claims, specification, or prosecution history that limits "data model" to something that is only "used" by a "back-end RDBMS." Per the words of the claims, any "relational database defined within a relational DBMS" (*see, e.g.*, '981 patent at 377:4-5) qualifies, and nothing says that the data model itself *must* pertain to a (or "the") "back-end" RDBMS. Kaufman also notes that some of the Asserted Claims, *e.g.*, '981 patent, claim 5 and '220 patent, claim 14, do not recite "RDBMS" at all, further showing that it is improper to import this RDBMS into the phrase "data model."

Furthermore, Zoho's proposed construction would conflate a relational database with an RDBMS, which stands for Relational Database *Management System*. As noted, the claims that refer to an RDBMS reflect this distinction, *e.g.*, the above-quoted language of '981 patent claim 1, referring to "a relational database defined *within* a relational DBMS" (emphasis added). Per the claim language, the tables, etc. of "said relational database" are "*stored in*" the DBMS, but it is a huge and unwarranted logical leap to go from there to an interpretation that the "tables, their columns and datatypes, constraints and relationships [of "said relational database" are] *used by* the backend (i.e. the RDBMS) for storing data"—and in any case completely wrong to *limit* the construction in such manner, as Zoho would do. How the back-end stores the components of "said database" itself may be wholly independent of the contents of "said database." The "data model" as referenced in the claims is clearly intended to refer to how "said database" (*i.e.*, the one for which the constructed application "provides displays of the table contents") organizes data, but not necessarily how any containing "backend" RDBMS does so.

Zoho is also altering the language of the claims, including the word "complement" before "of tables." The words of the '981 patent Asserted Claims include "complement" in a different position and the words of the '220 patent Asserted Claims do not include the word "complement" at all. The words of the claims themselves should govern.

**4. "scan[ning] said database"**

| Kaufman's Proposal | Zoho's Proposal |
|---|---|
| Plain and ordinary meaning | "read[ing] through the data model of the RDBMS without using preexisting knowledge of its structure" ('981 patent, claims 1, 4, 5; '220 patent, claims 1, 11, 14) |

This term should be afforded its plain and ordinary meaning. A person of skill in the art would understand the term as it is written and nothing in the specification or the file history redefines the term as Zoho would have the Court do.

Zoho is trying to incorporate "RDBMS" into this term and further redefining the "data model" here to be the "data model of the RDBMS." The data model is not a data model of an RDBMS, it is a data model of the relational database in question. For example, claim 5 of the '981 patent recites "*said relational database comprises a plurality of tables, constraints and relationships in accordance with a data model* comprising said tables and their column-complements and datatypes." '981 patent, 378:25-29 (emphasis added); see also '220 patent, 38:47-49 (claim 14) ("wherein the database is described by a data model comprising a plurality of tables, constraints, and relationships"). The claims are thus clearly directed to a data model of a relational database, not of an RDBMS.

Note also that, while nothing in the specification excludes (or requires) "preexisting knowledge" of the structure of the data model, there is express disclosure of *re-scanning* the database after it has been previously scanned. *See, e.g.*, '981 patent at 345:16-346:16. By necessity, a secondary scan of the data model would mean there is already preexisting knowledge of its structure. There is nothing in the claim language or the specification of the '981 or '220 patents that would exclude this process of re-scanning the data model from the claim scope. Zoho's proposed construction would improperly limit this term.

This term should be given its plain and ordinary meaning.

**5. "apply[ing] a body of rules to determine the table structures, constraints and relationships of said data model"**

| Kaufman's Proposal | Zoho's Proposal |
|---|---|
| Plain and ordinary meaning | "interpret[ing], with a body of rules, all table structures, constraints, and relationships of the data model of the RDBMS" ('981 patent, claims 1, 4, 5) |

As with the "scanning" limitation addressed in Section 4 above, the meaning of this limitation is clear from the language itself. Kaufman directs the Court to Zoho's repeated attempts to insert language referring to the "RDBMS" into various limitations (*see, e.g.,* Section 3 above and Zoho's brief at 14-15). For the present limitation, it likewise wants to make what it calls "the data model *of the RDBMS*" (emphasis added) become the sole subject of the claimed application building exercise. The "[s]aid data model" of this limitation refers to the data model of the relational database being addressed by the user, which is not necessarily the data model "of the RDBMS." The two data models could differ. Limiting the subject matter to that of the RDBMS would point the claim at the wrong subject matter.

Zoho cites to *Harris Corp. v. Fed. Exp. Corp.*, 502 F. App'x 957, 962–63 (Fed. Cir. 2013) for an argument that use of "the" necessarily applies to "all items in the list." This is an improper stretch of the *Harris Corp.* case, which was limited to the facts where there was a limitation about continuously monitoring and storing flight performance data "during an entire flight," such that a later reference to "the" accumulated data meant all of the data. *Id.* at 963. This was because identical language was used in multiple steps in the same claim, and so it had the same scope. *Id.* This is absolutely not a general rule that "the" means "all."

The term "apply[ing] a body of rules to determine the table structures, constraints and relationships of said data model" is clear from the claim language itself and requires no construction.

**6. “construct a corresponding client application”**

| Kaufman’s Proposal | Zoho’s Proposal |
|---|---|
| Plain and ordinary meaning | “generate[-ing] a corresponding front-end program without any custom software programming” (’981 patent, claims 1, 4, 5; ’220 patent, claims 1, 11, 14) |

This term means to construct a client application that corresponds to the scanned representations of the Asserted Claims of the ’981 and ’220 patents. Zoho is again trying to insert “without *any* custom software programming” (emphasis added) when that, of course, is not the meaning of “construct a corresponding client application.” This is the second place where Zoho attempts to bring in this requirement. This would compound the error by inserting these additional and incorrect words twice. The words “construct a corresponding client application” speak for themselves and should not be further altered or limited.

Date: September 24, 2026

Respectfully submitted,

*/s/ Ronald Abramson*

Ronald Abramson (*pro hac vice*)
New York Bar No. 1457126
ron.abramson@listonabramson.com
David G. Liston (*pro hac vice*)
New York Bar No. 2642049
david.liston@listonabramson.com
Ari J. Jaffess (*pro hac vice*)
New York Bar No. 4621397
ari.jaffess@listonabramson.com
Alex G. Patchen (*pro hac vice*)
New York Bar No. 4246021
alex.patchen@listonabramson.com
M. Michael Lewis (*pro hac vice*)
New York Bar No. 4467007
michael.lewis@listonabramson.com
Gina K. Kim
Texas Bar No. 24097937
gina.kim@listonabramson.com
**Liston Abramson LLP**
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
212-257-1630

Wasif H. Qureshi
Texas Bar No. 24048155
wqureshi@jw.com
**Jackson Walker LLP**
1401 McKinney, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4521

**COUNSEL FOR PLAINTIFF MICHAEL PHILIP KAUFMAN**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing is being served on the counsel of record via the CM/ECF system on September 24, 2026.

Dated: September 24, 2026

By: *<u>/s/ Ronald Abramson</u>*
Ronald Abramson