**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| MICHAEL PHILIP KAUFMAN,<br><br>Plaintiff,<br><br>v.<br><br>ZOHO TECHNOLOGIES CORPORATION,<br><br>Defendant. | Case No. 1:25-cv-001082-RP |

**DEFENDANT ZOHO TECHNOLOGIES CORPORATION'S REPLY CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. DISPUTED TERMS .......... 2

A. The Preambles Are Limiting .......... 2

B. "automatically" terms – '981, '220, and '801 patents .......... 2

*1. The Specification and Claims Support Zoho's Proposed Construction .......... 2*

*2. Kaufman's Statements to the Patent Office Support Zoho's Construction .......... 4*

*3. "Automatic" Was Not Construed in the Microsoft Case .......... 5*

*4. Kaufman Agreed "Automatically" Excludes Further User Intervention .......... 6*

*5. Kaufman Argued the '801 Patent Steps Were Performed Automatically .......... 7*

C. "data model" – '981 and '220 patents .......... 8

D. "scan[ning] said database" / "scanning the database" – '981 and '220 patents .......... 11

E. "apply[ing] a body of rules to determine the table structures, constraints, and relationships of said data model" – '981 patent .......... 13

F. "construct[ing] . . . a corresponding client application" – '981 and '220 patents .......... 14

III. CONCLUSION .......... 15

## TABLE OF AUTHORITIES

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ........................................5, 8, 13

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ........................................9

*Harris Corp. v. Fed. Express Corp.*,
502 F. App'x 957 (Fed. Cir. 2013) ........................................14

*Kaufman v. Microsoft Corp.*,
34 F.4th 1360 (Fed. Cir. 2022) ........................................6, 7

*Key Pharms. v. Hercon Lab'ys Corp.*,
161 F.3d 709 (Fed. Cir. 1998) ........................................6

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005) ........................................15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ........................................6, 9

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ........................................4

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007) ........................................8

## I. INTRODUCTION

Kaufman proposes constructions that ignore the explicit teachings in the specification and disregard the statements he made to the Patent Office and the Patent Trial and Appeal Board ("the Board") regarding the scope of his purported invention. For example, for the "automatically" term, Kaufman contends that the term simply means that custom programming or developer input is not required, but that there can be user intervention, programming, and customization when "automatically generating a user interface." Kaufman's argument deprives "automatically" of any meaning and directly contradicts the specification's description of the invention as generating a user interface "without any custom programming." '981 patent at 2:23–27. It also contradicts what Kaufman told the Board when he said the point of his invention was "to find a way for ***a machine to implement*** all the claimed UI functionality" and "***eliminate the repetitive human work*** in fully building the user interface[.]" Dkt. 42-6 at 3. And it contradicts his prior claim construction position, when he pushed for a construction of "automatically" that excludes "further intervention by the user." Dkt. 42-4 at 10.

Kaufman does the same with his proposed construction of "data model." In arguing the term should not be construed to be limited to use by the backend (i.e., the RDBMS), Kaufman ignores that the specification expressly defines "data model" as "the organizational structure ***to be used by the back-end*** for storing data." '981 patent at 2:41–45 (emphasis added). And he further ignores that he relied on this express definition when explaining the invention to the Board. *See* Dkt. 42-6 at 13.

For the "scanning" terms, Kaufman now argues there is no requirement that the "scanning" of the database be done without any prior knowledge of the underlying structure of the database. But during an IPR, Kaufman distinguished prior art by telling the Board that, unlike his invention, the prior art relied on "foreknowledge that the target database structure[.]" Dkt. 42-6 at 26.

Kaufman is bound by the explicit teachings in the specification as well as statements he made during prosecution and IPR proceedings to distinguish prior art. Thus, the Court should reject Kaufman's contradictory proposals and adopt Zoho's constructions, which are consistent with the intrinsic record.

## II. DISPUTED TERMS

### A. <u>The Preambles Are Limiting</u>

Kaufman agrees that the preambles are limiting. Dkt. 43 ("Op.") at 5. Thus, the Court should adopt Zoho's proposal and construe the preambles of the independent claims as limiting.

