# Exhibit B

**In the**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

**SALESFORCE.COM, INC.**
*Petitioner*,
v.
**MICHALE PHILIP KAUFMAN**
*Patent Owner*.

Case IPR2021-00396

U.S. Patent No. 10,025,801

# PATENT OWNER PRELIMINARY RESPONSE

# TABLE OF CONTENTS

**I. INTRODUCTION** **1**

A. The Petition Fails to Show a Reasonable Likelihood that the Petitioner Would Prevail on Any Challenged Claim . . . . . . . . . . . . . . 1

B. Background of the '801 Patent . . . . . . . . . . 2

C. Salesforce's Approach in the Present Petition 5

**II. *FINTIV* FACTORS FAVOR DEFERRAL TO THE DISTRICT COURT** **5**

**III. CLAIM CONSTRUCTION** **7**

A. "using a processor to *automatically construct a represen-tation of data from a row* of the primary table by . . . using a processor to identify a foreign key (FK) . . . using a processor to locate a row in the foreign table . . . using a processor to select a value from the foreign-table row . . . using a processor to derive a description of the foreign-table row . . ." . . . . . . . . 7

**IV. Grounds 1-3: Primary Reference Gardner Requires Extensive User Specification to Accomplish the Steps that are Claimed as Automatic and "With a Processor" in the Challenged Claims** **10**

A. Wendker Does Not Cure the Deficiencies of Gardner . . . . . . . . . . . . . . . . . . . . . . . . 16

B. None of the Secondary References Used for Element 1d/5d Show "using a processor to select a value from [a] foreign-table row other than the PK value based on at least one of the" recited Attributes . . . . . . . . . . . . 19
1. Wendker . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
2. Raitto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
3. Akins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**V. Grounds 4-6: Primary Reference Snelling, Like Gardner, Requires Extensive User Specification to Accomplish the Steps that are Claimed as Automatic and "With a Processor" in the Challenged Claims 24**

**VI. CONCLUSION 30**

| EXHIBIT LIST | |
|---|---|
| 2001 | RESERVED |
| 2002 | Scheduling Order from Parallel District Court Case |

# I. INTRODUCTION

## A. The Petition Fails to Show a Reasonable Likelihood that the Petitioner Would Prevail on Any Challenged Claim

Michael Philip Kaufman ("Patent Owner" or "Kaufman") submits this Patent Owner Preliminary Response with regard to salesforce.com, inc.'s ("Petitioner" or "Salesforce") challenge herein to U.S. Patent No. 10,025,801 (the " '801 patent"). In the '801 patent, Kaufman claims a major improvement to database-related software as it existed in 1999-2000, which operates to supplant prior art manual and partially automated end user database development applications by providing systems and methods that automatically generate an end user application, instead of relying on the prior methods, which all required developers as middlemen in outfitting end users with the software for working with such databases.[1]

The two primary references asserted by Petitioner, U.S. Patent No. 6,058,391 ("Gardner") and U.S. Patent No. 5,826,257 ("Snelling"), each represent the prior art approach of requiring significant user direction and manual processing to specify not only the relationship between two database tables, but also which data from the foreign table should be included in a display of the primary table. These are not the automatic methods and machine-readable media of the challenged claims of the '801 patent.

[1] Salesforce filed a separate Petition against Kaufman's related U.S. Patent No. 7,885,981 in Case No. IPR2021-00397, in which Kaufman is also filing a Preliminary Response.

The secondary references included by Petitioner are almost a pick-and-choose hodgepodge, and it is not clear how these pieces are meant to fit together into any sort of coherent whole. But nothing in the secondary references cures the core deficiency in these primary references (Gardner and Snelling), and all of the proposed combinations therefore fail to teach or suggest the claimed methods and machine-readable media of the ’801 patent.[2]

## B. Background of the ’801 Patent

The original application in the family of the ’801 patent was filed on October 31, 2000, by Michael Philip Kaufman, the first named inventor.