### B. <u>"automatically" terms – '981, '220, and '801 patents</u>

As a preliminary matter, Kaufman agrees that the term "automatically generating a user interface" requires all of the recited steps of the claims to be performed automatically after an end user trigger. Op. at 6. Any construction adopted by the Court should thus reflect this understanding (which Kaufman's proposed construction fails to do).

The parties otherwise dispute whether "automatically" precludes any custom software programming or any other user intervention. Specifically, Kaufman contends that "automatically" means that no separate custom software programming or developer input is required, but that there can be some other custom programming, developer input, and user intervention. *Id.* at 7. Kaufman's proposal is ambiguous and cannot be reconciled with the specification and explicit words of the claim, the statements Kaufman made to the Board during IPR proceedings, and Kaufman's own prior claim construction positions.

#### *1. The Specification and Claims Support Zoho's Proposed Construction*

Kaufman argues that "automatically" only precludes "separate" or "required" programming or developer input, but permits other custom programming or developer input. Kaufman, however, points to nothing in the intrinsic record to support this or explain what is meant

by "separate" or "required" programming in the context of the claims. Kaufman does not because he cannot; the specification and claims very clearly support Zoho's proposed construction.

Under Kaufman's proposal, the claims cover generating a user interface using custom programming and developer input, despite the specification defining the invention by the absence of custom programming. The specification states that the "present invention relates . . . to systems and methods for automatically generating ***without any custom programming*** a user interface for the database." '981 patent at 2:23–27 (emphasis added). And "an object of the invention" is a complete user interface "for any arbitrarily complex or large database schema, ***without any custom software programming***." *Id.* at 3:8–12 (emphasis added). It criticizes the prior art because it "require[d] by-hand coding" and because "the attendant explosion of manual-coding requirements quickly becomes unwieldy—and eventually, untenable." *Id.* at 2:53–3:4. Kaufman ignores the case law holding that such statements limit the scope of the claims. *See* Dkt. 42 ("Br.") at 8–10 (citing *Honeywell*, *Forest Labs.*, *C.R. Bard*, *VirnetX*, and *Chicago Board Options Exchange*).

With nothing in the specification to support his construction, Kaufman erects a strawman, arguing that "custom programming not tied to the actual claim steps should be of no moment." Op. at 7–8. But Zoho's proposed construction does not preclude custom programming or other user input that is not used for generating a user interface. For example, Zoho's construction does not exclude custom programming for steps such as installing the software and configuring its connection to a database before the user trigger. The passage Kaufman cites for "steps that would be taken by a user to set up the automated process" (*id.* at 9 (citing '981 patent at 344:62–345:4)) describes examples of those preliminary steps: entering information about how to connect to the database and log-in credentials (specifically, entering a JDBC connection string and database credentials). The specification confirms that these connection variables are "[t]he only

customization that should be required," and Zoho's proposed construction does not preclude them. '981 patent at 346:18–24.

There is, however, nothing in the specification that allows for or describes any developer input, custom programming, or user input taken as part of generating a user interface. The plain language of the claims—"automatically ***generating a user interface***"—makes clear that it is the process of generating a user interface that must be done without any custom programming. Thus, any action taken to generate the user interface—including the three recited steps of the claims—must be done without any custom programming or other user intervention.

### *2. Kaufman's Statements to the Patent Office Support Zoho's Construction*

In fact, during prosecution and IPR proceedings, Kaufman himself recognized that "automatically" means that generating the user interface (UI) is done without custom programming or any other user input. To overcome a rejection during prosecution of the application leading to the '220 patent, Kaufman told the Patent Office that the purported invention automatically generates the UI without custom programming, stating that "rather, the same universal and unvarying source code responds at run time to its reading of the internally cached representation of a database structure to dynamically fashion and deliver a user interface that conforms to this structure, without requiring the generation of any intermediate source code for subsequent execution on the server in order to construct the corresponding client application." Dkt. 42-2 at 12. A construction that permits custom programming in generating the user interface cannot be squared with that statement and cannot be correct. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution").