The challenged claims of the ’801 patent recite features of an automated solution for what was previously part of a tedious and error-prone manual process of database application creation for the existing relational database systems of the day, such as Oracle, Microsoft Access, and many others. The database provided an engine for managing tabular data, but the engine in itself was useless to end users, who also needed a software application through which to interact with the data. It was up to the software developer to craft and implement even the most basic applications for end users. As explained in the background section of the ’801 patent (’801 patent, 7:14-34), by the year 2000, tools had emerged

[2] Patent Owner intends by this Preliminary Response to point out some clear shortcomings in the Petition, and attendant reasons why the Board should not institute trial. Patent Owner does not admit the sufficiency of any grounds or issues in the Petition that are not expressly addressed herein.

to automate *parts* of this software development process, such as those to generate forms for entering or editing data within a single table.

But relational databases present data in a plurality of tables, such that the data in these tables may be interrelated. For example, in an HR database, a table of Employees may list various details for each Employee, including that Employee's Department. There may also be various details associated with that Department, such as the Department Name, its Building, its Street Address, its Receptionist, its Chairperson, and so on. Rather than repeat these details for each Employee in the same Department, it is preferable for several reasons to manage these details only once, separately, in their own Department table, and to cross-reference each Employee from the Employee table to the appropriate Department by including *only* that Department's unique identifier within the Department table (which might be called DEPARTMENT_ID). In this example, the DEPARTMENT_ID serves as the "primary key" (PK) of the Department table, and as a "foreign key" (FK) in the column of the Employee table, where it is used to cross-reference the corresponding Department for each Employee.

In practice, the ID (PK) from the other (Department) table will tend to be a number, and per industry "best practice," the ID will intentionally be devoid of extrinsic meaning. (When the only purpose of the ID is for internal record identification, there is no reason for it ever to be changed, where any such change would also require globally synchronized changes to all dependent references—an operationally difficult transaction at

best, as it would block competing actions, and is exceptionally vulnerable to incomplete execution—in order to prevent relational corruption.) Thus, a simple display of the Employee table's contents will include these "raw" numbers for every Employee's Department, and these numbers will be virtually useless to a lay user.

A human programmer hand-crafting a UI for a database application might visually inspect the related table (in this case, Department), see that it includes a column called DEPARTMENT_NAME, and decide that this column is a good source for more-descriptive labels (*e.g.,* "Accounting") which better represent each Employee's Department (for the user) than the actual FK values.

The '801 patent, proposing what is to be part of an automated process, proceeds from the assumption that there will *be* no human programmer, and prescribes a way to have a machine achieve a comparable result. It identifies that there is an FK relationship present in a base table, and identifies the other table to which that FK relates. It then looks at the columns in this second ("foreign") table, seeking to identify one or possibly more columns that are likely, alone or in combination, to provide a more intelligible description for the item referred to by that FK. The '801 patent does this by providing a set of rules, based on various column properties such as its name, relative location, or datatype, that can be used to identify one or more columns from the foreign table that will likely provide a more meaningful description of the data item than the FK itself. It then derives an actual substitute expression from

the one or more columns so identified, and makes this substitution, in place of the raw FK, throughout all displays of the primary table.

### C. Salesforce's Approach in the Present Petition

Salesforce's approach to this IPR is to assert obviousness based on primary references in which the most significant steps from the '801 patent's claims are actually performed manually in advance. As will be explained, both primary references, Gardner and Snelling, teach a process of utilizing a substitute for an FK reference within the display of a primary table. Both, however, rely on humans to identify and point the computer to the replacement source, and indeed both rely on humans even to identify when and where this needs to be done. Petitioner then tries to create obviousness arguments with secondary references that happen to use database column characteristics for entirely different purposes. None of the proposed combinations, even when viewed in combination, disclose all of the subject claim limitations, thus failing to make even a *prima facie* case of obviousness.

## II. *FINTIV* FACTORS FAVOR DEFERRAL TO THE DISTRICT COURT

Attached as Ex. 2002 is a copy of the Scheduling Order from the parallel District Court case. It is reasonably clear that, left on its current course, the District Court case will be tried before a final written decision would be rendered in this IPR.

The applicable factors under *Apple, Inc. v. Fintiv, Inc.*, Paper 11 (PTAB, Mar. 20, 2020) (precedential) are as follows:

**Whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted.** Salesforce has moved for a stay already (pre-institution), which has been fully briefed since February 23. The court has not ruled on the stay motion. The court did, however, stay the court's consideration of *Markman* issues pending resolution of the stay motion. Meanwhile, discovery has moved forward, and while the stay motion has been pending, the court adopted the attached scheduling order (Ex. 2002).