Kaufman told the Board the same thing during IPR proceedings challenging the validity of the patents. He told the Board that the object of the invention "is to prescribe one general process

that works automatically for *any* existing database, automatically scanning the database to learn its structure and using the scanned information to eliminate the repetitive human work in fully building the user interface . . . for every table found in the database." Dkt. 42-6 at 3. He distinguished prior art tools that "only automated limited parts of the process . . . requiring the assistance of a developer . . . thus relying on human, per-table input to complete the UI creation task." *Id.* Kaufman is bound by those statements and the public is entitled to rely on them. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

### *3. "Automatic" Was Not Construed in the Microsoft Case*

Unable to escape the unequivocal teachings in the patent specification and his prior statements to the Patent Office, Kaufman resorts to arguing that his proposed construction of "automatically" "is the definition that Judge Hellerstein adopted [in the *Microsoft* case] . . . which was also adopted by the Federal Circuit." Op. at 6. The record does not support either claim. Judge Hellerstein's Claim Construction Order sets out every term the court construed, and "automatic" is not among them. Ex. A, Claim Construction and Scheduling Order, *Kaufman v. Microsoft Corp.*, No. 1:16-cv-02880-AKH, at 3–4 (S.D.N.Y. Apr. 11, 2018).

Discussion of "automatic" only came up nearly two years later, at a January 16, 2020, pretrial hearing, and only as an agreement between the parties:

> MR. WOLFF: Can we resolve the claim construction issue?
> THE COURT: Which one?
> MR. WOLFF: Automatic.
> THE COURT: You agreed on a definition.
> MR. ABRAMSON: I think we have resolved it.
> …
> THE COURT: No separate developer input is required.

Dkt. 43-2 at 19:16–20. There is no order construing "automatically generating a user interface" and certainly no claim construction analysis or review of the intrinsic record.

The Federal Circuit did not construe the phrase either. It described the parties as having "appeared to agree" that "automatic" meant no separate developer input, and held that Microsoft forfeited any argument about the phrase's scope by not pursuing it at the jury-instruction stage. *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1369–71 (Fed. Cir. 2022). It then reviewed the verdict only for substantial evidence under that agreed language. *Id.* at 1371–72. This is not a claim construction. If anything, the *Microsoft* appeal shows why the claim construction dispute must be resolved now rather than left to the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

#### *4. Kaufman Agreed "Automatically" Excludes Further User Intervention*

As explained above, a full and proper claim construction analysis supports Zoho's proposed construction. Indeed, during the *Microsoft* proceeding, even Kaufman advocated for Zoho's proposed construction of "automatically." In fact, Zoho's proposed construction comes almost verbatim from Kaufman's own proposed construction in *Microsoft*: "The 'generating' - comprising steps (a), (b), and (c) - is carried out upon being triggered by a user, ***without requiring further intervention by the user in order to complete the generation of the UI***." Dkt. 42-4 at 10 (emphasis added). A patentee's prior construction of the same term in the same patent is strong evidence of its meaning. *See Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 714–15 (Fed. Cir. 1998). But Kaufman's proposed construction now omits, without explanation, the italicized clause. *Compare* Op. at 6, *with* Dkt. 42-4 at 10.

Disregarding what he previously told the *Microsoft* court, Kaufman now argues that precluding further intervention by the user is an "unbounded negative limitation" that conflicts with the Federal Circuit's finding that the '981 claims "do not preclude human activities to configure the processor for the desired generation" or "minor final human adjustments, after the processor has done its work." Op. at 8–9 (quoting *Kaufman*, 34 F.4th at 1371). But Zoho's

construction is not unbounded. It is limited to steps taken to generate a user interface, including performing steps (a), (b), and (c) after an end user trigger. Br. at 8.