**Proximity of the court's trial date to the Board's projected statutory deadline for a final written decision.** According to the Scheduling Order the case will be trial-ready 282 days after a *Markman* ruling. *Markman* issues are fully briefed. If the court were to rule on *Markman* in June, the case would be ready for trial in April 2022, which would be several months prior to the Board's projected statutory deadline for a final written decision.

**Investment in the parallel proceeding by the court and the parties.** The parties have considerable investment in the parallel proceedings, having conducted substantial documentary discovery and begun third-party subpoenas, with fact discovery set to close on May 18. The court has *sub judice* a motion to dismiss, a motion to transfer, and the motion to stay, with *Markman* issues ripe for determination.

**Overlap between issues raised in the petition and in the parallel proceeding.** The parallel proceedings involve both patents challenged in this and the related IPR filed by Salesforce.

**Whether the petitioner and the defendant in the parallel proceeding are the same party.** Salesforce is the sole defendant in the parallel proceeding.

**Other circumstances that impact the Board's exercise of discretion, including the merits.** Patent Owner understands that, as to this last *Fintiv* factor, every Petitioner claims its petition is strong, and every patent owner will tend to characterize the petition as weak. Nevertheless, the Board can hardly fail to notice the relatively large number of references that Salesforce has proposed to combine to make its obviousness arguments, and yet the combined references still fail to cover what is claimed.

## III. CLAIM CONSTRUCTION

### A. "using a processor to *automatically construct a representation of data from a row* of the primary table by . . . using a processor to identify a foreign key (FK) . . . using a processor to locate a row in the foreign table . . . using a processor to select a value from the foreign-table row . . . using a processor to derive a description of the foreign-table row . . ."

With the "automatically construct" limitation present in all claims of the '801 patent, it is important to understand that the following

five recited steps (labelled as elements 1b-5/5b-f in the Petition) are all encompassed within the automatic nature of the claimed method (or machine readable medium). This is not a claim where some parts of this process are automated and some steps can be manual. The entire claimed process of constructing the representations is done automatically, by computer processors.

The word "automatic" is in the very title of the '801 patent: "Systems and methods for *automatically* generating user interface elements for complex databases." '801 patent, 1:1-4 (emphasis added). Likewise, the Field of the Invention states that it relates to systems and methods for "automatically generating" a user interface for a database. '801 patent, 5:61-63.

The Background of the Disclosure points out the shortcomings of the prior art, in which creating a user interface for working with a relational database was *not* automatic, and required substantial human intervention:

> The construction of front-end applications is generally undertaken using conventional third- or fourth-generation computer languages, which require by-hand coding at a very low level of functionality.

'801 patent, 7:14-17. Moreover, the Background discussion recognized that there also existed "rich controls," form generators, software "wizards," and the like, that could help a developer generate code for parts of the application development process, but which *still* required significant developer input to create the end user application:

> Current tools for easing the development burden are limited to fairly specific (and, still, fairly low-level) uses—among them, providing more-sophisticated or "richer" controls for manipulating individual data elements; associating individual user-interface elements with specific back-end storage locations; or—at best—offering "form generator" or "wizard" facilities to automatically generate the code for a simple UI display which manipulates a single underlying (back-end) data table.

'801 patent, 7:17-26.

The Summary of the Disclosure reflects an intention to provide an automatic solution that overcomes the need for developer involvement in order to generate an end user interface for a database. The words "automatically" and "automatic" are used more than two dozen times in the specification, which reinforces that the disclosure seeks to generate a user interface automatically.

The plain meaning of "automatic" in the context of the challenged claims of the '801 patent is that the operations involved in generating the claimed portion of a user interface proceed "automatically" by machine action upon being triggered by the user.

Salesforce uses the prior art, discussed in the Background of the Disclosure section, to argue that manual specification of relationships and data somehow meet the automatic methods of the challenged claims. Yet, the entire purpose of the disclosure of the '801 patent was to get beyond the prior art, in which it was necessary to have "developers"

either hand-code the application in whole or in part, or (at best) to manipulate a series of "rich" controls, "form generators," and "wizards" to generate intermediate structures to get to a functional end-user application for working with the database.