Zoho's construction is also consistent with the Federal Circuit's reasoning. Zoho's proposal does not exclude human activity ***before*** the trigger (configuring the processor, identifying the database, entering log-in credentials) and ***after*** the steps are complete (minor adjustments). What the construction excludes is human work ***during*** the claimed generation of a user interface, which the Federal Circuit said "must then be automatic." *Kaufman*, 34 F.4th at 1371.

Finally, Kaufman asserts it is "inconsistent" for Zoho to exclude "user intervention" in its construction of "automatically" but not in the construction of "construct[ing] . . . a corresponding client application." Op. at 8 n.5. The two constructions are based on different intrinsic evidence. The construction of "automatically" governs all steps taken to generate a user interface and is described in the specification as not requiring additional human work. *See supra* Sections II.B.1–.2. The construction of "construct[ing]" relies on statements in the prosecution history that tie the construction of the application to the absence of programming. *See infra* Section II.F.

#### ***5. Kaufman Argued the '801 Patent Steps Were Performed Automatically***

Kaufman's argument specific to the '801 patent asserts only that "the representation of data is constructed without separate developer input." Op. at 9. In opposing an IPR petition challenging the '801 patent, Kaufman took a different position:

> With the "automatically construct" limitation present in all claims of the '801 patent, it is important to understand that the following five recited steps . . . are all encompassed within the automatic nature of the claimed method . . . . This is not a claim where some parts of this process are automated and some steps can be manual. The entire claimed process of constructing the representations is done automatically, by computer processors.

Ex. B, Patent Owner's Prelim. Resp., *Salesforce.com, Inc. v. Kaufman*, IPR2021-00396, at 7–8 (P.T.A.B. Apr. 14, 2021). He continued: "A processor (not a person) identifies a foreign key,

locates a row in the foreign table, selects a value therefrom, and derives a description of the foreign-table row. This is not done manually, but automatically." *Id.* at 10. He then distinguished art in which a ***database administrator*** manually specified the views and lookup fields that produced the substituted display values. *Id.* at 10–11. An administrator is not a "developer"; Kaufman's "developer input" construction would cover the very system he distinguished. *See Aylus*, 856 F.3d at 1360.

### C. "data model" – '981 and '220 patents

Zoho's proposed construction of "data model" is taken directly from the express definition of the term set forth in the specification. Specifically, the specification explicitly states that a "data model" is "***the organizational structure to be used by the back-end for storing data (that is, the complement of tables which store data, and the relational links between these tables***)[.]" '981 patent at 2:41–45 (emphasis added). The specification set off the term "back-end" with quotation marks, explaining that the back-end is a relational database management system (RDBMS). *Id.* at 2:33–35 ("At a minimum, such systems are generally composed of a 'back-end' relational database management system (RDBMS)"); *see Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (noting that terms set off by quotation marks strongly indicate that what follows is a definition). Inserting the definitions of "organizational structure" and "back-end" into the definition of "data model" (i.e., "the organizational structure to be used by the back-end for storing data") reveals the patentee's definition of "data model": "the complement of tables which store data, and the relational links between these tables to be used by the RDBMS for storing data." Thus, Zoho's proposed construction and inclusion of "backend (i.e. RDBMS)" in its proposed construction directly tracks the patentee's own definition of "data model."

Kaufman himself acknowledged this definition of "data model" and relied on it in describing his purported invention. In opposing an IPR on the '981 patent, Kaufman explained to the Board:

> A ***relational database*** *contains* ***a "schema" or "data model***," describing a "***complement of tables which store data and the relational links between these tables***," that defines the organizational structure of the database.

Dkt. 42-6 at 13 (emphasis added) (citing '981 patent at 2:41–48). He went on to explain that this "back-end schema" is designed and constructed within the RDBMS. *Id.* (citing '981 patent at 3:12–16). Having told the Board that his invention contains a "data model" that is used by a back-end RDBMS to store data, Kaufman cannot now disregard this express definition.