In the challenged claims of the '801 patent, the steps that follow the step of "using a processor to automatically construct a representation of data from a row of the primary table" (labelled as step 1a/5a in the Petition) are part of the "automatically construct[ing]" step. That step (1a/5a) is performed "*by*" doing the following steps (1b-f/5b-f). A processor (not a *person*) identifies a foreign key, locates a row in the foreign table, selects a value therefrom, and derives a description of the foreign-table row. This is not done manually, but automatically.

## IV. Grounds 1-3: Primary Reference Gardner Requires Extensive User Specification to Accomplish the Steps that are Claimed as Automatic and "With a Processor" in the Challenged Claims

Gardner's disclosure concerns "enabling a user who is unfamiliar with SQL to easily retrieve and modify information in a relational database." Gardner at 3:59-61. "The invention accomplishes this by providing a system and method by which *a database administrator can easily create and save custom designed 'views' of tables within the relational database*." Gardner, 3:61-65 (emphasis added). Gardner's entire disclosure is about a database administrator specifying the attributes

of a custom view. It is not done automatically, but rather through wizards and forms that must be set up and completed manually, like those described in the Background section of the ’801 Patent.

Gardner allows for an administrator to specifically and manually create each view. There is a process for creating a view that is outlined beginning at column 11, line 35 of Gardner. The administrator adds a view, gives it a name, selects the table to be viewed, selects the primary key ID of the base table to be displayed, and specifies groups who can access the view. Gardner, 11:35-65.[3]

The administrator needs to review each field and specify whether that field should be included in the view that the administrator is manually creating. *See* Gardner at 11:66-12:4. The administrator then specifies various “View Information” elements, “for the administrator to specify the attributes of the field” including the field’s “lookup status.” Gardner, 12:5-10.

The administrator decides whether the field should be added to the view and then “enter[s] data into the input fields 314-326.” Gardner

[3] It should be noted that the disclosure of Gardner cannot even automatically find the primary key in the base table of a view. “[T]he administrator enters . . . (b) the name of the table that is to be the base table for the view; (c) the primary key id of the base table . . .” Gardner at 11:43-47. The challenged claims recite “using a processor / a routine to identify a foreign key (FK) value in an FK column in the primary-table row.” ’801 Patent, 36:33-35 (claim 1), 37:14-16 (claim 5). This is a *more* complex process than simply locating the primary key of the base table, and Gardner does not even do this step with a processor, automatically.

at 12:12-18. It is these input fields that are manually entered by the Administrator that allow a "lookup" to work and for the display of data to work as the Petition touts. The Petition repeatedly uses the following image, which is an example view from the Gardner specification:

Salary Information

| Employee Name | Department | Salary |
|---|---|---|
| John | Engineering | $100,000 |
| Mary | Marketing | $60,000 |
| Eric | Sales | $75,000 |
| Mark | Sales | $45,000 |
| Jennifer | Engineering | $30,000 |

Petition at 37 (citing Gardner, 4:42-52) (Petition's highlighting). But the reason that the word "Marketing" appears in this view, rather than the department_id value, which for the Marketing department is ID 200 (*see* Gardner Fig. 1), is that *the administrator specifies* that this view should use a specific column from the Department Table rather than the "department_id" field from the Employee Table of the Company Database 100.

Below is the screen that is discussed above in relation to the administrator setting up the view in Gardner:




Gardner, Fig. 3 (excerpt) (emphasis added). As one can readily see, the administrator needs to specify whether or not a field is a lookup using checkbox 334. The administrator then needs to specify, in text boxes, all of the attributes to manually define the lookup, including the lookup table name (or alias) in textbox 320, the lookup field name in textbox 324, the return field name in textbox 326, and even the base name of the lookup table in textbox 328 (in case an alias was specified in textbox 320). All of this text needs to be manually determined and inputted by an administrator to make the above example display show "Marketing" rather than "200." This is not automatic, and it is not done "with a processor" as recited in the challenged claims of the '801 patent.