Kaufman, however, asks the Court to ignore the definition in the specification, arguing that the claims themselves define "data model." Specifically, Kaufman argues that the claims recite a "data model comprising" certain features and "data model" should thus be defined as those features. Op. at 10–11. Kaufman's "comprising" argument is an attempt to improperly delete the term "data model" from the claims, replacing it by some of its contents, "tables, constraints, and relationships." *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (holding that "claims are interpreted with an eye toward giving effect to all terms in the claim"). "Comprising" tells the reader what a data model ***includes***. It does not define what a data model ***is***. Because "comprising" is open-ended, the listed components do not define the term, but instead set a floor. The specification and Zoho's construction supply the actual definition of what the claimed data model is. Kaufman's proposed construction, which merely replaces "data model" by its minimum contents, leaves the parties' dispute unresolved. *See O2 Micro*, 521 F.3d at 1361.

The words of the claims themselves also further support Zoho's construction. Claim 1 of the '981 patent recites a relational database "defined within a relational DBMS," comprising "tables, constraints and relationships stored in said DBMS in accordance with a data model." '981

patent at 377:3–11 (emphasis added). Claim 1 of the ’220 patent likewise recites a database that “is described by a data model . . . and is stored within a relational database management system (RDBMS).” ’220 patent at 37:32–35. By the claims’ own terms, the data model is the structure under which the “relational DBMS” stores the database’s tables, constraints, and relationships. That is consistent with the specification’s definition proposed by Zoho.

Kaufman argues that Zoho’s construction “conflate[s] a relational database with an RDBMS.” Op. at 12. There is no conflation. The database is the collection of data, tables, constraints, and relationships, and the RDBMS is the “back-end” software that “maintains and manipulates” that information. ’981 patent at 2:32–37, 2:41–45. The database’s “data model” (also referred to in the specification as a schema (*see* ’981 patent at 2:45)) is the organizational structure used by the RDBMS for storing the data. The specification makes this clear; it defines “data model” (or schema) as “the organizational structure to be used by the back-end for storing data,” (*id.* at 2:41–45), and identifies that “back-end” as the RDBMS. *Id.* at 2:34–35. The specification describes the data model/schema as “instantiated within” the RDBMS (*id.* at 3:37–39, 11:27–28) and “designed and constructed within the RDBMS.” *Id.* at 3:12–16. And the claimed scanning of “said database” to build the UI is described in the specification as the RDBMS being “interrogated or scanned by this software, applying a body of rules to interpret the data model.” *Id.* at 11:29–33. The patentee called this structure the “RDBMS schema.” *Id.* at [57], 4:13–14.

Before the Board, Kaufman described the claimed systems as “interrogat[ing] the database schema,” Dkt. 42-5 at 2, the same structure the specification says is “constructed within the RDBMS.” ’981 patent at 3:12–16. Kaufman now asserts that “[h]ow the back-end stores the components of ‘said database’ itself may be wholly independent of the contents of ‘said database,’” and that “[t]he two data models could differ.” Op. at 12, 14. He cites nothing for either assertion.

The claimed data model concerns the database's structure (its tables, constraints, and relationships), not its contents. Nothing in the intrinsic evidence describes a relational database whose tables, constraints, and relationships are organized one way while the RDBMS stores them another. Construing "data model" by reference to the RDBMS therefore does not conflate the two. It identifies the only data model the patents describe.

Kaufman also notes that claim 5 of the '981 patent and claim 14 of the '220 patent do not recite an "RDBMS." Op. at 11. That does not matter. The definition from the specification which dictates the construction of "data model" applies to the term wherever it appears. Both claims still recite a relational database "in accordance with" or "described by" a data model. And the specification describes only one kind of data model: an organizational structure to be used by the back-end for storing data (that is, the complement of tables which store data, and the relational links between these tables). '981 patent at 2:41–45. Zoho's proposed construction is the only one that is consistent with the definition of "data model" set forth in the patent specification and should thus be adopted by the Court.