Figure 5B, below, shows the data that needs to be manually entered in the above form by the administrator to construct the view. One can see that, among other data, the administrator needs to manually enter the string "Department" into textbox 320 in the above excerpt of Figure 3 and manually enter the string "department_id" into textbox 324 in the above excerpt of Figure 3, which data is then stored in the database, in the highlighted third row:

Table_View 504

| table_view_id | view_id | field_name | lookup_yn | lookup_table | lookup_field | look_up_alias | display_field | field_title | read-only_yn | display_order | auto_gen_y/n |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | "employee_name" | no | N/A | N/A | N/A | N/A | "Name of employee" | yes | 1 | no |
| 2 | 1 | "salary" | no | N/A | N/A | N/A | N/A | "Salary" | yes | 2 | no |
| 3 | 1 | "department_id" | yes | "Department" | "department_id" | N/A | "department_name" | "Department Name" | yes | 3 | yes |
| 4 | 2 | "department_name" | no | N/A | N/A | N/A | N/A | "Department Name" | yes | 1 | no |
| 5 | 2 | "department_budget" | no | N/A | N/A | N/A | N/A | "Budget" | yes | 2 | no |

FIG. 5B

Gardner, Fig. 5B (emphasis added)

From this manually entered configuration data, Gardner knows to display not the field from the Employee table, but rather this specified field from another table (in this example, the department_name field from the Department table, as manually entered by the administrator in the above user entry screen from Figure 3, and stored in this table shown in Figure 5B).

This is not automatic. It is not "automatically construct[ing] a representation of data" as recited in the challenged claims of the '801 Patent. This does not "us[e] a processor to identify a foreign key (FK) value in an FK column in the primary-table row" as recited in the challenged claims of the '801 patent (the Petition's step 1b and routine 5b).

Gardner's *administrator* identifies what is an FK column within a table by specifying the attributes in the form from the excerpt of Figure 3 above. The administrator needs to specify that this is a lookup, and then enter the all of the various information necessary to effect the appropriate substitution. Gardner does not use a processor to automatically do any of this.

Critically, the Petition cites only to Gardner for this step of claim 1 and routine of claim 5 of the '801 Patent (elements 1b/5b, Petition at 27, 41-42). Gardner does not, automatically or in any way with "a processor" as recited in 1b/5b, identify a Foreign Key (FK) value in an FK column in the primary-table row. The administrator must specify in Gardner exactly which column is an FK column.

Gardner also does not "us[e] a processor to select a value from the foreign-table row other than the PK value based on at least one of the ... attributes" specified in the challenged claims (Petition element 1d/5d). A processor does not select a value from the foreign-table; the administrator must specify the column name in the foreign table, department_name[4], in order for the view of Gardner to be constructed.

[4] Patent Owner notes that the primary key column for Department Table 104 in Fig. 1 of Gardner is actually shown as "department_ID" with the "ID" capitalized, but Patent Owner believes that this change in capitalization is a typographical error, to the extent that the intended database system would be case sensitive, since all other field names shown in Fig. 1 (and all of Figs. 5A-5D) of Gardner are completely lowercase. Field Names in Fig. 4 of Gardner are fully uppercase, but at least no Gardner schema mixes cases.

Therefore, Gardner does not teach or suggest the method of challenged claim 1 or the computer-readable medium of challenged claim 5, as Gardner is missing at least these recited steps. Gardner is not automatic and does not use a processor to carry out at least these steps.

None of the secondary references the Petition attempts to combine with Gardner alter this fundamental flaw of Gardner as far as teaching or suggesting the steps of the challenged claims of the ’801 patent.

As discussed above, the Petition uses only Gardner for missing element 1b/5b. The Petition uses one piece of art for element 1a/5a and various art for pieces of element 1d/5d, using a processor to select the value from the foreign table row based on at least one of the specified attributes of the column in the foreign table.

### A. Wendker Does Not Cure the Deficiencies of Gardner

The Petition points to Wendker (Ex. 1004) for element 1a/5a of “using a processor to automatically construct a representation” of a primary table row. Petition at 22-23. Wendker concerns a process that builds a UI for a database, based on heuristics that classify the tables as “main,” “enumeration” (simple lists that can be edited), or “numeration” (simple tables without many columns) and then provide UI elements geared to the type of table involved. *See, e.g.*, Wendker, 8:31-9:38. To provide the UI elements, the system gathers “property lists” for each principal UI function, including the functionality by which the system “identifies” an entity (table). The UI elements are for Query, List (to

arrange the Query results), and Form (which represents an individual record for editing). Wendker at 10:52-11:5.