**D. <u>"scan[ning] said database" / "scanning the database" – '981 and '220 patents</u>**

Kaufman makes three arguments: that Zoho's reference to "the data model of the RDBMS" is wrong, that rescanning shows that "preexisting knowledge" is permitted, and that nothing in the specification excludes preexisting knowledge. Op. at 13. Each is incorrect.

First, Kaufman argues that "[t]he data model is not a data model of an RDBMS, it is a data model of the relational database in question." *Id.* As explained above, the only data model recited in the specification or the claims is the data model of the relational database that is stored in and used by an RDBMS. *See supra* Section II.C.

Second, Kaufman points to the specification's discussion of rebuilding the system's cache and argues that "a secondary scan of the data model would mean there is already preexisting

knowledge of its structure." Op. at 13 (citing '981 patent at 345:16–346:16). The passage shows the opposite. The cache is rebuilt "[w]hen changes are made to the schema structure," and the rebuild "re-interrogates the database." '981 patent at 345:16–25. The system rescans ***because*** it cannot rely on what it knew before (i.e., preexisting knowledge). Each scan reads the structure from the database itself. That is what Zoho's construction requires.

Third, Kaufman asserts that "nothing in the specification excludes (or requires) 'preexisting knowledge' of the structure of the data model." Op. at 13. That is incorrect. The specification states that "once a back-end schema has been designed and constructed within the RDBMS, the system can automatically 'interrogate' this schema, and 'absorb' its structure into an internal cache." '981 patent at 3:12–16. Scanning is how the system learns the structure. The claims say the same. The scan is performed "to determine the table structures, constraints and relationships of said data model." *Id.* at cl. 1 (377:20–22); *see also* '220 patent at cl. 1 ("to determine the tables, constraints, and relationships of the data model"). What must be determined is not already known. The preamble, reciting that the database "may be of any arbitrary size or complexity," requires the same thing. A system that must work for any schema cannot be supplied in advance with knowledge of the particular one it encounters.

Kaufman's IPR statements remove any doubt. He told the Board that the prior art, Yeager, did not meet the claims because its "UI generation methods . . . rely on the foreknowledge that the target database structure represents a hierarchy of Levels, foreknowledge of what those Levels comprise, and foreknowledge of how those Levels are to be navigated." Dkt. 42-6 at 26. He emphasized that Yeager "knows, specifically, as reflected in its hard-coded Location strings . . . how Levels have been represented within the plurality of tables in the particular target database." *Id.* at 27–28. He faulted another prior art reference, Cason, for relying on "pre-existing metadata

(in the form of a user-provided EAR model)" instead of deriving that information from the target database. *Id.* at 39. And he described the invention as "automatically scanning the database to learn its structure." *Id.* at 3. Having distinguished prior art on the ground that it relied on knowledge of the structure supplied in advance, Kaufman cannot now argue that the claimed scanning permits exactly that. *See Aylus*, 856 F.3d at 1360.

### E. "apply[ing] a body of rules to determine the table structures, constraints, and relationships of said data model" – '981 patent

Kaufman reiterates his objections to "the data model of the RDBMS" in Zoho's construction. Op. at 14. Zoho has explained why the inclusion of that phrase is correct because the only data model recited in the specification or the claims is one that is used by the RDBMS for storing data. *See supra* Section II.C.

Therefore, the only remaining dispute is whether the "body of rules" must be applied to ***all*** the data model's table structures, constraints, and relationships, or whether determining ***some*** of them is enough. Kaufman argues that *Harris Corp. v. Fed. Express Corp.*, 502 F. App'x 957 (Fed. Cir. 2013), was limited to its facts. Op. at 14. Zoho's construction is not based on a general rule that "the" means "all," but instead on the structure of this claim. The phrase "the table structures, constraints and relationships of said data model" refers back to the preamble, which recites a database comprising "a plurality of tables, constraints and relationships stored in said DBMS in accordance with a data model comprising ***said tables*** and their column-complements and datatypes, ***said constraints***, and ***the relationships across said tables***." '981 patent at 377:5–11 (emphasis added). The claim language "the table structures, constraints and relationships of said data model" refers to the whole of the database's tables, constraints, and relationships, not to some subset. The body of the claim confirms this. The client application must provide "displays of the table contents of said database for each of said modes" and must integrate processes "for

navigating across said tables." *Id.* at 377:28–36. A system that determined only some of the structure could not do either. *Harris* supports the same result in similar circumstances: where a claim refers back to a defined set, the later reference is to the whole set. 502 F. App'x at 962–63.