Wendker does not in any way replace *any* data that is displayed within its user interface with more meaningful data, let alone any foreign key data. Wendker is clear that its Foreign Keys are displayed as-is.

As stated in Wendker,

> Assume that an Order 3 is related to an instance of another main entity, namely, a Customer 2. If the user wants to view or edit all of the properties/attributes of Order 3, then a Form task 430 would be initiated. The Form task 430 then displays the identification of the customer placing Order 3, namely, Customer 2, and the date and total of the order.

Wendker at 11:24-30. This is shown in Figure 4 of Wendker:




Wendker Fig. 4 (excerpt). This Wendker order form shows "Customer 2." If the user wants to see the details of Customer 2, including the name, the user needs to click on Customer 2 and generate the Identify task.

> In this case, assume that the details of the customer field, which is a Main entity in its own right, need to be displayed. When the user requests such a display, Identify task 435 displays the properties relating to Customer 2, which is the customer related to Order 3. The Identify task 435 allows the user to invoke another Form task 470 which is used to edit/display the attributes of customers, such as Name, Address, Phone etc.

Wendker, 11:35-42. This action is further shown in Figure 4 of Wendker, in which the user clicks on "Customer 2," triggering an "Identify" task that links to a display of the details of Customer 2, including the name.




Wendker Fig. 4 (expanded excerpt).

Wendker's "IDENTIFY" procedure is fed through the "Identify Property List," discussed in column 10, lines 12-25. "If the attributes used the for primary key are part of the data object, then only those

primary key attributes are used for the identify property list." Wendker, 10:13-15. But this is necessarily the case for *all* relational databases, *i.e.*, that the primary key attribute or attributes (generally, just an ID number) are part of the object. (It is impossible to edit or update a table whose records do not incorporate a primary key.) This is the only data that exists to feed the identify task. And the form property list, which feeds the "FORM" screen, shown above, is all properties of the Identify property list, all attributes, all to-one relationships and all to-many relationships. Wendker, 10:38-42. These are, essentially, *all* of the fields in a table—the primary key, the other non-key columns, and the foreign keys (for relationships to other tables).

Nothing in Wendker's Identify or Form actions or screens even has the data necessary to replace any foreign keys with any other values. The attributes are simply not present in Wendker. Wendker displays raw foreign keys to the user, with no suggestion that it could have done otherwise.

### B. None of the Secondary References Used for Element 1d/5d Show "using a processor to select a value from [a] foreign-table row other than the PK value based on at least one of the" recited Attributes

The Petition, admitting that Gardner does not use the specified attributes to replace a foreign key, attempts to use secondary references to cure this particular deficiency.

### 1. Wendker

Wendker is argued to disclose "displaying certain columns of a table based on column datatype" such as character type values rather than numerical or Boolean values. Petition at 29. The Petition uses Wendker's Property List for a Query UI element, for which Wendker teaches to include properties needed to identify the entity, "all mandatory attributes with a string type," and "all mandatory to-one relationships" (*e.g.*, FKs). Wendker 10:26-29. But this only relates to selectively showing Query results. This is not replacing any data but, rather, merely including only a subset of the columns from the primary table for display within the query-results List, from which the user can then choose which item to view, ultimately, in the Form UI. This is the process shown in Figure 4 of Wendker, a Query for orders feeding a list of orders, which then allows the user to select an order and edit its properties.


410
QUERY
(for orders)
RESULTS IN
420
LIST
ORDER 1
ORDER 2
ORDER 3
. . .
SELECTING ALLOWS EDITING OF PROPERTIES THROUGH
430
FORM
IDENTIFY
435
CUSTOMER 2
TOTAL
DATE
. . .

Wendker Fig. 4 (excerpt). The Petition only points to Wendker's disclosure that, in some lists, only some columns of the table are displayed. This is a teaching to *omit* certain non-string columns from a summary list, not to identify a string that would provide a *better* representation for substitution *in place of* an FK, as recited elements 1d/5d.