The intrinsic evidence confirms that the body of rules is applied to all table structures, constraints, and relationships of the data model. For example, the specification explains that the system interrogates the RDBMS, "applying a body of rules to interpret the data model (comprising its tables; their column-complements, datatypes, and constraints; and relationships across the tables)," and "automatically deriv[es] enhanced back-end 'views' of ***all tables***." '981 patent at 11:29–37 (emphasis added). The generated interface "comprises all mode displays . . . for ***all tables***." *Id.* at 3:43–45 (emphasis added). The resulting cache "contains ***all of the metadata*** derived by interrogating the schema." *Id.* at 345:8–12 (emphasis added). And the application supports all database activities "across ***all base-tables*** comprising the schema." *Id.* at 3:19–25 (emphasis added). Additionally, Kaufman argued to the Board in an IPR that the invention builds the interface "with ***all*** requisite in-table and cross-table capabilities, for ***every*** table found in the database." Dkt. 42-6 at 3 (emphasis added). Kaufman offers no basis for applying a body of rules to less than the whole data model, and the intrinsic record supports none.

**F. "construct[ing] . . . a corresponding client application" – '981 and '220 patents**

Kaufman faults Zoho's construction for including "without custom software programming." Op. at 15. But the specification makes clear that the construction of the client application is done without custom programming. *See, e.g.*, '981 patent at 2:23–27 ("The present invention relates to the field of data processing, and more particularly to relational computer databases, and to systems and methods for automatically generating ***without any custom programming*** a user interface for the database, ***and/or a complete application utilizing the database***") (emphasis added). The claims cover both automatic generation of a user interface and

automatic construction of a client application. *Id.* at cls. 1, 4, 5. And indeed, the client application is what provides the generated user interface. *See id.* at cl. 1 ("***defining a user interface paradigm . . . wherein said client application . . . provides displays of the contents of said database . . . in accordance with the display formats of said paradigm***") (emphasis added). Thus, for the same reasons discussed for the "automatically generating" term, this term should be construed as "generate a corresponding front-end program without any custom software programming."

Just as with "automatically generating a user interface," the specification noted the invention was intended to improve upon "by-hand coding" of client applications. '981 patent at 2:53–56. The claims should not be read to cover the approach the patent describes as the problem. *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1343–44 (Fed. Cir. 2005). In fact, during prosecution, Kaufman told the Examiner that his invention runs "without requiring the generation of any intermediate source code for subsequent execution on the server in order to construct the corresponding client application." *See supra* Section II.B.2 (citing Dkt. 42-2 at 12).

## III. CONCLUSION

For the reasons above and in Zoho's opening brief, Zoho respectfully requests that the Court adopt its constructions of the disputed terms.

Respectfully submitted,

Dated: October 8, 2026

*/s/ Valerie K. Barker*

Ryan J. Marton (admitted *pro hac vice*)
Phillip J. Haack (CA 262060, admitted W.D. Tex.)
Valerie K. Barker (Texas Bar No. 24087141)
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
Telephone: (415) 360-2515
Email: ryan@martonribera.com
phaack@martonribera.com
valerie@martonribera.com

Darryl J. Adams (Texas Bar No. 00796101)
ADAMS IP LAW
12600 Hill Country Blvd.
Suite R130-235
Austin, TX 78378
Telephone: (512) 296-3198
Email: adamsiplawyers@gmail.com

*Counsel for Defendant Zoho Technologies Corporation*

**CERTIFICATE OF SERVICE**

I certify that on October 8, 2026, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Valerie K. Barker*
Valerie K. Barker