### 2. Raitto

The Petition uses Raitto (Ex. 1011) for the listed column constraint attribute in 1d/5d. Raitto does not concern a display at all, but rather concerns "techniques . . . for handling a query that specifies a first Set of one or more aggregate functions, where the particular materialized view reflects a Second Set of one or more aggregate functions." Raitto, Abstract. The "views" are not actual displays of data in a user interface, but rather are data views. Raitto does not concern a user interface, foreign keys, or replacing the display of any data whatsoever. Raitto processes and rewrites database queries based on certain conditions. Raitto does screen for NULL values in some contexts, but this has nothing to do with the challenged claims, and it is not clear how or why Raitto is purportedly being combined with the other art in the Petition other than that it relates to databases and checks for NULL values.

### 3. Akins

Akins is cited for the criterion of column position in selecting a value to display, from the foreign table. This is no "selection" at all, however, because as explained on page 161 of Ex. 1009 (p. 133

internal), by definition, all Combo Boxes in Visual FoxPro are hard-coded to display the first column of the designated RowSource. There is no choice available other than the first column, if one is going to use the Combo Box, so this does not educate a POSITA to the possibility of actively using column position as a mechanism to find a descriptive column in an arbitrary database table. Moreover, the discussion at pages 160-161 (p. 133-34 internal) does not relate to database usage. When Akins later at page 218 (p. 191 internal) does address using a Combo Box in a *database* table display, it actually teaches away from this usage, stating: "it's not a good solution" (*id.* at 218). It suggests a workaround, noting the downside that the workaround "must be performed at the instance level" (*id.*), *i.e.*, requiring manual, per table coding.

* * * * *

Therefore, Gardner, whether alone or in combination with Wendker, Raitto, and/or Akins fails to render obvious challenged claims 1 and 5 of the '801 patent and there is no reasonable likelihood that the Petitioner would prevail with respect to these independent claims under Ground 1.

Since all of the other challenged claims of the '801 patent depend from independent challenged claims 1 and 5, and all of Grounds 1-3 of the Petition rest on this same analysis with respect to the combinations with Gardner as the primary reference, and as nothing in Grounds 1-3 of the Petition address these deficiencies in Gardner, Grounds 1-3 do

not meet the threshold for institution, and institution on these Grounds must be denied.

## V. Grounds 4-6: Primary Reference Snelling, Like Gardner, Requires Extensive User Specification to Accomplish the Steps that are Claimed as Automatic and "With a Processor" in the Challenged Claims

Snelling makes clear in its Abstract how it is able to display data for a table that includes data from a separate table, including, *e.g.*, through a foreign key relationship. As Snelling's Abstract states:

> The display parameters may alternatively comprise a Second table identification and an associated query command. The Second table is joined with the first table (containing the lookup associated column) by a relation. The associated query command is applied to the join to extract a table of alternate values used in accessing the associated column.

Snelling, Abstract. This is how Snelling displays data from two different tables together, through a user-specified "lookup" with a "query command" to extract the proper values from the second table. But this specification process does not "automatically generate" the display. The display is created and specified by a person.

"FIG. 2 is a flowchart describing the operation of methods of the present invention applicable when a column of a database table is being initially defined by the application database designer." Snelling at 6:51-54. That is, the database designer manually specifies whether a field is to be a "lookup."

A lookup column, in Snelling, is "defined" as one of two types: a static lookup, which is a static list of values, and a "select table," which "is associated with a second database table (a related table) and a Select or query command to be performed upon the Second table for purposes of retrieving a resultant table of alternate values". Snelling at 7:29-39.

In Snelling, the "flowchart of FIG. 4 in conjunction with exemplary Screen displays 12–18 describes the process of defining a lookup column in association with a select table (a Select or query command applied to and associated related table of the application database)." Snelling, 7:44-48. Part of the Fig. 4 flowchart is shown below, with the steps for the branch used for the "select" lookups.




Snelling, Fig. 4 (excerpt). Step 408 is the first step in the process, and its contents are described in Snelling:

> Element 408 is first operable, in response to the designer's desire to associate a Select table with the lookup column, *to determine from designer input which table or query in the*

> *application database* (also referred to herein as the Second table or query) *is to be utilized as the Source of records in the Select process*. The Second table or query must be related to the table containing the lookup column being defined.

Snelling, 9:52-58 (emphasis added). The Snelling designer must input which table to use as the foreign table for the lookup. Once the designer inputs which table to use as the source of the data for the lookup field, "Element 410 is next operable to determine from designer input which fields of the selected second table are to be used for providing alternate values." Snelling, 10:14-16.

The Snelling designer must choose to create a "lookup" for a field, as discussed above. This means that Snelling does not automatically, "us[e] a processor to identify a foreign key (FK) value in an FK column in the primary-table row" as recited in element 1b/5b of the challenged claims. The designer specifies which field is a lookup, meaning which they can treat as an FK column.

Critically, as with Ground 1, in Ground 4, the Petition cites only to the primary reference, Snelling, for this step of claim 1 and routine of claim 5 of the '801 patent (Petition at 62-63, 78-79). Snelling does not, automatically or in any way with "a processor" as recited in 1b/5b, identify a Foreign key (FK) value in an FK column in the primary-table row. The designer must specify to Snelling exactly which column is an FK column.

Further, the Snelling designer must manually specify not only the "table or query" to use as the source of the data in the lookup field, but also the particular fields of the second table to use as the source of the data. This is not the recited "using a processor to select a value from the foreign-table row other than the PK value based on at least one of the" specified attributes of element 1d/5d. The Snelling administrator specifies the query to be used to populate the lookup field of the primary table. It is a manual process, not done "with a processor" automatically.

As discussed above, the Petition uses only Snelling for missing element 1b/5b which is, itself, fatal to the Petition.

The Petition again uses Wendker for element 1a/5a, but Wendker is off the mark and is of no more help to Snelling than it was to Gardner. As discussed above in Section IIIA, Wendker at most teaches selectively displaying query results. As discussed, Wendker simply does not teach *replacing* any display value or datatype with another in a display of database data.

As discussed above in Section IIIB, the Petition uses various other art for pieces of element 1d/5d, using a processor to select the value from the foreign table row based on at least one of the specified attributes of the column in the foreign table. But none of the secondary references teach or suggest automatically, with a processor, replacing any user interface displayed data, let alone a foreign key, based on one of the specified attributes. There is also teaching or suggestion to combine the referenced disclosures from the secondary references into Snelling's

manual process requiring a user to specify the exact table and column in the foreign table to display for a manually-specified lookup field in Snelling.

Therefore, Snelling, whether alone or in combination with Wendker, Raitto, and/or Akins fails to render obvious challenged claims 1 and 5 of the '801 patent and there is not a reasonable likelihood that the Petitioner would prevail with respect to these independent claims under Ground 4.

Since all of the other challenged claims of the '801 patent depend from independent challenged claims 1 and 5, and all of Grounds 4-6 of the Petition rest on this same analysis with respect to the combinations with Snelling as the primary reference, and as nothing in Grounds 4-6 of the Petition address these deficiencies of Snelling, Grounds 4-6 do not meet the threshold for institution, and institution on these Grounds must be denied.

## VI. CONCLUSION

Because Petitioner has failed to show that it is reasonably likely to invalidate at least one claim in the ’801 patent, the Board should deny institution of *inter partes* review of the ’801 patent.

Respectfully submitted,

*/Ronald Abramson/*
Ronald Abramson, Reg. No. 34,762
Ari J. Jaffess, Reg. No. 74,558

Dated: April 14, 2021

LISTON ABRAMSON LLP
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
Telephone: (212) 257-1630

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 CFR § 42.24(d), the undersigned hereby certifies that the word count for the foregoing Patent Owner Preliminary Response totals 9,469, which is within the 14,000 allowed under 37 CFR §§ 42.24(a)(1)(i); 42.24(b)(1).

/*Ronald Abramson*/
Ronald Abramson

Dated: April 14, 2021

## CERTIFICATE OF SERVICE

Pursuant to 37 CFR § 42.6(e), the undersigned certifies that on April 14, 2021, a complete and entire copy of this Patent Owner Preliminary Response was provided to the Petitioner by filing through the PTAB E2E System and via email to *qe-kaufman-salesforce@quinnemanuel.com*, *rayzado@quinnemanuel.com*, *mglass@quinnemanuel.com*, *samstake@quinnemanuel.com*, *gavinsnyder@quinnemanuel.com*, and *richardlowry@quinnemanuel.com* as authorized in Petitioner's mandatory notices.

/*Ronald Abramson*/
Ronald Abramson

Dated: April 14, 2021